JAMES M. MALONEY (JM-5297)
Plaintiff *pro se*
33 Bayview Avenue
Port Washington, New York 11050
Telephone: (516) 767-1395
Email: maritimelaw@nyu.edu

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

JAMES M. MALONEY,

                              Plaintiff,

              - against -

KATHLEEN M. RICE, individually and in her official
capacity as District Attorney of the County of Nassau,

                              Defendant.

-------------------------------------------------------------------X

**SECOND
AMENDED
VERIFIED
COMPLAINT**

Case No. 03 Civ. 0786

(ADS)(MLO)

        JAMES M. MALONEY, as and for his Second Amended Verified Complaint against

the above-named Defendant, alleges:

## PARTIES

        1. At the commencement of this action and at all times hereinafter mentioned, Plaintiff

was and is a natural person, a citizen of the United States, and a resident of the State of New

York, of the County of Nassau, and of this District.

        2. At the commencement of this action and at all times hereinafter mentioned,

Defendant was and is a natural person and, upon succession to said office in or about January

2006, was and is the District Attorney of the County of Nassau.  She is sued herein in her

official capacity only in connection with the First and Second Causes of Action, and both

-1-

individually and in her official capacity in connection with the Third and Fourth Causes of Action.

3. The District Attorney of the County of Nassau is the personal responsible for the potential prosecution of Plaintiff under the criminal statutes in question.  As more fully appears herein, the District Attorney of the County of Nassau (the late Denis Dillon, originally named as a defendant in this action and the predecessor to the current Defendant) has actually prosecuted Plaintiff under said criminal statutes.

## JURISDICTION, VENUE, AND PROCEDURAL HISTORY

4. This action arises under the Constitution of the United States.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and has the power to render declaratory judgment and further relief pursuant to the provisions of 28 U.S.C. §§ 2201-2202. This action is also brought pursuant to the provisions of 42 U.S.C. §  1983, and, as to the claims asserted herein arising under state law, under this Court's supplemental jurisdiction as provided by 28 U.S.C. § 1367.

5. Venue is properly placed in this Court pursuant to 28 U.S.C. § 1391(b).

6. This case was commenced by filing a Verified Complaint *sub nom. Maloney v. Spitzer, et al.* on February 18, 2003.  An Amended Verified Complaint ("Amended Complaint") was filed on September 3, 2005.  By Memorandum and Order dated January 17, 2007, reported at 470 F. Supp. 2d 205, this Court granted the defendants' Rule 12 motions and dismissed the Amended Complaint *sub nom. Maloney v. Cuomo, et al.*, and appeal was taken.  By Opinion dated January 28, 2009, reported at 554 F.3d 56, the United States Court of Appeals for the Second Circuit affirmed.  A petition for *certiorari* was filed on June 26, 2009.  On June 29, 2010, the United States Supreme Court granted *certiorari sub nom.*

*Maloney v. Rice*, vacated the decision of the United States Court of Appeals for the Second

Circuit, and remanded for further consideration in light of *McDonald v. Chicago*, 561 U.S.

___ (June 28, 2010), which held that the Second Amendment is incorporated as against the

states, building upon the Supreme Court's earlier decision in *District of Columbia v. Heller*,

554 U. S. ___ (2008), which in turn had held that the Second Amendment guarantees an

individual right.  By Summary Order dated August 13, 2010, the United States Court of

Appeals for the Second Circuit vacated the judgment of this Court and remanded the case to

this Court.

7.  Two aspects of this Court's Memorandum and Order dated January 17, 2007,

reported at 470 F. Supp. 2d 205, were not appealed: (a) the dismissal of the Governor and the

Attorney General; and (b) the dismissal of the Amended Complaint's First Cause of Action,

which was based on the First Amendment to the Constitution of the United States.

Accordingly, this Second Amended Verified Complaint and its caption reflect the final

dismissal of those defendants and of that cause of action.

## GENERAL BACKGROUND

8. On or about August 24, 2000, Plaintiff possessed in his home one or more martial

arts devices known as nunchaku or "chuka sticks," consisting of foot-long wooden sticks

connected by a cord, the possession of which is defined as a crime by sections 265.00 *et seq.*

of the Penal Law of the State of New York, as more fully appears herein.

