ADMITTED TO PRACTICE IN:
NEW YORK; NEW JERSEY;
UNITED STATES SUPREME COURT;
U.S. COURTS OF APPEALS FOR THE
SECOND AND THIRD CIRCUITS;
U.S. DISTRICT COURTS FOR THE
DISTRICT OF CONNECTICUT,
NORTHERN DISTRICT OF FLORIDA,
NORTHERN DISTRICT OF ILLINOIS,
DISTRICT OF NEW JERSEY, AND
NORTHERN, SOUTHERN & EASTERN
DISTRICTS OF NEW YORK; U.S.
COURT OF INTERNATIONAL TRADE;
U.S. COURT OF FEDERAL CLAIMS.

# JAMES M. MALONEY
ATTORNEY AT LAW
PROCTOR IN ADMIRALTY



P.O. BOX 551
33 BAYVIEW AVENUE
PORT WASHINGTON, NY 11050

TEL: (516) 767-1395
FAX: (516) 767-1326

E-MAIL ADDRESS:
maritimelaw@nyu.edu

July 31, 2015

The Honorable Pamela K. Chen
United States District Judge
United States District Court, E.D.N.Y.
225 Cadman Plaza East
Brooklyn, NY 11201                              Re: *Maloney v. Singas*, CV-03-0786

**Via ECF**

Dear Judge Chen:

      I am the *pro se* plaintiff in the above-captioned matter, and write in follow-up to the in-person conference that was held eight days ago, on July 23.

      Specifically, I write to address the question of whether I will consent to be deposed by the Defendant or, alternatively, waive my right to give testimony at the upcoming trial. As was established at the conference, while my testimony would certainly be relevant, it is impossible at this stage to determine whether it would be essential, but if I am to retain the right to testify I must consent to be deposed. Thus, my decision not to be deposed now would irrevocably put the outcome of the case at risk even before a witness list has been drafted.[1] And although I am a *pro se* plaintiff, I have not labored on this case for twelve years solely for my own benefit, but have done so for that of fellow martial artists throughout the nation and even the world as well,[2] so that is not a risk that I can evaluate casually. Since the conference, I have accordingly given the matter a great deal of thought, and believe that I now have a solution. In order to present it effectively, I must begin by explaining my specific concerns about being deposed.

      At the conference, Your Honor correctly identified those concerns as related primarily to issues involving self-incrimination. But since my specific concerns involve certain subtleties that are not widely understood, and because this letter is a matter of permanent public record, I shall

---

[1] Your Honor recognized that I am presented with something akin to a Hobson's choice.

[2] The constitutional courts of many nations have historically looked to decisions of the federal courts of the United States (including and especially those of the Supreme Court) for guidance and inspiration.

begin by elaborating upon those concerns with some (hopefully not tedious) degree of specificity.

I am well aware that the Fifth Amendment privilege against self-incrimination "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).  So clearly I have the *right* not to answer questions about my possible possession of nunchaku since August 23-24, 2000 (when the principal events that gave rise to my bringing this lawsuit occurred).  But answering that threshold question only begins to address my specific concerns, which relate to my motive in asserting the privilege if need be, to the inferences that may or may not be drawn as a result of my doing so, and to how such inferences may be applied.

The common understanding of the assertion of the privilege against self-incrimination is undoubtedly that the one asserting it has actually engaged in the illegal activity about which the question is directed, and simply does not wish to give potential or actual prosecutors what might be termed a "get-[the defendant]-into-jail-free-card," enabling a conviction on the basis of what amounts to a confession.  Indeed, that popular misconception may even be factually correct in a relatively high percentage of cases.  But it is certainly not true all of the time.

In some instances, one's motive to exercise the right to refrain from answering questions derives from other, more subtle concerns.  It is not hard to imagine some activities that take place in the privacy of one's home and that are also practiced by fellow citizens, and which are considered illegal under current law but which: (1) harm no one; (2) are simply none of the State's business; and (3) should not truthfully be denied (even when the opportunity to do so exists) on the "I-have-nothing-to-hide" premise, because doing so would act to the detriment of others engaging in such activities to whom the would-be confessor/denier/privilege-asserter *has a duty arising from the very nature of the litigation at hand*.

