Cite as: 577 U. S. ____ (2016)     1

Per Curiam

# SUPREME COURT OF THE UNITED STATES

JAIME CAETANO *v.* MASSACHUSETTS

ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME JUDICIAL COURT OF MASSACHUSETTS

No. 14–10078. Decided March 21, 2016

PER CURIAM.

The Court has held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *District of Columbia* v. *Heller*, 554 U. S. 570, 582 (2008), and that this "Second Amendment right is fully applicable to the States," *McDonald* v. *Chicago*, 561 U. S. 742, 750 (2010). In this case, the Supreme Judicial Court of Massachusetts upheld a Massachusetts law prohibiting the possession of stun guns after examining "whether a stun gun is the type of weapon contemplated by Congress in 1789 as being protected by the Second Amendment." 470 Mass. 774, 777, 26 N. E. 3d 688, 691 (2015).

The court offered three explanations to support its holding that the Second Amendment does not extend to stun guns. First, the court explained that stun guns are not protected because they "were not in common use at the time of the Second Amendment's enactment." *Id.,* at 781, 26 N. E. 3d, at 693. This is inconsistent with *Heller*'s clear statement that the Second Amendment "extends . . . to . . . arms . . . that were not in existence at the time of the founding." 554 U. S., at 582.

The court next asked whether stun guns are "dangerous per se at common law and unusual," 470 Mass., at 781, 26 N. E. 3d, at 694, in an attempt to apply one "important limitation on the right to keep and carry arms," *Heller*, 554 U. S., at 627; see *ibid.* (referring to "the historical tradition of prohibiting the carrying of 'dangerous and

2 CAETANO *v.* MASSACHUSETTS

Per Curiam

unusual weapons'"). In so doing, the court concluded that stun guns are "unusual" because they are "a thoroughly modern invention." 470 Mass., at 781, 26 N. E. 3d, at 693–694. By equating "unusual" with "in common use at the time of the Second Amendment's enactment," the court's second explanation is the same as the first; it is inconsistent with *Heller* for the same reason.

Finally, the court used "a contemporary lens" and found "nothing in the record to suggest that [stun guns] are readily adaptable to use in the military." 470 Mass., at 781, 26 N. E. 3d, at 694. But *Heller* rejected the proposition "that only those weapons useful in warfare are protected." 554 U. S., at 624–625.

For these three reasons, the explanation the Massachusetts court offered for upholding the law contradicts this Court's precedent. Consequently, the petition for a writ of certiorari and the motion for leave to proceed *in forma pauperis* are granted. The judgment of the Supreme Judicial Court of Massachusetts is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Cite as: 577 U. S. ____ (2016)      1

ALITO, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

JAIME CAETANO *v.* MASSACHUSETTS

ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME JUDICIAL COURT OF MASSACHUSETTS

No. 14–10078. Decided March 21, 2016

JUSTICE ALITO, with whom JUSTICE THOMAS joins, concurring in the judgment.

After a "bad altercation" with an abusive boyfriend put her in the hospital, Jaime Caetano found herself homeless and "in fear for [her] life." Tr. 31, 38 (July 10, 2013). She obtained multiple restraining orders against her abuser, but they proved futile. So when a friend offered her a stun gun "for self-defense against [her] former boy friend," 470 Mass. 774, 776, 26 N. E. 3d 688, 690 (2015), Caetano accepted the weapon.

It is a good thing she did. One night after leaving work, Caetano found her ex-boyfriend "waiting for [her] outside." Tr. 35. He "started screaming" that she was "not gonna [expletive deleted] work at this place" any more because she "should be home with the kids" they had together. *Ibid.* Caetano's abuser towered over her by nearly a foot and outweighed her by close to 100 pounds. But she didn't need physical strength to protect herself. She stood her ground, displayed the stun gun, and announced: "I'm not gonna take this anymore. . . . I don't wanna have to [use the stun gun on] you, but if you don't leave me alone, I'm gonna have to." *Id.,* at 35–36. The gambit worked. The ex-boyfriend "got scared and he left [her] alone." *Id.,* at 36.

