UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JAMES M. MALONEY,

               Plaintiff,

     - against -

MADELINE SINGAS,

               Defendant.
------------------------------------------------------------------X

03-cv-786 (PKC) (AYS)

**PLAINTIFF'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

**TABLE OF CONTENTS**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. FINDINGS OF FACT (¶¶ 1-39) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  A. Analytical Framework and Preliminary Finding . . . . . . . . . . . . . . . . . . . . . . . . 3
  B. Police, Corrections, and Military Use of the Nunchaku  . . . . . . . . . . . . . . . . . . 4
  C. Civilian Use of the Nunchaku  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
  D. Lawful versus Unlawful Use.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
  E. Plaintiff's Use of the Nunchaku . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II. CONCLUSIONS OF LAW (¶¶ 40-?) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  A. The Nunchaku Is An "Arm" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  B. "Commonly Used for Lawful Purposes" versus "Dangerous and Unusual"  . . . . . . . 10
  C. The Nunchaku Is Commonly Used for Lawful Purposes . . . . . . . . . . . . . . . . . . 11
  D. Banning Simple In-Home Possession of Nunchaku Is Unconstitutional . . . . . . . . 12

Introduction

Since 1974, New York has banned the possession of nunchaku or nunchucks,[1] a martial arts weapon consisting of two sticks connected by a cord or chain. Under New York law, possession of nunchucks constitutes a Class A misdemeanor. See N.Y. Penal Law § 265.01 ("A person is guilty of criminal possession of a weapon in the fourth degree when: (1) He or she possesses any . . . chuka stick . . . ."); *id*. at § 265.00(14) (defining "chuka stick"). Plaintiff James M. Maloney, an attorney and martial arts practitioner, filed this action in 2003, seeking a declaration that New York's ban on the simple possession of nunchucks in one's home is unconstitutional. Although the Honorable Arthur D. Spatt dismissed Maloney's constitutional claims relating to the ban in 2007, which dismissal was affirmed by the Second Circuit on appeal in 2009 (*Maloney v. Cuomo*, 554 F.3d 56 (2d Cir. 2009)), the United States Supreme Court in 2010 vacated the judgment and remanded the case for further consideration in light of its decision in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), which had held that the Second Amendment is applicable as against the states. *See Maloney v. Rice*, 561 U.S. 1040 (2010). On remand, this Court denied cross-motions for summary judgment, *see Maloney v. Singas*, 106 F. Supp. 3d 300 (2015), finding that there were disputed issues of material fact that must first be resolved by means of a trial.

A bench trial was held from January 9 through 12, 2017. Having reviewed the parties' submissions and the evidence presented at trial, and having assessed the credibility of the five (5) witnesses who testified at trial, the Court sets forth the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. For the reasons stated below, the Court finds that New York Penal Law § 265.01, to the extent that it bans the simple possession of nunchucks by a citizen within his or her home, is unconstitutional as violative of the Second Amendment to the United States Constitution.

---

[1] In its Memorandum & Opinion in this matter dated May 22, 2015, *Maloney v. Singas*, 106 F. Supp. 3d 300 (2015), the Court referred to "chuka sticks" and "nunchakus" interchangeably. *See id.* at footnote 1. "Chuka stick," however, is statutorily defined as "any device designed primarily as a weapon, consisting of two *or more* lengths of a rigid material joined together by a thong, rope or chain in such a manner as to allow free movement of a portion of the device while held in the hand and capable of being rotated in such a manner as to inflict serious injury upon a person by striking or choking. These devices are also known as nunchakus and centrifugal force sticks." N.Y. Penal Law § 265.00(14) (emphasis added). Since all the testimony and exhibits at trial relating to the weapon in question appeared to describe a weapon consisting of two (but not more) sticks so connected, and since New York's statutory definition of "chuka stick" is broader, encompassing weapons that may consist of more than two sticks, the terms "nunchaku" (used to denote both singular and plural sets of the two-stick instrument) and its English-language variant "nunchucks," rather than the statutory "chuka stick," will be used herein to describe the specific weapon for which Maloney seeks Second Amendment protection. In this regard, the Court is informed by the Tenth Circuit's definition as set forth in *United States v. George*, 778 F. 2d 556, 558 n.1 (10th Cir. 1985) ("A 'nunchaku,' also known as 'nunchucks,' is an Oriental martial arts weapon comprised of *two* pieces of wood or steel connected by a cord or chain and which can be held in the hands. It had its origin as a farm implement in Okinawa.") (emphasis added). *See also State v. Muliufi*, 643 P.2d 546, 547 n.1 (Haw. 1982) ("This instrument is a *pair* of wooden sticks or metal pipes bound together by a rope or chain.") (emphasis added). The Court notes, however, that nunchucks may also be made of material other than wood or metal (e.g., plastic).