9. On or about August 24, 2000, The People of the State of New York, through the

office of the District Attorney of the County of Nassau, charged Plaintiff with criminal

possession of a weapon in the fourth degree, a Class A misdemeanor defined at section 265.01

of the Penal Law of the State of New York, based on Plaintiff's possession within his home of

a nunchaku that was found by Nassau County Police in Plaintiff's home.

10. The aforementioned criminal charge for possession of a nunchaku was based solely on allegations of simple possession of said nunchaku in Plaintiff's home, and was not supported by any allegations that Plaintiff had: (a) used said nunchaku in the commission of a crime; (b) carried or displayed the nunchaku in public; or (c) engaged in any other improper or prohibited conduct in connection with said nunchaku except for such simple possession within his home, nor is any such conduct an element of the defined crime.

11. The aforementioned criminal charge for possession of a nunchaku remained pending against Plaintiff for a period of approximately 29 months, until it was eventually dismissed on or about January 28, 2003.

12. Upon information and belief, said dismissal was not based on any explicit or implicit recognition by the District Attorney that said statutes, as applied against Plaintiff and defining as a crime the simple possession of nunchaku within one's home, are or were unconstitutional.

## PLAINTIFF'S BACKGROUND AND STANDING TO SUE

13. Plaintiff has been a student of the martial arts since approximately 1975, when he began studying Uechi-Ryu, an Okinawan style of karate, under the tutelage of Vincent Pillari in Fort Lee, New Jersey.  Plaintiff has subsequently studied various styles of martial arts, including other Okinawan styles of karate, the Ving Tsun or "Wing Chun" style of kung fu, and aikido.  Drawing from these and other influences, Plaintiff formulated his own martial arts style, known as Shafan Ha-Lavan, beginning in 1998.  Shafan Ha-Lavan incorporates the use of the nunchaku as an integral and essential part of its training and technique.

14. Since 1975, Plaintiff has trained in a peaceful manner with the nunchaku, and has

-4-

acquired numerous nunchaku, which are or were his personal property.

15. Plaintiff has never used a nunchaku or any other weapon to inflict harm or physical injury on another human being or on any animal, and has used nunchaku only for socially acceptable purposes, for legitimate martial arts practice, for preparedness in defense of his home, and to develop physical dexterity and coordination.

16. Plaintiff first became interested in the nunchaku, and began training with it in 1975, in part because the weapon is particularly effective in defense against an assailant armed with a knife or other sharp instrument, and in part because Plaintiff's father, John Maloney, had been fatally stabbed on June 19, 1964, when John Maloney, unarmed, attempted to intervene on behalf of a victim of a crime of violence, at which time Plaintiff was five years old.

17. Since May 17, 1980, Plaintiff has served honorably as, and remains (in an inactive status), a commissioned officer in the United States Naval Reserve.  From 1986 to 1995, he served as a paramedic in New York City's 911 Emergency Medical Services system, and observed numerous instances of serious injury or fatality due to wounds inflicted by assailants armed with knives and other penetrating weapons.

18. Plaintiff has ties to and roots in the State of New York (including being licensed to practice law in all of the State's courts and in five federal courts sitting therein, consisting of three United States District Courts, the United States Court of Appeals for the Second Circuit, and the United States Court of International Trade) and cannot conveniently relocate, nor does he wish to do so.

19. Because Plaintiff was charged with a Class A misdemeanor for the simple possession of a nunchaku in his own home, and for more than two years lived under the

-5-

constant threat of being imprisoned for up to one year in punishment therefor, Plaintiff must reasonably either: (1) forgo possession of any nunchaku within his own home; (2) relocate from the State of New York to a jurisdiction that does not criminalize the simple possession of nunchaku within the home; or (3) risk being the target of another prosecution for disobeying the same law, even though he believes he has a constitutional right to do so.

20. Plaintiff still wishes to possess nunchaku in his home provided that he may do so lawfully.  Thus, Plaintiff is forced to choose between risking further criminal prosecution and forgoing what should be declared to be constitutionally protected conduct (i.e., possessing nunchaku in his home for the legitimate purposes of martial-arts practice and home defense) and is thus caught "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." *Steffel v. Thompson*, 415 U.S. 452, 462 (1974).