This situation involves precisely such activities and duties.

To illustrate what I mean, I will resort to a hypothetical[3] based on the facts from the tragic[4] case of *Bowers v. Hardwick*, 478 U.S. 186 (1986), but varying them to make a closer parallel to the case at bar for purposes of this illustration.  Imagine that the plaintiff in that case seeking to strike down Georgia's "sodomy" law was not Michael Hardwick but a lawyer whom I

---

[3] I am mindful of the sentiment expressed by a character in the 2010 remake of the 1969 film, *True Grit* ("I do not entertain hypotheticals: the world, as it is, is vexing enough."), but I believe that here the actual illustrative value exceeds the potential vexatiousness.

[4] I describe the case as tragic because it was a 5-4 decision that remained "good" law for 17 years (until it was overruled by *Lawrence v. Texas*, 539 U.S. 558 (2003)), and because Justice Lewis F. Powell, after retiring, said publicly that he regretted joining the majority, but spent little time considering it and thought the case relatively unimportant at the time.

shall call Mr. Smith, who, after having been arrested for having been observed by police violating the state's "sodomy" law with his monogamous partner ("Mr. Jones") and having been charged with that "crime" in state court, brought essentially the same federal constitutional case as *Bowers*, proceeding *pro se*. Imagine further that at his deposition in the federal civil case Smith is asked questions about the couple's sexual activities following the arrest, and that Smith and Jones are still together but, for whatever reason, have actually not had sex in the years since the arrest, so Smith can answer the questions truthfully without any risk of self-incrimination. Should he do so? I would submit that he should not, for the enumerated reasons set forth on the previous page of this letter, especially (in the current context) number 3, i.e., that answering the questions truthfully because "he has nothing to hide" would act to the detriment of others engaging in similar activities to whom Smith has a duty arising from the very nature of the litigation he has presumably brought on behalf of those others as well as himself. If Smith were to answer truthfully rather than assert the privilege, he would, in effect, be saying: "I for one no longer break the law that I am challenging." Of course, there are others still "breaking" that law who would be somewhat orphaned by Smith's having made such a statement. Put another way, while open civil disobedience may well be the bravest (and correspondingly riskiest) option, there is a middle ground between that and affirmatively stating one's non-disobedience, and that middle ground is provided by the privilege against self-incrimination.

For comparable reasons, I would prefer not to make any statement as to whether I have possessed nunchaku in my home in the 15 years since I was charged with the "crime" of doing so even if I have not. But while the "middle ground" provided by the Fifth Amendment privilege against self-incrimination would at first blush seem to accommodate that preference, that is emphatically not the case here, for reasons that I will next elaborate upon. The foregoing hypothetical was provided primarily to illustrate my reasons for not answering questions about my possible in-home possession of "chuka sticks" between August 24, 2000, and today (whether or not I have again engaged in the still-prohibited act of "keep[ing]" such "arms"), but it also serves as a point upon which to introduce the next part of my analysis.

Aside from whatever distinctions may be made between in-home weapons possession as over against in-home intimate behavior (and I acknowledge that there are many), there is another, very relevant distinction between Mr. Smith's hypothetical litigation and my own. It derives from the rule that, although no inferences against the asserter of the privilege may be drawn in a *criminal* proceeding, that is not so in a civil proceeding. In other words, although it is true that the privilege allows me "not to answer official questions put to [me] in any other proceeding, civil or criminal," *Lefkowitz, supra*, it is equally true that "in a civil case, a court may draw an adverse inference against a person whose invocation of the Fifth Amendment results in obstruction of discovery." *Amusement Industry, Inc. v. Stern*, 293 F.R.D. 420, 428 (S.D.N.Y. 2013) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). In the hypothetical case of Mr. Smith, any such inferences (e.g., that Smith has continued to engage in "sodomy" with Jones) would likely be of little consequence, since the privacy right that Smith seeks to vindicate is in no way tied to whether or not Smith is a "law-abiding citizen." But that is not the case here.