It is settled that the Second Amendment protects an individual right to keep and bear arms that applies against both the Federal Government and the States. *District of Columbia* v. *Heller*, 554 U. S. 570 (2008); *McDonald* v. *Chicago*, 561 U. S. 742 (2010). That right

2   CAETANO *v.* MASSACHUSETTS

ALITO, J., concurring in judgment

vindicates the "basic right" of "individual self-defense." *Id.*, at 767; see *Heller*, *supra*, at 599, 628. Caetano's encounter with her violent ex-boyfriend illustrates the connection between those fundamental rights: By arming herself, Caetano was able to protect against a physical threat that restraining orders had proved useless to prevent. And, commendably, she did so by using a weapon that posed little, if any, danger of permanently harming either herself or the father of her children.

Under Massachusetts law, however, Caetano's mere possession of the stun gun that may have saved her life made her a criminal. See Mass. Gen. Laws, ch. 140, §131J (2014). When police later discovered the weapon, she was arrested, tried, and convicted. The Massachusetts Supreme Judicial Court affirmed the conviction, holding that a stun gun "is not the type of weapon that is eligible for Second Amendment protection" because it was "not in common use at the time of [the Second Amendment's] enactment." 470 Mass., at 781, 26 N. E. 3d, at 693.

This reasoning defies our decision in *Heller*, which rejected as "bordering on the frivolous" the argument "that only those arms in existence in the 18th century are protected by the Second Amendment." 554 U. S., at 582. The decision below also does a grave disservice to vulnerable individuals like Caetano who must defend themselves because the State will not.

I

The events leading to Caetano's prosecution occurred sometime after the confrontation between her and her ex-boyfriend. In September 2011, police officers responded to a reported shoplifting at an Ashland, Massachusetts, supermarket. The store's manager had detained a suspect, but he identified Caetano and another person in the parking lot as potential accomplices. Police approached the two and obtained Caetano's consent to search her

purse. They found no evidence of shoplifting, but saw Caetano's stun gun. Caetano explained to the officers that she had acquired the weapon to defend herself against a violent ex-boyfriend.

The officers believed Caetano, but they arrested her for violating Mass. Gen. Laws, ch. 140, §131J, "which bans entirely the possession of an electrical weapon," 470 Mass., at 775, 26 N. E. 3d, at 689.[1] When Caetano moved to dismiss the charge on Second Amendment grounds, the trial court denied the motion.

A subsequent bench trial established the following undisputed facts. The parties stipulated that Caetano possessed the stun gun and that the weapon fell within the statute's prohibition.[2] The Commonwealth also did not challenge Caetano's testimony that she possessed the weapon to defend herself against the violent ex-boyfriend. Indeed, the prosecutor urged the court "to believe the defendant." Tr. 40. The trial court nonetheless found

---

[1] Specifically, the statute prohibits the possession of any "portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill." Mass. Gen. Laws, ch. 140, §131J (2014). The statute includes exceptions for law-enforcement officers and weapon suppliers, who may possess electrical weapons "designed to incapacitate temporarily." *Ibid.* Violations are punishable by a fine of $500 to $1,000, imprisonment of 6 months to 2½ years, or both. *Ibid.*

[2] Stun guns like Caetano's "are designed to stun a person with an electrical current" by running a current between two metal prongs on the device and placing the prongs in direct contact with the person. 470 Mass. 774, 775, n. 2, 26 N. E. 3d 688, 689, n. 2 (2015). A similar device, popularly known by the brand name "Taser," shoots out wires tipped with electrodes that can deliver an electrical current from a distance. Tr. 25–26. Tasers can also be used like a stun gun without deploying the electrodes—a so-called "dry stun." *Id.,* at 26. As the Commonwealth's witness testified at trial, these sorts of electrical weapons are "non-lethal force" "designed to incapacitate"—"not kill"—a target. *Id.,* at 27.

Caetano guilty, and she appealed to the Massachusetts Supreme Judicial Court.