I. FINDINGS OF FACT

A. Analytical Framework and Preliminary Finding

  1. In its Memorandum & Opinion in this matter dated May 22, 2015 (*Maloney v. Singas*, 106 F. Supp. 3d 300 (2015)) (hereinafter, the "May 22 Order"), this Court held that in order to determine whether New York's criminalization of the in-home possession of nunchucks burdens a Second Amendment right, the Court must first determine whether those instruments "constitute 'arms' protected by the Second Amendment—namely, whether they are commonly used for lawful purposes." 106 F. Supp. 3d at 309.

  2. The above-framed inquiry, which subdivides into several components, is a mixed question of fact and law.

  3. The first component of the inquiry (which, like the others, has both factual and legal dimensions) is whether the nunchaku is an "arm." The Supreme Court defined that term broadly in *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (*see* ¶ 40, *infra*), and it is beyond dispute that nunchucks are capable of, *inter alia*, being held in the hands and used as a weapon, so the Court finds that the essential attributes of an "arm" for Second Amendment purposes are met by the nunchaku. Indeed, the parties did not dispute this threshold question in their cross-motions for summary judgment,[2] and this Court in rendering the May 22 Order noted that "the parties do not dispute the fact that chuka sticks are weapons." 106 F. Supp. 3d at 312.

  4. The Supreme Court stated in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," 554 U.S. at 582. However, the factual/legal determination made in the foregoing paragraph that the nunchaku is an "arm," i.e., an instrument to which the Second Amendment's "keep" and "bear" provisions extend "prima facie," does not end the inquiries relevant to the Second Amendment's applicability.[3]

---

 [2] *See, e.g.*, Defendant's Memorandum of Law (ECF Document 140, filed March 20, 2014), at 6 (pdf page 7 of 25) (conceding that state court's 1981 holding that nunchaku did not constitute arms is "naturally untenable in light of *Heller* and *McDonald*"); *id.* at 11 (pdf page 12 of 25) ("Maloney has argued, and Defendant readily concedes, that nunchaku is a type of arms within the purview of the Second Amendment.").

 [3] This Court does not view the Supreme Court's decision in *Caetano v. Massachusetts*, 577 U.S. ___, 136 S. Ct. 1027 (2016) (*per curiam* opinion from which no dissent was taken, rendered subsequent to the May 22 Order) as having changed the law from that enunciated in *Heller* regarding either the necessary inquiry about the nunchaku's status as an "arm" or that of whether the instrument is "commonly used for lawful purposes." See Memorandum & Order dated April 15, 2016 (ECF Document 164) at 2 ("This Court . . . based no part of its May 22 Order on the any of the grounds rejected by the Supreme Court in *Caetano*. Rather, this Court found that, in this case, there remain disputed issues of fact to be resolved at trial about whether nunchaku are 'commonly used for lawful purposes.' . . . The *Caetano* opinion offers no further guidance on how the 'commonly used for lawful purposes' standard is to be interpreted or how a plaintiff may meet that standard as an evidentiary matter—the two key issues in the instant case.") (citations omitted).