21. Plaintiff accordingly has standing to seek declaratory judgment on the question of the constitutionality of those New York statutes that criminalize the simple possession of nunchaku within one's home.

## THE NUNCHAKU AND ITS REGULATION BY VARIOUS GOVERNMENTS

22. Upon information and belief, the nunchaku was originally a farm implement, and was developed at least as early as 1609 for use as a weapon on the island of Okinawa after invading oppressive governments attempted to disarm the people there.

23. Upon information and belief, the nunchaku had already been used as an "arm" or weapon for the common defense, by the citizens' militias of Okinawa, in defense against samurai invaders armed with swords and other weapons, well before the dates of the ratification of the United States Constitution and of the first ten amendments thereto.

-6-

24. The nunchaku, unlike most other weapons, including firearms, knives, swords and all other penetrating weapons, is capable of being used in a restrained manner such that an opponent may be subdued without resorting to the use of deadly physical force.

25. For the reasons stated in the foregoing paragraph, the nunchaku is used by many police departments within the United States.

26. The nunchaku, in comparison with most other arms, including firearms, is relatively safe and innocuous, such that a child or person untrained in the weapon's proper use would be unable to inflict serious injury upon him- or herself, either accidentally or intentionally.

27. Accordingly, nunchaku kept in the home, even if not secured in a locked compartment, are far less likely to be associated with serious injury or fatality than are most other weapons or even common household objects such as kitchen knives and scissors.

28. Upon information and belief, no states other than New York and California have defined and prosecuted as a crime the mere possession of nunchaku within one's own home.

29. New York Penal Law § 265.00 (14) (one of two subsections so numbered) defines a "chuka stick" (i.e., nunchaku) in substantial part as follows: "any device designed primarily as a weapon, consisting of two or more lengths of a rigid material joined together by a thong, rope or chain in such a manner as to allow free movement of a portion of the device while held in the hand and capable of being rotated in such a manner as to inflict serious injury upon a person by striking . . ."

30. New York Penal Law §§ 265.01 and 265.02 define the possession of a "chuka stick" (i.e., nunchaku) as a Class A misdemeanor and as a Class D felony, respectively, and make no exception from criminal liability for the simple possession of a nunchaku or "chuka

stick" within one's own home.  As alleged in paragraphs 9 through 11, *supra*, the District Attorney interpreted § 265.01 as reaching such simple possession in prosecuting Plaintiff.

31.  Upon information and belief, the New York bill that made mere possession of nunchaku, even in one's own home, a crime, was signed into law on April 16, 1974, and became effective on September 1, 1974.

32.  Upon information and belief, a memorandum from the State of New York Executive Department's Division of Criminal Justice Services to the office of the Governor dated April 4, 1974, pointed out that nunchaku have legitimate uses in karate and other martial-arts training, and opined that "in view of the current interest and participation in these activities by many members of the public, it appears unreasonable--and perhaps even unconstitutional--to prohibit those who have a legitimate reason for possessing chuka sticks from doing so." A true copy of said memorandum is annexed hereto as **Exhibit 1**.

33.  Upon information and belief, the memorandum annexed hereto as Exhibit 1 was received by the office of the Governor on April 9, 1974, before the bill banning nunchaku in New York was signed into law.

34.  Upon information and belief, a letter and report from the Committee on the Criminal Court of the New York County Lawyers' Association to the Governor dated May 3 and April 29, 1974, respectively, opined that "[w]hile the possession of [nunchaku] with demonstrable criminal intent is a proper subject of legislation, the proposed legislation goes further, making the mere possession (even absent criminal intent) a criminal offense.  If it is the desire of the legislature to prohibit the use of nunchakus in criminal conduct, a more narrowly drawn statute can be fashioned to achieve this end." True copies of said letter and report annexed hereto as **Exhibit 2**.

35. Upon information and belief, the letter and report annexed hereto as Exhibit 2 were received by the office of the Governor on May 7, 1974, after the bill banning nunchaku in New York had already been signed into law.