The Supreme Court has said that "the Second Amendment does not protect those

weapons not typically possessed by law-abiding citizens for lawful purposes," *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008). It is but a short conceptual hop to argue (as is arguably my opponent's job) that the Second Amendment does not confer any right to bear arms upon *non*-law-abiding citizens. Thus, the factual question of whether I have possessed nunchaku in my home after having been charged with the "crime" of doing so may be relevant to the question of whether I am a "law-abiding citizen." Under *Amusement Industry*, *supra,* my refusal to answer it would thus result in "obstruction of discovery," thereby giving rise to permissible inferences that may even include an inference that I have continued to possess "chuka sticks" in my home in violation of the New York Penal Law, and that I therefore cannot be said to be "law-abiding." Moreover, whatever this Court may or may not infer in that regard, and however this Court may apply any such inferences as well as other sources of such information[5] to this case, those findings of fact and law will almost certainly not be the end of the story, and it is virtually inconceivable that the District Attorney, through the Office of the County Attorney, would fail to make and support arguments to the Second Circuit that I am *not* a law-abiding citizen and therefore not entitled to Second Amendment protection. Indeed, even before *Heller* was decided, the earlier appellate brief by the District Attorney in this case (ECF Document 102-1, which, five years ago, I reluctantly made a part of the record here in support of my now-dismissed-but-then-new claim) concluded its substantive text with the sentence: "It is not irrational to prohibit those prone to irrational behavior from possessing weapons." *Id*. at pdf page 29 of 30 (numbered page 24 of brief), *q.v.* (Leading up to that concluding statement was a series of *ad hominem* attacks, including not only the complained-of disclosure that was for some time the subject of this litigation on remand, but also the false-but-immunized statement that I had "asserted an insanity defense" to criminal charges, *id*.)[6]

By agreeing to be deposed in order to preserve my right to testify at the upcoming trial but asserting the privilege against self-incrimination, I would be inviting more of the same.

Unfortunately, the foregoing is not the only harm that I would risk. On January 7, 2008 (eight months after this action was "finally" dismissed but five months before *Heller* was decided), the State of New York Grievance Committee for the Tenth Judicial District (the

---

[5] A 2006 judicially authored synopsis of my "criminal history" listing the five times in my life that I have been arrested, two of which relate to nunchaku possession, is already a part of the record herein. ECF Document 136-4 at page 4. That list remains complete.

[6] No such "defense" was ever "asserted." Rather, while the criminal charges arising from the August 2000 incident were pending, and before any psychiatric examinations were conducted, my criminal defense attorney filed notice of an intention to proffer psychiatric evidence, thereby preserving the right to offer it at trial if appropriate (but the case was subsequently resolved without trial). To avoid waiver, that notice is required by CPL § 250.10, and filing it does **not** equate to an invocation of the "insanity" defense (statutorily defined at § 40.15 of the Penal Law). *See People v. Cruickshank*, 105 A.D.2d 325, 329, 484 N.Y.S.2d 328, 333 (3d Dep't 1985), *aff'd* 67 N.Y.2d 625, 499 N.Y.S.2d 663 (noting that by amending CPL § 250.10 in 1982 the legislature "expanded the notice requirement beyond those situations where psychiatric testimony might be used in support of the traditional insanity defense").

"Committee") formally admonished (i.e., disciplined) me for engaging in the unlawful conduct of "possession of chukka [*sic*] sticks," finding that such conduct adversely reflected on my fitness as a lawyer in violation of then-applicable Disciplinary Rule 1-102(A)(7) of the Lawyer's Code of Professional Responsibility (now replaced by the identically worded Rule 8.4(h) of the Rules of Professional Conduct).[7] The Admonition further stated that "[i]n determining an appropriate sanction, the Committee took into consideration your lack of any previous disciplinary history," and warned that "[i]n the event that charges of misconduct are brought against you in the future, this ADMONITION may be considered in determining the extent of any discipline imposed."