The Supreme Judicial Court rejected Caetano's Second Amendment claim, holding that "a stun gun is not the type of weapon that is eligible for Second Amendment protection." 470 Mass., at 775, 26 N. E. 3d, at 689. The court reasoned that stun guns are unprotected because they were "not 'in common use at the time' of enactment of the Second Amendment," *id.,* at 781, 26 N. E. 3d, at 693 (quoting *Heller*, *supra*, at 627), and because they fall within the "traditional prohibition against carrying dangerous and unusual weapons," 470 Mass.*,* at 779, 26 N. E. 3d, at 692 (citing *Heller*, *supra*, at 627).

II

Although the Supreme Judicial Court professed to apply *Heller*, each step of its analysis defied *Heller*'s reasoning.

A

The state court repeatedly framed the question before it as whether a particular weapon was "'in common use at the time' of enactment of the Second Amendment." 470 Mass., at 781, 26 N. E. 3d, at 693; see also *id.,* at 779, 780, 781, 26 N. E. 3d, at 692, 693, 694. In *Heller*, we emphatically rejected such a formulation. We found the argument "that only those arms in existence in the 18th century are protected by the Second Amendment" not merely wrong, but "bordering on the frivolous." 554 U. S., at 582. Instead, we held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, *even those that were not in existence at the time of the founding.*" *Ibid.* (emphasis added).[3] It is hard to

---

[3] Stun guns are plainly "bearable arms." As *Heller* explained, the term includes any "[w]eapo[n] of offence" or "thing that a man wears for his defence, or takes into his hands," that is "carr[ied] . . . for the purpose of offensive or defensive action." 554 U. S., at 581, 584 (inter-

Cite as: 577 U. S. ____ (2016) 5

ALITO, J., concurring in judgment

imagine language speaking more directly to the point. Yet the Supreme Judicial Court did not so much as mention it.

Instead, the court seized on language, originating in *United States* v. *Miller*, 307 U. S. 174 (1939), that "'the sorts of weapons protected were those "in common use at the time."'" 470 Mass., at 778, 26 N. E. 3d, at 692 (quoting *Heller*, *supra*, at 627, in turn quoting *Miller*, *supra*, at 179). That quotation does not mean, as the court below thought, that only weapons popular in 1789 are covered by the Second Amendment. It simply reflects the reality that the founding-era militia consisted of citizens "who would bring the sorts of lawful weapons that they possessed at home to militia duty," *Heller*, 554 U. S., at 627, and that the Second Amendment accordingly guarantees the right to carry weapons "typically possessed by law-abiding citizens for lawful purposes," *id.,* at 625. While stun guns were not in existence at the end of the 18th century, the same is true for the weapons most commonly used today for self-defense, namely, revolvers and semiautomatic pistols. Revolvers were virtually unknown until well into the 19th century,[4] and semiautomatic pistols were not invented until near the end of that century.[5] Electronic stun guns are no more exempt from the Second Amendment's protections, simply because they were unknown to the First Congress, than electronic communications are exempt from the First Amendment, or electronic imaging devices are exempt from the Fourth Amendment. *Id.,* at 582 (citing *Reno* v. *American Civil Liberties Union*, 521

---

nal quotation marks omitted).

[4] See J. Bilby, A Revolution in Arms: A History of the First Repeating Rifles 23 (2006). Samuel Colt did not patent his famous revolver until 1836. *Ibid.*

[5] See Firearms: An Illustrated History 166 (2014); see also W. Greener, The Gun and Its Development 524–529, 531–534 (9th ed. 1910) (discussing revolvers and self-loading semiautomatic pistols as "modern pistols").

6 CAETANO *v.* MASSACHUSETTS

ALITO, J., concurring in judgment

U. S. 844, 849 (1997), and *Kyllo* v. *United States*, 533 U. S. 27, 35–36 (2001)). As *Heller* aptly put it: "We do not interpret constitutional rights that way." 554 U. S., at 582.