5. This Court in the May 22 Order identified the disputed issues of material fact that precluded summary judgment and that were to be resolved at trial as: (a) whether the nunchaku is "in common use," and (b) whether its common use is a lawful one. 106 F. Supp. 3d at 310. The Court emphasized that these two elements are to be read in the conjunctive, that is, both must be satisfied if the weapon at issue is to be associated with the protections provided by the Second Amendment. *Id*. ("Thus, to reiterate, the weapon at issue must be 'in common use' *and* its common use must be a lawful one.") (emphasis in original). The legal basis for the Court's continued use of this two-element breakdown of the "commonly used for lawful purposes" test is discussed further in the Conclusions of Law beginning at ¶ 48, *infra*.

6. The ultimate question of whether a weapons's use is "common" for Second Amendment purposes must be determined with some reference to the word's ordinary meaning. The online version of the Merriam-Webster dictionary[4] provides three "simple" definitions of the word "common": "(1) belonging to or shared by two or more people or groups; (2) done by many people; and (3) occurring or appearing frequently; not rare." The Court determines that "common" for present purposes must mean at least that the use is "shared" among people or groups and "not rare," although such use need not occur among a majority of people or groups in order to be "common."

7. The following findings of fact as applied to the ultimate mixed question of fact and law that the Court has previously framed, i.e., whether nunchucks "constitute 'arms' protected by the Second Amendment—namely, whether they are commonly used for lawful purposes," 106 F. Supp. 3d at 309, are made within the context of the foregoing analytical framework and preliminary finding.

B. Police, Corrections, and Military Use of the Nunchaku

8. The nunchaku has a history of police use in the United States going back to at least 1982. Transcript ("Tr.") at 143.

9. The specific variety of nunchaku that has been most frequently employed for such police use is the Orcutt Police Nunchaku or OPN, which does not differ substantially from a standard nunchaku of historical origin (Tr. at 123), the main difference between the two being that the OPN includes an innovation in the manner in which the cord is woven between the two sticks, resulting in "connecting core rings" that prevent rolling when the nunchaku is used to trap the wrist or leg to control a suspect. Tr. at 124.

10. The OPN may be used in all of the same ways as a traditional nunchaku, including striking and kata (i.e., "forms" that may include spinning and hand-switching techniques). Tr. at 125.

11. In addition to police use, the OPN has also been used by corrections departments,

---

[4] http://www.merriam-webster.com/dictionary/common

including sheriff's departments that operate jails, Tr. at 126, and its use is also intended for military personnel, some of whom have been trained in such use. Tr. at 130, 122.

12. As of the date of trial in this matter, approximately 900 instructors (comprised of police, corrections, sheriffs, and military personnel) had been trained to teach the use of the OPN by its originator, Kevin Orcutt. Tr. at 122. Each such instructor receives 32 hours of training, Tr. at 132, and "line officers" under current standards each receive 24 hours of training over three days. Tr. at 131.

13. At the peak of its use in the late 1990s, approximately 243 American police, corrections and sheriff's departments in the aggregate were using the OPN. Tr. at 121, 151, 162, 196, 201; Plaintiff's Exhibit E.

14. At the peak of its use in the late 1990s, a total of approximately 15,000 police officers, corrections officers and sheriff's department officers in the United States were trained in the use of, and equipped with (i.e., using) the OPN. Tr. at 127-128, 151, 161, 196, 207.

15. The current law enforcement and corrections use of the OPN, based on 2016 information, is less than that which existed at its peak, and is estimated to be at between 5,000 and 10,000 officers among 50 or fewer departments. Tr. at 128, 147, 161, 196, 209; Plaintiff's Exhibit G. That level of use has remained fairly constant between 2010 and 2015. Tr. at 161.