36. Since 1974, many courts outside the State of New York have recognized that the nunchaku is primarily a defensive weapon with socially acceptable uses withing and without the martial arts:

(a) In 1981, an Arizona appellate court sustaining a conviction for criminal possession of nunchaku in an automobile nonetheless recognized that nunchaku have socially acceptable purposes, noting that "the use of nunchakus in the peaceful practice of martial arts or the possession for such use is not a crime." *State v. Swanton*, 629 P.2d 98, 99 (Ariz. Ct. App. 1981).

(b) In 1982, the Supreme Court of Hawaii recognized that, in ancient Okinawa, "nunchakus developed into a defensive weapon against the samurai's sword. Today, nunchaku sticks are widely used in the martial arts to build up dexterity, timing, mind and body coordination and aids in developing a larger sphere of consciousness around an individual." *State v. Muliufi*, 643 P.2d 546 (Haw. 1982).

(c) In 1983, a District of Columbia appellate court noted that "it is worth making a few further observations about the nunchaku. Like the courts of other jurisdictions, we are cognizant of the cultural and historical background of this Oriental agricultural implement-turned-weapon. We recognize that the nunchaku has socially acceptable uses within the context of martial arts and for the purpose of developing physical dexterity and coordination." *In re S.P., Jr.*, 465 A.2d 823, 827 (D.C. 1983).

(d) In 1984, an Ohio appellate court reversed a criminal conviction for possession of

nunchaku, holding that "the evidence tends to indicate that the device was used only for lawful purposes" and that "[m]ere possession of an otherwise lawful article . . . does not make it illegal." *State v. Maloney*, 470 N.E.2d 210, 211 (Ohio Ct. App. 1984).

37.  The nunchaku is an "arm" as defined by the United States Supreme Court in *District of Columbia v. Heller*, 554 U. S. ___ (2008).

38.  The nunchaku is an "arm" with a reasonable connection to a "militia," both in 17th-Century Okinawa as described in paragraph 23, *supra*, and in 20th- and 21st-Century America, based, *inter alia*, on its use by Navy SEALs in military operations in Vietnam and, as alleged in paragraph 25, *supra*, by police departments throughout the nation.

39.  The nunchaku is an "arm" typically possessed by law-abiding citizens for lawful purposes where it has not been banned, and, as evidenced*, inter alia,* by the memorandum annexed hereto as Exhibit 1, was typically possessed by law-abiding citizens for lawful purposes in New York before being banned in New York in 1974.

40.  The nunchaku is not a "dangerous or unusual weapon," *District of Columbia v. Heller*, 554 U. S. ___ (2008), that may be denied Second Amendment protection based on extreme inherent destructive capacity such as may exist in such weapons as short-barreled ("sawed-off") shotguns.

41.  The nunchaku lacks highly destructive capabilities as were present with the sawed-off shotgun at issue in *United States v. Miller*, 307 U.S. 174 (1939), and the nunchaku contains no stored potential energy as is the case with a firearm cartridge or explosive device.

42. Under New York Penal Law §§ 265.00 through 265.01, New York's treatment of its citizens who have no previous criminal record, if found guilty of possessing nunchaku in their homes, "far from imposing a minor fine, threatens citizens with a year in prison," *District of*

*Columbia v. Heller*, 554 U. S. ___ (2008).

43. Subsequent to the prosecution of Plaintiff as described in paragraphs 9 to 12, *supra*, additional persons have been prosecuted in and under the authority of the State of New York for simple possession of nunchaku in their homes.

44. During roughly the same time-frame as the prosecution of Plaintiff as described in paragraphs 9 to 12, *supra*, the State of New York caused notices to be sent to citizens of New York who had been identified as having purchased nunchaku by Internet or mail order, with such notices advising such citizens to surrender their nunchaku to law enforcement agencies.

45. Accordingly, this action is not hypothetical, nor would the declaratory judgment sought in this action amount to a mere advisory opinion, and it is the province and duty of this Court to safeguard the ideals and free institutions that are the pride and glory of our country.