Although I sought, through counsel, reconsideration of the Admonition less than a week after *Heller* was decided, on the basis that my possession of nunchaku in the home may be constitutionally protected activity, that request was summarily denied.

Since adverse inferences may legally be drawn against me by virtue of my refusal in this civil litigation to answer deposition questions about whether I have continued to possess nunchaku in my home, there is a genuine risk of subjecting myself to further (and possibly more severe) professional discipline were I to do so. (Whether this may be done directly by the Committee based on the deposition transcript should someone file another complaint[8] is a question that I have not been able to answer despite substantial research. Although disciplinary proceedings are often described as "quasi-criminal," this is in many ways a misnomer, especially in New York,[9] and it is not at all clear that my assertion of the privilege in this litigation would prevent a grievance committee from directly using that assertion to infer my continuing violation of the proscription against conduct adversely reflecting on a lawyer's fitness.)

---

[7] Although I have never before disclosed this private discipline publicly, I believe that it is appropriate to do so now, as appears to be my right under *Matter of Capoccia*, 59 N.Y.2d 549, 554, 466 N.Y.S.2d 268, 270 (1983) (provisions for confidentiality "were enacted primarily, if not only, for the benefit of the attorney under investigation").

[8] In the only professional misconduct complaint that has ever been made against me, the complainant was neither a client nor an attorney, but a *pro se* party-opponent in a civil action in which I had been represented by counsel. Of course, that misconduct complaint, made in 2004, related not to my law practice but to the events that took place at my home in August 2000.

[9] For example, in New York, the standard of proof for a determination of professional misconduct in an attorney disciplinary proceeding is a fair preponderance of the evidence, not proof beyond a reasonable doubt as in criminal cases, nor even clear and convincing evidence, as it is in most other states. *See, e.g., Capoccia, supra*, 59 N.Y.2d at 551, 466 N.Y.S.2d at 268-69. Also, as an active member of the City Bar Association's Committee on Professional Discipline since 2009, I have come to learn that, largely as a consequence of this relaxed standard of proof, collateral estoppel is frequently used by the various attorney disciplinary bodies in New York to impose discipline on attorneys by simple motion practice based on findings made in civil cases in which the subject attorney has been involved either as a party or as counsel. Thus, any finding made by any court in connection with this litigation that I am not a law-abiding citizen for Second Amendment purposes could readily subject me to further discipline even without the filing of formal charges.

Finally, there remains the possibility, however remote it may seem from the bench, that my refusal to answer questions at a deposition about my continued possession of nunchaku may actually lead to another search of my home, this time pursuant to a warrant.  Because no adverse inferences may be drawn from my asserting the privilege in a criminal proceeding, it would seem to follow that the same would apply to obtaining search warrants.  The difficulty I have with relying on such a "parchment barrier" to protect my family against another such intrusion stems from the fact that judges issuing warrants do sometimes make mistakes but nonetheless have absolute immunity, and from the further reality that remedies for Fourth Amendment violations for the most part consist of the exclusion of illegally obtained evidence in the ensuing criminal proceeding and nothing more.  Were police to search my home again and find no nunchaku or other "prohibited items," there would be no criminal proceeding, but the search and its associated harms would already have occurred, probably without any remedy ever being available for those harms, and certainly with a long and expensive road of litigation ahead should I try to test that premise.[10]  Moreover, any additional support (e.g., a statement by an informant, whether reasonably credible or not) that led to the issuance of the warrant could easily be held, after the fact, to have provided an independent basis for a finding of probable cause—even if what actually convinced the issuing judge to issue the warrant was my assertion of the privilege when asked about my possession of nunchaku.

On the one hand, recognizing all of the above-described risks of agreeing to be deposed while asserting the Fifth Amendment privilege against self-incrimination, I simply cannot place my family in harm's way again (such potential harm including my possible professional suspension or disbarment, with consequent diminution in my capacity to make a living, and even a possible invasive, stigmatizing and demeaning search of the home in which they live) for the benefit of this non-remunerative cause that I have been fighting for more than a decade.  On the other hand, given the risk to the case itself of my not testifying at the upcoming trial about my own nunchaku use, I am unwilling to forgo that opportunity by refusing to be deposed now.