B

The Supreme Judicial Court's holding that stun guns may be banned as "dangerous and unusual weapons" fares no better. As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are "unusual," it does not need to consider the lower court's conclusion that they are also "dangerous." See *ante*, at 1–2. But make no mistake—the decision below gravely erred on both grounds.

1

As to "dangerous," the court below held that a weapon is "dangerous per se" if it is "'designed and constructed to produce death or great bodily harm' and 'for the purpose of bodily assault or defense.'" 470 Mass., at 779, 26 N. E. 3d, at 692 (quoting *Commonwealth* v. *Appleby*, 380 Mass. 296, 303, 402 N. E. 2d 1051, 1056 (1980)). That test may be appropriate for applying statutes criminalizing assault with a dangerous weapon. See *ibid.*, 402 N. E. 2d, at 1056. But it cannot be used to identify arms that fall outside the Second Amendment. First, the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. See *Heller*, *supra*, at 627 (contrasting "'dangerous and unusual weapons'" that may be banned with protected "weapons . . . 'in common use at the time'"). Second, even in cases where dangerousness might be relevant, the Supreme Judicial Court's test sweeps far too broadly. *Heller* defined the "Arms" *covered by* the Second Amendment to include "'any thing that a man wears for his defence, or takes into his

Case 2:03-cv-00786-PKC-AYS Document 162-1 Filed 04/04/16 Page 9 of 12 PageID #: 1429

hands, or useth in wrath to cast at or strike another.'" 554 U. S., at 581. Under the decision below, however, virtually every covered arm would qualify as "dangerous."

Were there any doubt on this point, one need only look at the court's first example of "dangerous per se" weapons: "firearms." 470 Mass., at 779, 26 N. E. 3d, at 692. If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous. 554 U. S., at 636. *A fortiori*, stun guns that the Commonwealth's own witness described as "non-lethal force," Tr. 27, cannot be banned on that basis.

2

The Supreme Judicial Court's conclusion that stun guns are "unusual" rested largely on its premise that one must ask whether a weapon was commonly used in 1789. See 470 Mass., at 780–781, 26 N. E. 3d, at 693–694. As already discussed, that is simply wrong. See *supra,* at 4–6.

The court also opined that a weapon's unusualness depends on whether "it is a weapon of warfare to be used by the militia." 470 Mass., at 780, 26 N. E. 3d, at 693. It asserted that we followed such an approach in *Miller* and "approved its use in *Heller*." 470 Mass., at 780, 26 N. E. 3d, at 693. But *Heller* actually said that it would be a "startling reading" of *Miller* to conclude that "only those weapons useful in warfare are protected." 554 U. S., at 624. Instead, *Miller* and *Heller* recognized that militia members traditionally reported for duty carrying "the sorts of lawful weapons that they possessed at home," and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use. 554 U. S.*,* at 627; see *id.,* at 624–625. Indeed, *Heller* acknowledged that advancements in military technology might render many commonly owned weapons ineffective in warfare. *Id.,* at 627–628. But such "modern developments . . . cannot change our

8 CAETANO *v.* MASSACHUSETTS

ALITO, J., concurring in judgment

interpretation of the right." *Ibid.*

 In any event, the Supreme Judicial Court's assumption that stun guns are unsuited for militia or military use is untenable. Section 131J allows law enforcement and correctional officers to carry stun guns and Tasers, presumably for such purposes as nonlethal crowd control. Subduing members of a mob is little different from "suppress[ing] Insurrections," a traditional role of the militia. U. S. Const., Art. I, §8, cl. 15; see also *ibid.* (militia may be called forth "to execute the Laws of the Union"). Additionally, several branches of the U. S. armed services equip troops with electrical stun weapons to "incapacitate a target without permanent injury or known side effects." U. S. Army, Project Manager Close Combat Systems, PD Combat Munitions: Launched Electrode Stun Device (LESD), http://www.pica.army.mil/pmccs/combatmunitions/ nonlethalsys/taserx26e.html (all Internet materials as last visited Mar. 18, 2016); see U. S. Marine Corps Administrative Message 560/08 (Oct. 2, 2008) (Marine Corps guidance for use of Tasers), http://www.marines.mil/ News/Messages/MessagesDisplay/tabid/13286/Article/1130 24/marine-corps-training-and-use-of-human-electro-muscular-incapacitation-hemi-dev.aspx; Joint Non-Lethal Weapons Directorate, Non-Lethal Weapons (NLW) Reference Book 3 (2012) (Department of Defense report stating that "[m]ultiple Services employ" Tasers), http://dtic.mil/dtic/ tr/fulltext/u2/a565971.pdf.