16. Based on the foregoing findings of fact, the definition of "common" as described in paragraph 6, *supra*, and the presumption that police, corrections, and related use is lawful, the Court finds that the nunchaku is "in common use for lawful purposes" in modern times in the United States. The implications of this primarily factual finding, made here in the context of police, corrections, and related use, on the ultimate conclusion of whether the nunchaku is subject to Second Amendment protection, are discussed in the Conclusions of Law, *infra*.

C. Civilian Use of the Nunchaku

17. The nunchaku is the most popular of the martial-arts weapons, Tr. at 238, 244, and is widely represented in American popular culture, Tr. at 253; *see also id.* at 256 (reference to students who "grew up watching shows and movies and games that had nunchaku in them").

18. Many martial-arts styles, including those that did not traditionally include nunchaku use, have incorporated the use of the nunchaku into their training and technique in modern times. Tr. at 304-305.

19. Although there appear to be no statistics available to indicate the number of martial-arts schools in the United States that teach the use of nunchaku, a conservative estimate would be that more than 5,000 such schools do teach the use of nunchaku. This estimate was determined

by expert testimony[5] as follows: a database, http://dojos.info/USA, as of the date the estimate was initially made (some six months before trial) indicated there were 20,324 martial-arts schools in the United States. Excluding martial-arts located in New York (1,438) and Massachusetts (653) (the two states where the weapon is completely banned, even in martial-arts schools) leaves 18,233 martial-arts schools in the United States that could possibly teach nunchaku legally. Based on the expert's knowledge and experience, he estimated that at least one-third would include some form of weapons training, yielding a number of at least 6,077 martial-arts schools in states other than New York or Massachusetts that teach weapons at all. The expert conservatively estimated that 85% of martial-arts schools in states other than New York or Massachusetts that teach weapons at all would teach the nunchaku,[6] and that the number of such schools nationwide could therefore conservatively be estimated to be 85% of 6,077, or 5,165. Tr. at 241-245. The Court finds a conservative estimate of 5,000 or more martial-arts schools in the United States that teach the use of nunchaku to be a credible one. The foregoing numbers, source website, and methodology were provided to Defendant in an expert report six months before trial, see Tr. at 240-241, and Defendant offered no evidence at trial in rebuttal thereof.

20. The use of nunchaku in martial-arts schools where such use has not been defined as a crime, and absent evidence of unlawful use in martial-arts schools, is presumptively "lawful use." Defendant offered no evidence at trial tending to show the use in the 5,000 or more martial-arts schools referenced in the foregoing is anything other than lawful use.

21. One commercial martial-arts equipment supplier, whose representative testified and produced documents pursuant to subpoena and subject to a confidentiality order, indicated through business records that were admitted into evidence that over 50,000 pairs of hardwood nunchaku were sold in the United States by that company alone during a roughly six-year period between 2010 and 2016. Tr. at 349; Plaintiff's Exhibit I.

22. Although the same witness was unsure of the market share of the company whose records were produced, and indicated that that was a fact that was not necessarily determinable, the witness indicated that many other companies were selling martial-arts equipment, including nunchucks, online and by mail-order, and indicated that there were between five and ten "larger ones" in addition to many smaller ones. Tr. at 354-356.

23. Christopher Pellitteri, the expert witness described in footnote 5, *supra*, testified that there are four or five companies that are "major players" as suppliers of martial-arts equipment including nunchucks in the United States, that most will not ship nunchaku to California, and that the martial-arts equipment supplier whose representative testified by subpoena and produced

---

[5] This expert witness was Christopher Pellitteri, a martial-arts school owner for more than 20 years with 30 years' experience in the martial arts, a knowledge of the industry, and particular expertise in the nunchaku.

[6] This high rate is consistent with the fining that is the most popular of the martial-arts weapons, see paragraph 17, *supra*.

documents subject to a confidentiality order was one of those larger four or five suppliers. Tr. at 309.