## CONSTITUTIONAL BASES FOR THE CHALLENGE

46. The First and Second Causes of Action pleaded herein challenge the constitutionality of the application of the aforementioned New York statutes to criminalize possession of nunchaku in one's own home without criminal intent on two independent bases, respectively.

47. The first basis is that the application of the aforementioned New York statutes to criminalize possession of nunchaku in one's own home without criminal intent violates rights specifically conferred by the Second Amendment to the Constitution of the United States, which guarantees a personal right and is applicable as against the states.

48. The second basis is that the application of the aforementioned New York statutes to criminalize possession of nunchaku in one's own home without criminal intent would violate unenumerated rights, including those involving protection of the person from unwarranted government intrusions into a dwelling or other private place and/or regulation of activity therein

that causes no harm, as has been recognized by the United States Supreme Court in *Lawrence v. Texas*, 539 U.S. 558 (2003).

49. As more fully appears herein, unenumerated rights are specifically guaranteed by the Ninth Amendment to the Constitution of the United States ("Ninth Amendment"), but have largely been recognized in American constitutional jurisprudence under the doctrine of substantive due process.  Either approach may draw inferentially from the first eight amendments to the Constitution of the United States and/or from other sources in establishing the scope and content of rights not enumerated.

### FIRST CAUSE OF ACTION

50. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 49 as if fully set forth herein.

51. New York Penal Law §§ 265.00 through 265.02, to the extent that said statutes criminalize the simple possession of nunchaku within one's home for martial-arts practice and/or home defense, infringe upon Plaintiff's rights as conferred by the Second Amendment to the Constitution of the United States and as incorporated as against the states through the Fourteenth Amendment to the Constitution of the United States .

### SECOND CAUSE OF ACTION

52. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 49 as if fully set forth herein.

53. New York Penal Law §§ 265.00 through 265.02, to the extent that said statutes criminalize the simple possession of nunchaku within one's home for martial-arts practice and/or home defense, infringe upon Plaintiff's unenumerated federal constitutional rights, including, without limitation: (a) those rights guaranteed by the Ninth Amendment to the Constitution of the United States; (b) those rights recognized under the doctrine of substantive due process; (c) those rights recognized by the United States Supreme Court in *Lawrence v. Texas*, 539 U.S. 558

(2003); (d) those rights guaranteed by the Fourteenth Amendment and (e) those rights the existence of which may be drawn inferentially ("penumbras and emanations," *see Griswold v. Connecticut*, 381 U. S. 479 (1965)) from a reading of the first eight amendments to the Constitution of the United States and/or of the Declaration of Independence.

## THIRD CAUSE OF ACTION

54. This and the following cause of action are supplemental to the Amended Complaint, in that they arise out of an event that occurred after the filing of the Amended Complaint, namely, the unlawful public disclosure made by Defendant at page 6 of the Appellee's Brief dated October 24, 2007, before the United States Court of Appeals for the Second Circuit, stating that "since Plaintiff's infant sons had been in the home at the time of the incident, Office of Child Family Services investigated, concluded that the incident 'indicated' maltreatment of his sons, and Plaintiff was listed on the New York State Child Abuse and Maltreatment Register."

55. By stating the foregoing, Defendant publicly disclosed that Plaintiff was, as of the date such public disclosure was made, the subject of an "indicated" report of child abuse or maltreatment, and that he was accordingly listed on the New York State Central Register of Child Abuse and Maltreatment (hereinafter, the "SCR," the "Register" or the "Central Register").

56. In making the disclosure described in paragraph 54, *supra*, Defendant made factual allegations that were not in the record then before the United States Court of Appeals for the Second Circuit, were not before this Court before that appeal was taken, and constituted statutorily confidential information that had no relevance whatsoever to the appeal.

57. In making the disclosure described in paragraph 54, *supra*, and permitting such disclosure to remain without retracting it before it became more widely disseminated (i.e.,

"maintaining" the disclosure, Defendant was acting under color and authority of state law.