Having thus framed my apparently irreconcilable dilemma in somewhat more stark detail

---

[10] When police surrounded my home and cut off all my communication with the outside world for 12 hours in 2000 based on the uncorroborated (and false) allegation that I had pointed a rifle at a telephone worker, I refused to leave my home as demanded and, in turn, repeatedly demanded that they obtain an arrest warrant, even citing *Payton v. New York*, 445 U.S. 573 (1980), in my conversations with the attorney who pretended to be acting on my behalf but later turned out have been an agent of the police all along.  After the attorney relayed to me the threat that the police were about to break down the door and that my family could be hurt if this were to occur, I finally came outside peacefully at about 2:00 a.m. on August 24, 2000.  Nassau County police then entered my home in my absence and conducted various warrantless searches and seizures, including blowing open my safe with explosive charges.  While the details of the ensuing § 1983 litigation under which I sought (but failed) to obtain redress for what was done by the attorney and the state actors are well beyond the scope of this letter, suffice it to say that, as both a lawyer and a citizen who has actually had such experiences, I am well aware that Fourth Amendment violations are not always remedied.  That is ever so much more the case when a warrant is obtained and/or when no criminal charge results from the search and seizure.

than that which emerged at the conference of July 23, my expected next step would be to state my choice between the two alternatives.

Instead, I believe that my proper (albeit perhaps not properly expected) next step should be to inform the Court and opposing counsel formally of what amounts to a way out of the dilemma at hand that has existed at least since March 16 of this year, namely, that I am counsel in another federal declaratory judgment action that seeks similar relief and which, on that date, was stayed pending the final outcome of this case. *See Nuccio v. Duve*, 2015 WL 1189617 (N.D.N.Y., March 16, 2015) (copy of Slip Opinion attached). Until now, I have been disinclined to jettison this case in favor of that one, in large part for the very reason that the Northern District articulated in its opinion, i.e., that "the parties in the Maloney Action have been litigating these issues for more than twelve years," *id*. at *5, Slip Opinion at 10, and, relatedly, because abandoning this case after the judicial resources of this Court, the Second Circuit, and even the United States Supreme Court have all brought it to its current phase, in favor of another in which I have a chance of earning attorney's fees, smacks of self-serving bad faith and opportunism.

Although at this juncture I feel that I would be justified in taking that step, I am nevertheless still not entirely comfortable doing it. (Perhaps like a variation of Stockholm Syndrome, one can form an attachment to causes that can cause one harm.)

In any event, I shall close by proposing the alternative that has occurred to me only over the last several days while researching and writing this letter in the wake of the conference, and that is to move this Court for a permanent injunction preventing the Nassau County District Attorney from enforcing the in-home prohibition on possession of nunchaku against me for any such in-home possession in which I engage or have engaged during the pendency of this action. Such an injunction, if granted, would obviously deprive me of my Fifth Amendment privilege as to nunchaku-possession questions, but then again it would ameliorate or eliminate all three of my concerns[11] about agreeing to be deposed while asserting the privilege. Of course, inherent in my making the motion would be my agreement to submit to the deposition if the motion is granted.

Accordingly, it is respectfully requested that the Court treat this letter as both a response to the order made at the conference and a request for a telephonic pre-motion conference. I am aware that, under Your Honor's Individual Rules, a pre-motion conference is not required for such a motion, but under the circumstances it seems to me the best way to proceed, and so I am suggesting it. Given that this letter is already long enough, I will address the merits of my proposed motion at that conference when and if this request is granted.

Respectfully,

/s

James M. Maloney

cc:   Liora M. Ben-Sorek, Esq. (via ECF and email)

---

[11] My worries about another invasive search of my home and about further professional discipline would be substantially eliminated by the issuance of the permanent injunction.