C

 As the foregoing makes clear, the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes *today*. The Supreme Judicial Court offered only a cursory discussion of that question, noting that the "'number of Tasers and stun guns is dwarfed by the number of firearms.'" 470 Mass., at 781, 26 N. E. 3d, at 693. This ob-

servation may be true, but it is beside the point. Otherwise, a State would be free to ban *all* weapons *except* handguns, because "handguns are the most popular weapon chosen by Americans for self-defense in the home." *Heller*, *supra*, at 629.

The more relevant statistic is that "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens," who it appears may lawfully possess them in 45 States. *People* v. *Yanna*, 297 Mich. App. 137, 144, 824 N. W. 2d 241, 245 (2012) (holding Michigan stun gun ban unconstitutional); see Volokh, Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights To Keep and Bear Arms and Defend Life, 62 Stan. L. Rev. 199, 244 (2009) (citing stun gun bans in seven States); Wis. Stat. §941.295 (Supp. 2015) (amended Wisconsin law permitting stun gun possession); see also Brief in Opposition 11 (acknowledging that "approximately 200,000 civilians owned stun guns" as of 2009). While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment.

### III

The lower court's ill treatment of *Heller* cannot stand. The reasoning of the Massachusetts court poses a grave threat to the fundamental right of self-defense. The Supreme Judicial Court suggested that Caetano could have simply gotten a firearm to defend herself. 470 Mass., at 783, 26 N. E. 3d, at 695. But the right to bear other weapons is "no answer" to a ban on the possession of protected arms. *Heller*, 554 U. S., at 629. Moreover, a weapon is an effective means of self-defense only if one is prepared to use it, and it is presumptuous to tell Caetano she should have been ready to shoot the father of her two young children if she wanted to protect herself. Courts should

10 CAETANO *v.* MASSACHUSETTS

ALITO, J., concurring in judgment

not be in the business of demanding that citizens use *more* force for self-defense than they are comfortable wielding.[6]

Countless people may have reservations about using deadly force, whether for moral, religious, or emotional reasons—or simply out of fear of killing the wrong person. See Brief for Arming Women Against Rape & Endangerment as *Amicus Curiae* 4–5. "Self-defense," however, "is a basic right." *McDonald*, 561 U. S*.,* at 767. I am not prepared to say that a State may force an individual to choose between exercising that right and following her conscience, at least where both can be accommodated by a weapon already in widespread use across the Nation.

\* \* \*

A State's most basic responsibility is to keep its people safe. The Commonwealth of Massachusetts was either unable or unwilling to do what was necessary to protect Jaime Caetano, so she was forced to protect herself. To make matters worse, the Commonwealth chose to deploy its prosecutorial resources to prosecute and convict her of a criminal offense for arming herself with a nonlethal weapon that may well have saved her life. The Supreme Judicial Court then affirmed her conviction on the flimsiest of grounds. This Court's grudging *per curiam* now sends the case back to that same court. And the consequences for Caetano may prove more tragic still, as her conviction likely bars her from ever bearing arms for self-defense. See Pet. for Cert. 14.

If the fundamental right of self-defense does not protect Caetano, then the safety of all Americans is left to the mercy of state authorities who may be more concerned about disarming the people than about keeping them safe.

---

[6]The court below also noted that Massachusetts no longer requires a license to possess mace or pepper spray. 470 Mass., at 783, 26 N. E. 3d, at 695. But the law was changed in 2014, after Caetano was convicted. A spray can also be foiled by a stiff breeze, while a stun gun cannot.