24. Based on the foregoing, and conservatively estimating that the martial-arts equipment supplier whose representative testified at trial in fact has 20% or one-fifth of the national market share,[7] an extrapolation from the six-year sales of hardwood nunchaku set forth in paragraph 21, *supra* (50,000 pairs), would yield a national commercial market of 250,000 pairs for the same six-year period, or more than 40,000 pairs of real hardwood nunchaku commercially sold in the United States in a single year.

25. Even assuming that the martial-arts equipment supplier whose representative testified had 50% of the national market share, extrapolating from the six-year sales of hardwood nunchaku set forth in paragraph 21, *supra* (50,000 pairs), would yield a national commercial market of 100,000 pairs for the same six-year period, or more than 16,000 pairs of real hardwood nunchaku commercially sold in the United States in a single year.

26. Christopher Pellitteri, the expert witness described in footnote 5, *supra*, testified that all the nunchucks used in his California martial-arts school are custom-made by a private woodworker, shipped to Pellitteri unstrung, and then strung by Pellitteri at his martial arts school. Tr. at 307. Pellitteri's students buy all their nunchucks from him, Tr. at 308. Pellitteri is aware that some of the other martial-arts schools in California buy their nunchucks from martial arts supply stores in California. *Id*. He did not express an opinion as to the percentage of martial-arts schools that use custom-made as opposed to factory-made nunchucks, but did indicate that at least one of his own reasons for having nunchucks specially designed and made for his system is because of his own preferences as to weight, length, and shape. Tr. at 307. Although the Court is unable to glean from the foregoing any indicia of the numbers of privately woodworked nunchaku in use throughout the United States, it stands to reason, and the Court finds, that the number of nunchaku commercially manufactured and sold in the United States must represent fewer than the total number of nunchaku in use, given that martial-arts practitioners (such as Pellitteri himself) are likely to have individual preferences as to weight, length, and shape, and given further that woodworking to make nunchaku is a relatively simple process (as compared with manufacturing firearms).

27. The martial-arts equipment supplier whose representative testified indicated through business records that were admitted into evidence that substantial numbers of lightweight plastic "training" nunchaku are also manufactured and sold throughout the United States. However, since it is unclear whether such items may or should be considered to be the same instrument for

---

[7] If, as it appears, there are at least five larger suppliers of nunchaku in the United States (see paragraphs 22 ("between five and ten") and 23 ("four or five"), *supra*), a 20% market share of one such major supplier (i.e., the one whose representative testified) would be a reasonable estimate. Given further that a significant market share may also be held in the aggregate by many additional suppliers beyond those larger ones (see paragraph 22), a 20% estimate of market share for one large supplier would likely be conservative (that is, its share is probably actually even less than 20%) for purposes of extrapolating total sales of nunchaku nationwide.

purposes of the "in common use for lawful purposes" analysis, the Court declines to consider those additional numbers.

28. Based on the foregoing numbers and other factors actually considered, the Court finds that at least 16,000-40,000 pairs of nunchaku, and possibly many more, are sold commercially in the United States each year for civilian use, and that an unknown additional quantity are custom-made for such use by woodworking or similar means.

29. Given the foregoing, coupled with the fact that nunchucks first became popular in the United States in the 1970s with the advent of the Bruce Lee movies (see. e.g., Tr. at 115, 305), and given further that nunchucks are not consumable items but tend to remain in existence until worn out or destroyed (with the capacity to accumulate in private collections, see Tr. at 306-307), it stands to reason that there are at present a great many nunchaku among the personal property of civilian residents of the United States, with such numbers certainly running well into the tens of thousands, probably into the hundred of thousands, and possibly higher.

30. Based on the foregoing findings of fact and the definition of "common" as described in paragraph 6, *supra*, and subject to further analysis of the evidence as to whether there is any indication of widespread unlawful use of nunchaku (which would imply that a significant percentage of the "common use" is unlawful), the Court finds that the nunchaku is "in common use for lawful purposes" in modern times in the United States among the civilian (i.e., non law-enforcement, corrections or military) population.