58. This cause of action is brought pursuant to the provisions of 42 U.S.C. § 1983.

59. Defendant is not entitled to sovereign immunity as a state officer, because she is defined as a "local officer" by §2 of the New York Public Officers Law, and by operation of the doctrine articulated in *Fisher v. State*, 23 Misc.2d 935, 203 N.Y.S.2d 363 (N.Y. Ct. Cl. 1959), to the effect that there is no valid cause of action against the State of New York based on the actions of a District Attorney because the District Attorney and his or her assistants "are not officers or employees of the State."

60. In making and maintaining the disclosure described in paragraph 54, *supra*, Defendant violated Plaintiff's rights, privileges and/or immunities as secured by the Constitution and laws of the United States, including but not limited to: (a) those rights guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States, including the right to due process; and (b) those rights protecting the individual from disclosure of statutorily confidential information as recognized in *Harman v. City of New York*, 140 F. 3d 111 (2d Cir. 1998).

61. Although the disclosure described in paragraph 54, *supra*, was technically correct at the time that it was made, Plaintiff had at that time not yet been granted the administrative hearing to which he was entitled by law, even though Plaintiff had by then diligently sought adjudication of the matter for some six years.

62. On July 14, 2008, some nine (9) months subsequent to the date of the disclosure described in paragraph 54, *supra*, the administrative hearing described in the foregoing paragraph was held following Plaintiff's final and successful request for one.

63. On September 22, 2008, an administrative decision was rendered, based on the

-14-

administrative hearing of July 14, 2008, noting that "[t]he Agency based its indication on the

proposition that the Appellant's failure to surrender himself to the police and the fact that he

allowed them to barricade his home for about twelve hours amounts to maltreatment of his one

year old twins" and ordering that "[t]he request of [Plaintiff] that the record of the report . . .

relating to him being maintained in the Central Register be amended to unfounded is granted."

Specifically, the decision stated:

> The essential facts are not in dispute. There is no dispute that the Appellant
> [Plaintiff herein] refused to surrender to the police officers or allow them in to his
> home. There is also no dispute that the family was observed carrying on their
> daily activities not minding the police officers in front of their property. The
> Agency based its indication on the proposition that the Appellant's failure to
> surrender himself to the police and the fact that he allowed them to barricade his
> home for about twelve hours amounts to maltreatment of his one year old twins
> that were observed playing and being fed by their parents. To prove its case, the
> Agency presented the case notes of the investigative caseworker. The progress
> notes indicated that the children were seen playing and that the family was seen
> eating their dinner and not paying any attention to the officers outside their home.
> The Agency opined that the Appellant placed his children at risk of harm for not
> surrendering to the police when they knocked at his door. Based on that premise,
> the Agency concluded that the Appellant maltreated his children.
>
> ........
>
> The question to be addressed in this case is whether the Appellant maltreated [his
> children] as indicated by the Agency. Based on the evidence presented by the
> Agency, it failed to prove by a fair preponderance of the evidence that the
> Appellant maltreated his children by not allowing the police officers in to his
> home. The fact that the officers barricaded his home for twelve hours while the
> children were observed playing with their parents does not amount to
> maltreatment. The Appellant was observed taking care of his children during the
> period in question. The Agency did not present any evidence to prove that the
> Officers threatened to forcefully break in to his home. When the Appellant was
> eventually arrested, he came outside quietly.
>
> Consequently, in light of the foregoing, the Agency did not meet its burden by a
> fair preponderance of the evidence establishing that the Appellant failed to
> exercise the minimum degree of care owed to [his children].  Therefore, the
> Agency failed to prove by a fair preponderance of the evidence that by
> Appellant's actions on the date in question threatened the physical, mental and

-15-

emotional condition of [his children].

Accordingly, it is concluded that the allegations of maltreatment against the Appellant contained in the Central Register report have not been established by a fair preponderance of the evidence and as such, the report must be amended from indicated to unfounded and sealed.

A redacted but otherwise true copy of the September 22, 2008, decision is annexed hereto as

**Exhibit 3**.  The names of Plaintiff's minor children and the recitation of the contents of the initial

report (many parts of which, as reflected in the Nassau County Department of Social Services

case worker's notes, were subsequently admitted to have been inaccurate by the person who

maliciously and in bad faith made the initial report, described in paragraph 66, *infra*) have been

redacted.