D. Lawful versus Unlawful Use

31. No evidence was presented at trial to indicate that nunchucks are widely used for unlawful purposes even locally, let alone nationally. In Nassau County, New York, there were five (5) prosecutions for charges involving possession or use of chuka sticks for the period December 14, 2014, through January 11, 2016, all of which occurred during the calendar year 2015 (that is, there were none during the calendar year 2016). Tr. at 373-374; Defendant's Exhibit D. Of these five cases, two involved alleged conduct with the weapon (assault), Tr. at 376. The Court is unable to draw any inference from this evidence that would imply that a significant percentage of the nationwide "common use" is unlawful, see paragraph 30, *supra*.

32. Defendant's Exhibit E consists of a United States Bureau of Justice Statistics Special Report entitled, "National Crime Victimization Survey, 1993-2001: Weapon Use and Violent Crime." The Report contains statistical data about violent crimes committed during that time period, including some information about the type of weapons (if any) involved. The Report does not contain any information with regard to crimes involving nunchucks specifically. It is noteworthy, however, that at page 3 (middle column) the Report states: "Between 1993 and 2001 about 5% of all violent crimes were committed with weapons other than guns, knives, or blunt objects. Such weapons include ropes, chains, poison, martial arts weapons, BB guns . . . and objects that could not be classified." Given that the Report's "other weapons" category includes many weapons other than nunchucks, the Court is unable to draw any inference from this evidence that would imply that any significant percentage of the nationwide "common use" of

nunchucks is unlawful, see paragraph 30, *supra*.

E. Plaintiff's Use of the Nunchaku

33. As this Court wrote in the May 22 Order, "Maloney's personal experience is just one data point and does not, on its own, establish that chuka sticks are 'in common use today' or that their common use is for the 'lawful purpose' of self-defense." 106 F. Supp. 3d at 312. Maloney testified at some length about subject including but not limited to his use of nunchucks, but much of this testimony was not directly relevant to the central question before the Court. The Court considers the following findings of fact relevant to that question.

34. The use of nunchucks is integral to Maloney's style of martial arts, which he formulated himself after studying various other styles. Tr. at 34-37.

35. Many styles and varieties of martial arts include the use of nunchaku, and many styles and varieties that did not originally or traditionally include the use of nunchaku came to include nunchaku as the weapon became more popular. Tr. at 304-305.

36. Accordingly, Maloney's use of nunchaku in his own martial arts style does not appear to be inconsistent with the use of the weapon in various other martial arts styles and varieties, notwithstanding the fact that Maloney formulated his style himself and is at present (and may remain) its only practitioner (see Tr. at 37-38, 73).

37. Maloney testified that he wishes to possess nunchaku in his home in part for home defense purposes, Tr. at18-22, 66-69. Christopher Pellitteri, the expert witness described in footnote 5, *supra*, testified that the nunchaku "has great utility as a home defense weapon." Tr. at 237.

38. No specific evidence as to whether the "lawful common use" of nunchaku throughout the United States includes home defense was presented at trial, but the Court recognizes that the very nature of such use (i.e., private) tends to make it unlikely that information about the extent of such use would be publicly available and verifiable.

39. The Court credits Maloney's testimony to the effect that the use of the nunchaku as a martial-arts practice instrument cannot realistically be separated from its use as a weapon. Tr. at 43-45. Accordingly, the Court views the lawful use of potential home defense using nunchucks as consistent with the lawful use of the same instrument for martial-arts practice.