64. Under the applicable provisions of § 413 of the New York Social Services Law, if any

police officer or other law enforcement official had had reasonable cause to believe that Plaintiff

had committed any act of child abuse or maltreatment, such police officer(s) or other law

enforcement official(s) would have had a legal obligation to make a report of suspected child

abuse or maltreatment to the New York State Office of Children and Family Services and/or the

Nassau County Department of Social Services.

65. Upon information and belief, no police officer(s) or other law enforcement official(s),

whether federal, state, county or local, have ever made any report of suspected child abuse or

maltreatment to the New York State Office of Children and Family Services and/or the Nassau

County Department of Social Services in connection with Plaintiff.

66. Upon information and belief, on or about August 28, 2000, a subsequently identified

individual who is not a party hereto, is not a member of Plaintiff's family, and is not and has

never been a police officer or other law enforcement official, maliciously and in bad faith made

the unfounded report of alleged child abuse or maltreatment to the New York State Office of

-16-

Children and Family Services and/or the Nassau County Department of Social Services that resulted in Plaintiff's being the subject of an "indicated" report and resulting in Plaintiff's being listed on the New York State Child Abuse and Maltreatment Register for more than seven years, as hereinbefore described.  That individual, whose identity is omitted in order to avoid publicly shaming that individual, has subsequently admitted under oath to having made the report.

67.  Although Plaintiff moved before the Second Circuit to strike the complained-of brief, that motion was first referred to the Merits Panel, then denied once by the Panel, and then denied again after Plaintiff renewed the motion with the permission of the Court after oral argument had taken place in December 2008.  Following that last denial, Plaintiff had no effective means left of obtaining reversal of the order denying his motion to strike the complained-of brief, which is now a matter of permanent and, for all practical purposes, indelible, public record.

68.  Defendant did not withdraw the complained-of brief, although Plaintiff formally demanded that she do so in writing on or about November 19, 2007, shortly after the motion described in the foregoing paragraph was referred to the Merits Panel.  A true copy of that formal demand, entitled, "Notice of Entry and Demand for Retraction of Appellee's Brief," which was mailed to all counsel of record in this case and to Defendant herself on or about November 19, 2007, is annexed hereto as **Exhibit 4**.

69.  Defendant did not withdraw or seek to redact the complained-of brief, although Plaintiff pointed out to her in writing on or about August 4, 2008, that the disclosure made in it amounted to a misdemeanor under §422 of the New York Social Services Law (see paragraph 82, 83, 84, 83, 84, *infra*).  A true copy of that correspondence, which Plaintiff mailed to Defendant on or about August 4, 2008, enclosing a copy of the complained-of brief, is

-17-

annexed hereto as **Exhibit 5**.

70. Defendant did not withdraw or seek to redact the complained-of brief, although Plaintiff informed her in writing on or about September 29, 2008, that the decision described in paragraph 63, *supra*, had resulted in the determination that Plaintiff's having been listed on the SCR had never been supported by a fair preponderance of the evidence. A true copy of that correspondence, which Plaintiff mailed to Defendant on or about September 29, 2008, enclosing a redacted copy of the decision identical to that annexed hereto as Exhibit 3 as well as a copy of the August 4, 2008, letter annexed hereto as Exhibit 5, is annexed hereto as **Exhibit 6**.

71. Upon information and belief, Appellee's Brief dated October 24, 2007, as filed and containing the complained-of disclosure described in paragraph 54, *supra*, was scanned and converted into electronic format and made available to the public via Westlaw® and possibly other on-line sources at least as early as May 2009, where it remains publicly available, and may be expected to remain publicly available, indefinitely and indelibly, in all likelihood for the remainder of Plaintiff's life.

72. As more fully appears herein, Plaintiff has suffered a tangible economic loss, as a result of and by virtue of Defendant's having made and maintained the disclosure described in paragraph 54, *supra*.

73. Plaintiff has taught a course in his local school district since 2001, earning $20 per hour for doing so for one or two sessions per year, and deriving considerable personal and professional satisfaction from doing so.

74. One or more of Plaintiff's children has attended elementary school in the same local school district since 2004, and one or more of Plaintiff's children is expected to attend middle

school and/or high school in the same local school district.