II. CONCLUSIONS OF LAW

A. The Nunchaku Is An "Arm"

40. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court defined "arms" (to which the Second Amendment's "keep" and "bear" provisions broadly apply subject to the restrictions discussed *infra*) as follows: "Before addressing the verbs 'keep' and 'bear,' we

interpret their object: 'Arms.'  The 18th-century meaning is no different from the meaning today.  The 1773 edition of Samuel Johnson's dictionary defined 'arms' as "weapons of offence, or armour of defence." . . . . Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' . . . see also N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar)."  *Heller*, 554 U.S. at 581.

41.  The parties did not dispute this threshold question in their cross-motions for summary judgment.  *See* Defendant's Memorandum of Law (ECF Document 140, filed March 20, 2014), at 6 (pdf page 7 of 25) (conceding that state court's 1981 holding that nunchaku did not constitute arms is "naturally untenable in light of Heller and McDonald"); *id*. at 11 (pdf page 12 of 25) ("Maloney has argued, and Defendant readily concedes, that nunchaku is a type of arms within the purview of the Second Amendment.").

42.  Given the parties' agreement on this point, coupled with the indisputable fact that the nunchucks are capable of, *inter alia*, being held in the hands and used as weapons, the instrument has the essential attributes that qualify it as an "arm" for Second Amendment purposes.  See Findings of Fact at ¶ 3, *supra*.

B. "Commonly Used for Lawful Purposes" versus "Dangerous and Unusual"

43. The twofold inquiry of whether (1) the nunchaku is "in common use," and (2) whether it common use is a lawful one, is inextricably interwtwined with another question alluded to by the Supreme Court in *Heller*, i.e., whether the attributes of the weapon in question make it "dangerous and unusual."  *See Heller*, 554 U.S. at 627 ("We also recognize another important limitation on the right to keep and carry arms.  [*United States v. Miller*, 307 U.S. 174 (1939)] said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.' . . . We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'") (citations omitted).

44. In the same vein, the *Heller* Court wrote: "We may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits [emphasis in original]. . . . We think that *Miller*'s 'ordinary military equipment' language must be read in tandem with what comes after: '[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.'  307 U.S. at 179 [citing *Miller*]. . . . The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense. . . . Indeed, that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface.  We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  *Heller*, 554 U.S. at 624-625.

45.  It appears that, under *Heller*, there should be little if any overlap as between weapons falling into one or the other of the two categories ("dangerous and unusual," *Heller*, 554 U.S. at 627, on the one hand, as over against "typically possessed by law-abiding citizens for lawful

purposes," *Heller*, 554 U.S. at 625 (quoting *Miller*), on the other).  Put another way, "dangerous and unusual" weapons generally are precisely those sorts of weapons that are *not* "typically possessed by law-abiding citizens for lawful purposes," the latter being the phrase borrowed from *Miller* that roughly correlates to *Heller*'s "commonly used for lawful purposes" test.  *See* May 22 Order, 106 F. Supp. 3d at 309 (attributing test to *Heller* and its progeny).

46. Maloney has argued, *see* Plaintiff's Memorandum of Law (ECF Document 132, filed March 20, 2014), at 8 (pdf page 10 of 23). that since he has not challenged New York's prohibition on carrying nunchaku, and since *Heller* references the "historical tradition of prohibiting the *carrying* of 'dangerous and unusual weapons,'" 554 U.S. at 627 (emphasis added) the question of whether the nunchaku may be a "dangerous and unusual weapon" should not be before this Court at all.  The Court rejects that argument for two reasons: (1) as explained above (see ¶¶ 42-45, *supra*), under *Heller* the two categories of weapons ("dangerous and unusual" versus "typically possessed by law-abiding citizens for lawful purposes") appear to be for the most part mutually exclusive, such that a finding that a weapon falls into one category is tantamount to a finding that it does not fall into the other, the short-barreled shotgun being the paradigmatic example of a dangerous and unusual weapon that is not typically possessed by law-abiding citizens for lawful purposes derived from *Miller* and *Heller*; and (2) *Heller* specifically noted that the "dangerous and unusual" rubric was "an important limitation on the right to *keep* and carry arms," 554 U.S. at 627 (emphasis added).