75. In making and maintaining the disclosure described in paragraph 54, *supra*, Defendant created an unacceptable risk that the disclosed information would become know to Plaintiff's local school district if Plaintiff continued to teach the course he has taught there since 2001.

76. Plaintiff has suffered a tangible loss of livelihood by virtue of his having reasonably chosen to avoid the above-described unacceptable risk that the disclosed information would become know to Plaintiff's local school district.

77. Plaintiff has also suffered stigma, plus harm to his personal and professional reputation as an attorney engaged in federal litigation and as an aspiring professor of law, all as a result of Defendant's having made and maintained the disclosure described in paragraph 54, *supra*.

78. In making and maintaining the disclosure described in paragraph 54, *supra*, Defendant failed to exercise, and abused, the just and rightful authority conferred upon her as a public officer by the laws of the State of New York and of the United States.

79. Compensatory damages in connection with this cause of action are sought against Defendant in her individual capacity to the extent that she was acting under color of state law but without legitimate authority, and is thus subject to suit for damages in her individual capacity under the doctrine articulated in *Home Telephone & Telegraph v. City of Los Angeles*, 227 U.S. 278 (1913) (*see also Patterson v. Coughlin*, 761 F.2d 886 (2d Cir. 1985)).

80. But for Defendant's having made and maintained the disclosure described in paragraph 54, *supra*, Plaintiff reasonably expects that would have continued teaching the course in his local school district that he has taught since 2001, and would have earned $20 per hour or

more for doing so for one or two sessions per year, and would have continued to derive

considerable personal and professional satisfaction from doing so, for at least ten more years.

## FOURTH CAUSE OF ACTION

81. Plaintiff repeats and realleges each and every allegation set forth in the foregoing

paragraphs 54 through 80 as if fully set forth herein, except that Plaintiff does not repeat and

reallege the allegations set forth in paragraphs 58-59, *supra*, for purposes of this cause of action.

82. In making and maintaining the disclosure described in paragraph 54, *supra*,

Defendant was acting in violation of §422 of the New York Social Services Law, which provides

at subdivision 12:

> Any person who willfully permits and any person who encourages
> the release of any data and information contained in the central
> register to persons or agencies not permitted by this title shall be
> guilty of a class A misdemeanor.

83. In making and maintaining the disclosure described in paragraph 54, *supra*,

Defendant willfully permitted the release of data contained in the Central Register to persons or

agencies not permitted to receive it.

84. In making and maintaining the disclosure described in paragraph 54, *supra*,

Defendant encouraged the release of data contained in the Central Register to persons or agencies

not permitted to receive it.

85. Plaintiff, in the context and setting of the disclosure described in paragraph 54, *supra*,

is a member of the class of persons for whose particular benefit §422(12) of the New York Social

Services Law ("NYSSL") was enacted.

86. Recognition of a private right of action in connection with Defendant's having made

and maintained the disclosure described in paragraph 54, *supra*, would promote the legislative

purposes of §422(12) of the NYSSL.

87. Recognition of a private right of action in connection with the disclosure described in paragraph 54, *supra*, is consistent with the legislative scheme of the NYSSL.

88. This Court may exercise supplemental jurisdiction in connection with this cause of action under the provisions of 28 U.S.C. § 1367.

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)     assume jurisdiction over this action;
(2)     declare that those portions of sections 265.00 through 265.02 of the New York Penal Law that define and punish as a crime the simple possession of nunchaku within one's home are unconstitutional and of no force and effect;
(3)     award Plaintiff compensatory damages in the amount of $1,600 in connection with the Third and/or Fourth Case of Action;
(4)     award Plaintiff punitive damages in an amount to be determined by the Court;
(5)     award Plaintiff costs, expert witness fees, and, to the extent that he is represented by counsel, attorneys' fees ; and
(6)     grant such other, further, and different relief as this Court may deem just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 15, 2010
     Port Washington, New York

                                               _____/s_____

                                               JAMES M. MALONEY (JM-5297)
                                               Plaintiff *pro se*
                                               33 Bayview Avenue
                                               Port Washington, New York 11050

                                               (516) 767-1395