47. Conceivably, however, a given weapon may not be "dangerous and unusual" yet may nonetheless also not be "commonly used for lawful purposes" to the degree needed to merit Second Amendment protection.  Logically, therefore, the proper sequence as between these two inquiries would be to examine the latter one first, since generally weapons that are "commonly used for lawful purposes" will, under the analysis proffered above, not be "dangerous and unusual," whereas a weapon found not to be "dangerous and unusual" must still pass the "commonly used for lawful purposes" test.

C. The Nunchaku Is Commonly Used for Lawful Purposes

48. This Court in the May 22 Order identified the disputed issues of material fact that were to be resolved at trial as: (a) whether the weapon at issue is "in common use," and (b) whether its common use is a lawful one.  106 F. Supp. 3d at 310.  The Court emphasized that these two elements are to be read in the conjunctive, that is, both must be satisfied if the weapon at issue is to be associated with the protections provided by the Second Amendment.  *Id*. ("Thus, to reiterate, the weapon at issue must be 'in common use' *and* its common use must be a lawful one.") (emphasis in original).

49. Based on (a) Sergeant Orcutt's testimony and the exhibits admitted into evidence with that testimony, (b) the definition of "common" as described in paragraph 6, *supra*, and (c) the presumption that police, corrections, and related use is lawful, the Court has found (paragraph 16, *supra*) that the nunchaku is "in common use for lawful purposes" by police and corrections officers in modern times in the United States, meaning that is satisfies both prongs as delineated in the foregoing paragraph.  While Defendant argues that such police and corrections use "can

readily be discounted" because it does not relate to civilian use (see, e.g., Tr. at 363-364), this Court concludes that *Heller*'s reasoning requires that police, corrections, and related (e.g., military, see Tr. at 130, 122) use should be considered. Such personnel are, after all, among those who, in times of national emergency, would be called upon to respond, bringing with them ordinary weapons in their possession. *Cf. Heller*, 554 U.S. at 624-625. While certain weapons (such as machineguns, *see id.*) that might be commonly used by police or military would not give rise to Second Amendment protection, that is because such weapons are not in common use among the general (non-military) population as well and thus may readily be classified as dangerous and unusual. Nunchucks, however, as this Court has found at paragraph 30, *supra*, area los in common use among the general population. Thus, the police and military use should weigh toward the finding that the nunchaku is "commonly used for lawful purposes" rather than being discounted as Defendant argues.

50. Considering the police and military use of the nunchaku in modern times, the number of nunchaku likely sold for civilian use, the number of martial arts schools that train in the use of nunchaku, and the absence of evidence tending to show that any significant percentage of use of nunchucks in the United States is for other than lawful purpose, this Court concludes that nunchaku is a weapon that gives rise to Second Amendment protection because it is in common use and its common uses are lawful ones.

D. Banning Simple In-Home Possession of Nunchaku Is Unconstitutional

51. Having found that nunchucks come within the scope of the Second Amendment's protection, the Court must next determine how substantially New York's ban burdens the exercise of Maloney's Second Amendment rights, in order to determine the applicable level of scrutiny. *See, e.g., Kwong v. Bloomberg*, 723 F.3d 160, 167 (2d Cir. 2013).

52. Here, Maloney is challenging New York's nunchaku ban only to the extent that it prohibits simple in-home possession of the instrument. As the Supreme Court noted in *Heller* when discussing the District of Columbia's handgun ban, which that it held unconstitutional, "[t]he prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute." 554 U.S. at 628 (going on to note that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," the ban would fail). *See also Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) (stating Second Amendment guarantees are at their zenith within the home ). Accordingly, this Court holds that New York Penal Law § 265.01, to the extent that it bans the simple possession of nunchucks by a citizen within his or her home, is unconstitutional as violative of the Second Amendment to the United States Constitution.