UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JAMES M. MALONEY,                                              CV-03-0786 (PKC)

                                    Plaintiff,

                    -    against    -

MADELINE SINGAS, Nassau County
District Attorney,

                                    Defendant.
-----------------------------------------------------------X


**DEFENDANT'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW PURSUANT TO
FEDERAL RULES OF CIVIL PROCEDURE 52**


CARNELL T. FOSKEY
Nassau County Attorney
One West Street
Mineola, New York 11501
Attorney for Defendant


*Of Counsel*:    Liora M. Ben-Sorek
                 Deputy County Attorney
                 (516) 571-3014

**Table of Contents**

Table of Contents ...................................................................................... ii

Table of Authorities ................................................................................. iv

FINDINGS OF FACT ............................................................................. 1

Background ............................................................................................. 1

Limited Relief Sought in this Action ....................................................... 2

Plaintiff .................................................................................................... 3

      *Three Categories of Nunchuck Use* ................................................... 4

      *Core Concepts to Plaintiff's Martial Arts System* ............................. 5

      *Plaintiff's Home Defense Theory* ..................................................... 6

      *No Licensing or Registration Requirement* ...................................... 7

      *Reasonable Alternatives* .................................................................. 7

Plaintiff's Witness, Sergeant Kevin Orcutt (Ret.) ..................................... 9

      *Orcutt Police Nunchaku ("OPN")* .................................................... 10

      *OPN Purpose and Method* ............................................................... 10

      *"Socially Redeeming Values" of OPN* .............................................. 10

      *Law Enforcement Exemption to Penal Law § 265.01* ......................... 11

      *Ratio or Comparison of Nunchucks Use by Law Enforcement vs. Civilian Population* .................................... 11

      *Decreasing Numbers of Law Enforcement Agencies Using OPN* ......... 11

Plaintiff's Witness Christopher Pellitteri .................................................. 13

      *Number of Dojos in the United States is Not a Reliable Figure* ........... 14

      *No Data to Demonstrate Nunchucks Popularity in the United States* ..... 15

      *Pellitteri's Bias* .............................................................................. 15

*Challenges to Nunchuck Regulations in New York and California* .............. 16

*Are Nunchucks Practical for Home Defense or
Do They Have Therapeutic Benefits?* ............................................... 16

Plaintiff's Witness, Nunchuck Supply Company Representative ........................ 17

Defendant's Witness, Catherine Rice ...................................................... 19

PROPOSED CONCLUSIONS OF LAW ................................................. 19

Preliminary Statement ....................................................................... 19

POINT I
    The Second Amendment Does Not Guarantee
    the Right to Possess Nunchucks ................................................... 20

Conclusion ....................................................................................... 26

## **Table of Authorities**

Cases:

*D.C. v. Heller,* 554 U.S. 570 (2008) ……………………………………………… 20, 22

*In re S.P., Jr.,* 465 A.2d 823 (D.C. Ct. Apps. 1983) ………………………………... 21

*McDonald v. City of Chicago, Ill.,* 130 S. Ct. 3020 (2010) …………………………. 20, 24

*R.V. v. State,* 497 So.2d 912 (1986) …………………………………………………… 21

*State v. Courtier,* 166 Or.App. 514 (2000) …………………………………………… 21

*State v. Mitchell,* 371 N.W.2d 432 (1985) …………………………………………….. 21

*U.S. v. Marzzarella,* 614 F.3d 85 (3d Cir. 2010) …………………………………… 20

Statutes:

Federal Rules of Civil Procedure 52

New York State Penal Law § 265.00
New York State Penal Law § 265.01

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JAMES M. MALONEY,                                      CV-03-0786 (PKC)

                            Plaintiff,

              -    against    -

MADELINE SINGAS, Nassau County
District Attorney,

                            Defendant.
-----------------------------------------------------------X

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
### BY DEFENDANT MADELINE SINGAS, NASSAU COUNTY DISTRICT ATTORNEY

Defendant Madeline Singas, Nassau County District Attorney, by her attorney Carnell T.

Foskey, Nassau County Attorney, by Liora M. Ben-Sorek, Deputy County Attorney, submits the

following proposed findings of fact and conclusions of law pursuant to Federal Rules of Civil

Procedure 52.[1]

### FINDINGS OF FACT

Background

On August 23, 2000 a Verizon telephone company employee was working on a telephone

pole which was outside of the Plaintiff's home and approximately 20 feet from his window. Tr.

97:10-13. At some point Plaintiff aimed an instrument, which he claims was a telescope mounted

on a cane, at the Verizon worker. Tr. 97:22-24. The Verizon worker reported to police that he

was threatened by someone who appeared to be holding a rifle and, consequently, police went to

Plaintiff's home to investigate the complaint. Tr. 90:8-12. Plaintiff refused to come out of his

home to speak with the police unless they had a warrant. Tr. 90:8-12. After a period of twelve

---

[1] Throughout these proposed findings of fact and conclusions of law, Defendant cites to the trial transcript
("Tr.") in this matter.

1

hours, in a situation which Plaintiff called a "Mexican Standoff," Plaintiff exited his house.  Tr. 90:13-14; 91:6-9.

Plaintiff is aware that police conducted a search of his home after he left.  Tr. 99:19-21. Police seized "a lot of stuff" from the home.  Tr. 100:4, Defendant's Exhibit B.  Among the items seized was one pair of nunchucks[2], three unlicensed handguns, a 20-gauge shotgun with a laser aim, a .22 caliber rifle, a crossbow with a scope, many boxes of ammunition of various calibers, a surgical scalpel, plain white envelopes, a chess set, a checkbook and various documents in the name of James Jason Webster, and a book titled "How to Create a New Identity."  Tr. 100:6-22; 103:18-105:4; 105:14-16.  No "cane with attached telescope" was retrieved by police.  Tr. 101:25-102:3.

The set of nunchucks taken from Plaintiff's home by police on the date of his arrest in August 2000 was one of six sets that he possessed at that time.[3]  As part of an arranged plea agreement, Plaintiff agreed to the destruction of the seized set of nunchucks (as well as three illegally-possessed handguns).  Tr. 63:9-16.

Limited Relief Sought in this Action

In February 2003 Plaintiff commenced this lawsuit with the filing of a complaint seeking declaratory relief in the form of an Order finding that New York State Penal Law Section 265.01 violates Plaintiff's Second Amendment rights as it pertains to simple possession of nunchucks in his home for the purpose of home defense and martial arts training.  Tr. 39:23-25; 66:22-25; 67:5-

---

[2] Testimony at trial indicated that the original name for the Okinawan weapon is "nunchaku" but an Americanized or colloquial version is "nunchucks."  Both terms are accepted.  For purposes of the within Proposed Findings of Fact and Conclusions of Law, the terms "nunchaku" and "nunchucks" may be used interchangeably.

[3] In a deposition taken in January 2016 Plaintiff testified that he had six pairs of nunchucks in his home, only one of which was seized by police following his arrest.  When asked this question on cross-examination during the trial, Plaintiff denied that fact.  Tr. 60:21-25.  Plaintiff was then impeached with his prior sworn testimony.  Tr. 61:5-8; 62:2-21.

2

6; 67:20-22. A first amended complaint was filed in September 2005. Tr. 40:1-4. Plaintiff is seeking the same relief in both, the initial and first amended complaints. More specifically, Plaintiff is *not* seeking to lift the ban on nunchucks in New York State in all respects, nor does he endeavor to legalize the use of nunchucks in settings outside the home, such as martial arts studios or dojos. Tr. 87:8-11. He is only seeking a declaration that it is lawful under the Second Amendment to possess nunchucks in his home for martial arts training and home defense. Tr. 67:20-22; 87:8-11.

Plaintiff

Plaintiff is 58 years old. Tr. 9:19. He has a solo law practice and has just started his second semester as an adjunct instructor at SUNY Maritime College. Tr. 11:14-16; 11:19-21. Plaintiff first became involved with nunchucks at the approximate age of 16 when he was living in New Jersey. Tr. 23:15-18. At that time, nunchucks were a fad and were used by teenagers for spinning and twirling. Tr. 23:18-21. Plaintiff became entranced with the weapon and crafted his own pair. Tr. 23:24-24:4. He concedes that a "homemade" set of nunchucks could cause injury or damage. Tr. 81:17-23. He knows this from personal experience as well as reading about it in his research. Tr. 81:22-24. Plaintiff agrees that nunchucks can be dangerous, meaning that they can inflict harm or injury. Tr. 89:14-20. Likewise, Plaintiff's witness Kevin Orcutt agrees that nunchucks have the potential to be destructive and cause lethal damage. Tr. 167:10-17 ("a trained individual with the right type of a nunchaku . . . certainly could have . . . lethal damage if you hit them in the right place"). Plaintiff acknowledges that one could not use nunchucks as a weapon without a great deal of training. Tr. 44:4-9.

Plaintiff was self-taught in the use of nunchucks and then began formal training in martial arts at a school that did not use or teach weapons. Tr. 34:23-35:13. Plaintiff studied, but did not

master, various other forms of martial arts. Tr. 36:3-11. Finding faults with these other styles, Plaintiff developed his own system.[4] Tr. 36:11-14. Plaintiff's system was named in 1998 or 1999; he calls it Shafan Halavan. Tr. 36:16-19. It is not a commonly used style of martial arts practice. Tr. 37:7-11. No one else has adopted or uses Plaintiff's martial arts system. Tr. 37:4-11. Nor is Shafan Halavan taught in any school or dojo. Tr. 87:4-7. Plaintiff is the sole practitioner of Shafan Halavan. Plaintiff wanted to teach his sons Shafan Halavan but was unable to because of Penal Law 265.01. Tr. 37:21-24. Plaintiff testified about a solitary effort he made to teach his martial arts techniques to his sons during the summer of 2009. Plaintiff travelled with his sons to Vermont, a state where possession of nunchucks was permitted. For reasons that are inconsequential to the issue before this Court, that effort was wholly unsuccessful. Tr. 56:8-13; 57:7-12. Plaintiff did not testify about any attempt before 2009, or subsequent, to educate his sons in his martial arts technique or the use of nunchucks.

Other than himself, Plaintiff has not furnished the Court with any other data points of persons who utilize nunchucks for home defense, or for in-home martial arts training.

*Three Categories of Nunchuck Use*

Plaintiff divided the potential uses of nunchucks into three categories; to wit, gyration, striking and trapping. Tr. 83:20-84:7. The gyration involves spinning or twirling the nunchucks and is not effective for self-defense purposes. 84:11-13. If a spinning nunchuck hits an object, it will recoil, deflecting back to hit the person swinging the weapon. Tr. 84:15-25. "[T]he twirling stuff, all the fancy stuff you do is a lot of fun. In a real combat situation, you'd be a fool to spin [nunchucks] around all the time like that." Tr. 44:16-19. "Unless you learn how to strike, you're

---

[4] Plaintiff named his system Shafan Halavan in either 1998 or 1999 (Tr. 36:11-19), but he does not specify when he developed that system or for how long prior to his arrest in August 2000 he had been practicing his self-styled method.

4

going to hit yourself." Tr. 84:18-19. Plaintiff's witness Kevin Orcutt agrees that spinning or twirling nunchucks is more of a recreational use and not intended for self-defense. Tr. 170:7-15.

Self-defense involves the second category, striking techniques, which require a more refined set of skills than gyration. 84:20-21. According to the Plaintiff, lessons in martial arts weapons are considered more advanced. Tr. 79:4-5. And one cannot use nunchucks as a weapon without a great deal of training. Tr. 44:4-9. Striking is what Plaintiff's martial arts method involves. 85:1-3.

The third category is not something that Plaintiff or martial artist Chris Pellitteri use. Tr. 85:15-17. However, trapping a limb is an essential component of retired Sergeant Kevin Orcutt's methodology.  Sgt. Orcutt trains law enforcement officers (comprising police departments, sheriff's offices, and corrections officers) to use patented Orcutt Police Nunchaku to gain compliance from arrestees. Tr. 124:9-14; 125:18-20.

*Core Concepts to Plaintiff's Martial Arts System*

Plaintiff testified as to the core concept behind his martial arts system, as well as to its main principles. Plaintiff is fixated, almost to the point of paranoia, with the possibility of a knife attack and believes that nunchucks will protect him in such an event. Indeed, the essence of Plaintiff's martial arts style is avoidance of a knife attack. Tr. 16:23-25. According to Plaintiff, that is accomplished by two principles:  (1) awareness that knives are everywhere and that the person approaching you may have a knife (Tr. 17:4-7), and (2) keeping the attacker at a distance (Tr. 17:12-14).  The latter is accomplished through Plaintiff's stance, use of his lower limbs to kick and use of his upper limbs to strike the attacker with nunchucks. Tr. 17:11-24. Plaintiff's martial arts style relies on "sticks and kicks" involving more than just nunchucks. Tr. 71:19-21. Plaintiff would utilize his nunchucks as an extension of the arms to bat the knife out of the attacker's hand.

5

Tr. 72:1-3.  However, Plaintiff's expert witness, Kevin Orcutt, testified that he would not attempt to "surgically strike" the knife-carrying attacker's hand.  Tr. 159-160.  Contrary to Plaintiff's core theory that he could effectively defend against a knife attack (or a person holding a knife) with his nunchucks, Plaintiff's own expert witness diplomatically opined that nunchucks would not be his weapon of choice to defend against a knife.  Rather, Orcutt would choose a firearm to oppose a knife-wielding individual.  Tr. 159:12-14.

*Plaintiff's Home Defense Theory*

Plaintiff stated that "[i]t's quite easy to use nunchaku in a way that doesn't kill the other person and adequately defends against the knife, or the person wielding the knife."  Tr. 19:16-19.  Nunchucks are less risky than firearms.  Tr. 19-21.  Plaintiff's choice of nunchucks is partly because it is a weapon that he can conceal under his bed, or under his mattress.  Tr. 20:4-6.  Plaintiff's belief that nunchucks are a safer option for home defense against a knife attack than are firearms is based in part on the notion that he would not engage the intruder with the nunchucks until the intruder is within range of the weapon which also would be within his sight range, notwithstanding Plaintiff's severe nearsightedness[5].  Tr. 20:22-23; 21 10-13.

Plaintiff assumes that a home invader would be a mentally disturbed individual and/or a person bearing a knife, but provides no basis for that opinion other than his experience as a paramedic over 30 years ago in New York City.  Tr. 21:16-19.  His main fear is of a knife attack and he acknowledges that he would not use nunchucks to defend against a gun.  Tr. 21:13-16.

Home security is a matter of personal choice, but how one chooses to protect one's home is relevant to this case.  As noted above, Plaintiff's choice of nunchucks as a weapon for home

---

[5] Plaintiff does not explain why he could not engage an intruder with some other weapon once he was close enough to see them, nor does he address the risks inherent in approaching an intruder with poor eyesight and not knowing whether or not the intruder is armed and, if so, with what type of weapon.

defense is partially based on his ability to conceal it under his mattress or bed and have them readily accessible. Tr. 20:4-6. Yet, the pair of nunchucks seized on the date of his arrest were located under his living room couch, not under his mattress or bed. Tr. 69:4-8. Plaintiff tried to justify this discrepancy at trial by explaining that he sometimes fell asleep on the couch (Tr. 69:8-9). He further indicated that under his bed or under the couch are just examples of places where he could hide the nunchucks, but that his real intention is to have weapons "reasonably accessible" (Tr. 69:13-14) and "readily available." (Tr. 69:15-19). "I would have them in various locations in the house, sure. Yeah." (Tr.69:25-70:1). Based on these assertions, and in light of the fact that Plaintiff had five other sets of nunchucks in his possession which were not seized by police in August 2000 (Tr. 62:8-18), this testimony conjures up the image of finding sets of nunchucks stashed throughout Plaintiff's home.

If Plaintiff lived in a high-crime neighborhood, perhaps that could be understandable. However, Plaintiff resides "in a pretty safe neighborhood" (22:12-13) and the only example he gave at trial of being "on alert" occurred after Hurricanes Irene and Sandy when two men broke bottles in front of his house, and his neighbor's generator was stolen. (22:10-18).

*No Licensing or Registration Requirement*

In terms of licensing, Plaintiff testified that he is unaware of any requirement for nunchucks in New York State, perhaps because it is a banned weapon. Tr. 88:25-89:3; 96:20-21; 96:23-25.

*Reasonable Alternatives*

Nunchucks can be constructed of different materials. Plaintiff's Trial Exhibits I and J, which were admitted into evidence as sealed documents, are records of nunchucks sales between June 2010 and August 2016 from one supplier.[6] Both exhibits contain the same basic information,

---

[6] A representative of the supplier provided testimony during trial in a closed courtroom, and documents admitted into evidence through this witness are sealed. In lieu of naming the witness or company with which the

but Exhibit I is more instructive for purposes of this trial. Exhibit I differentiates generally between three types of materials from which their nunchucks are constructed: hardwood, foam and plastic.

The foam and plastic nunchucks are reasonable alternatives for training purposes. One type of training version "would be the full weight with padding on them, which might give you a more realistic feel." Tr. 26:5-7. A second type of training version consists of hollow plastic covered with foam. Tr. 26:9. Plaintiff questions whether the hollow plastic model would be considered a weapon under Penal Law § 265.01 because he does not believe they have sufficient weight to constitute a weapon. Tr. 26:8-10.

Plaintiff and Pellitteri prefer the hardwood models. Tr. 26:19-21; 248:7-9. Plaintiff's preference is to work "without training wheels" and follow the traditional method of using non-padded nunchucks. Tr. 26:12; 26:19-21. Pellitteri's preference for hardwood nunchucks is based upon the student having to learn respect for the weapon. Tr. 248:7-9. Both Plaintiff and Pellieri overlook the fact that seminars that train in defense from gun or knife attacks utilize rubber facsimiles; there is no concern that a person learns to defend against a loaded firearm, or an unsheathed knife. Orcutt, on the other hand, prefers not to use wooden or metal nunchucks. Instead he utilizes a co-polymer polycarbonate material because it has some "give" that wooden or metal nunchucks do not have, and, therefore reduces risk of breaking bones when used to for its intended purpose of control. Tr. 184:1-3; 185:17-186:5.

Since his arrest in August 2000, Plaintiff states that he has had to improvise Shafan Halavan because of the statutory ban on the use of nunchucks; he has given this improvised method the moniker "sticks and kicks." Plaintiff practices with "imaginary sticks" and acknowledges that he

---

witness is affiliated, which would require this document to also be filed under seal, counsel will refer to the witness and the company in generic terms.

has effectively preserved and maintained his fighting skills through this improvised method. Tr. 85:11-14.

Plaintiff's Witness, Sergeant Kevin Orcutt (Ret.)

Sergeant Orcutt's testimony was offered by Plaintiff to demonstrate a lawful use for nunchucks. Tr. 136:4-10. Orcutt is a retired member of the Thornton, Colorado Police Department where he was a defensive tactics coordinator. Tr. 119:7-8. Orcutt has developed and patented a set of nunchucks that he calls "Orcutt Police Nunchucks" or "OPN." Tr. 119:12-16. The OPN are marketed and intended only for law enforcement services and he does not sell the weapon to the private sector. Tr. 123:5-9; 131:5-14; 134:25-135:7; 173:4-8; 195:1-4. By law enforcement, it is meant police departments, sheriff's offices, corrections departments, military, certain government and federal agencies. Tr. 126:4-8; 130:9-15.

Orcutt will not sell the OPN to civilians because he recognizes "the injurious potential of the nunchaku in the wrong hands" and of the potential of the OPN to cause physical harm or be used to commit a crime. Tr. 176:12-15; 176:20-21. Nunchucks are weapons. Tr. 212:21-213:6.

Orcutt is also concerned about his reputation and possible liability if he were to sell the OPN to anyone indiscriminately. Tr. 185:6-10. One reason testified to by Orcutt is the lack of "quality control" as to who would possess his invention. Tr. 173:9-11; 211:14-25. Without quality control, the weapon could end up being used for criminal purposes, or by someone who is mentally unstable or paranoid. Tr. 211:14-21.

Orcutt testified that there are statutes in many states prohibiting the use of nunchucks. Tr. 123:10-11.

*Orcutt Police Nunchuck ("OPN")*

The OPN is made up of two 12-inch portions of co-polymer polycarbonate, each weighing less than seven ounces, which are connected by a single cord. Tr. 123:12-124:6. The cord is made of nylon and stretches under pressure. Tr. 185:24-25. Orcutt's innovation was to add "connecting core rings" to each of the sticks that lock together to prevent a rolling effect that would occur with traditional nunchucks. Tr. 124:8-14.

The OPN could be used in the same ways as traditional nunchucks (Tr. 125:13-17; 125:21-22) but was specifically designed to trap limbs. Tr. 125:18-20.

*OPN Purpose and Method*

Orcutt saw a need for a control and restraint tool, one that would be different from an impact weapon such as a baton, and set out to incorporate nunchucks into law enforcement. Tr. 117:14-20 6-19.

Orcutt's method includes a basic 24-hour training course in control and restraint but also incorporates some martial arts techniques that are similar to traditional impact weapon use. "There are no Bruce Lee moves or any of that" in Orcutt's training. Tr. 132:4-20. Orcutt's instruction does not even provide his trainees with basic martial arts training. Tr. 210:21-24. In Orcutt's opinion, training is necessary to use OPN safely. Tr. 177:23-178:1.

*"Socially Redeeming Values" of OPN*

Orcutt did not speak to socially redeeming values of nunchucks in general, instead focusing his response on the benefits that the OPN has in police work. For example, Orcutt believes that the OPN has been instrumental in ending fights and preventing injuries. Tr. 139:10-16. 98% to 99% of OPN use is for control and restraint. Tr. 140:25-141:2; 214:21-24.

*Law Enforcement Exemption to Penal Law § 265.01*

Defendant's Exhibit K is a copy of Penal Law § 265.20 that exempts enforcement of Penal Law § 265.01 against law enforcement officers. In other words, if a law enforcement officer were in possession of a set of nunchucks, he would not be prosecuted for violating § 265.01.

Orcutt testified that most states do allow officers to possess prohibited weapons. Tr. 133:1-2. In answer to a question posed by the Court, Orcutt acknowledged that if a member of the New York City Police Department wanted to possess an OPN that would not constitute a violation of New York State Law. Tr. 133:14-17.

*Ratio or Comparison of Nunchucks Use by Law Enforcement vs. Civilian Population*

Orcutt is not aware of how law enforcement's use of nunchucks compares with use by the rest of the population. Tr. 127:14-21. At the height of its popularity, approximately 15,000 officers in the United States used OPN's, which is a very small percentage of all law enforcement. Tr. 127:25-128:4.

*Decreasing Numbers of Law Enforcement Agencies Using OPN*

Plaintiff's Trial Exhibits E, F, and G are documents prepared by Sgt. Orcutt in various years and list the names of agencies and departments that were using the OPN. Orcutt approximates that 243 departments constituting an estimated 15,000 officers were using the OPN at the peak of his business that was around 1997-1998. Tr. 151:5-15; 196:10-12. Plaintiff's Exhibit E was prepared in 1999 and reflects that 215 departments were using the OPN at that time. Despite being the only control device available, "the only game in town," as Orcutt observed, sales of his police nunchucks declined in the 1990's. (Tr. 146:24-147:1). The OPN was never sold to any agencies or departments in New York, New Jersey, Connecticut or Massachusetts. Tr. 203:6-8; 203:16-204:7.

11

Plaintiff's Exhibit F is dated 2005 and shows 218 departments using the OPN. Thereafter, a sharp decline is noted. According to Exhibit G, which was prepared in 2016, only 32 departments are using the OPN. Orcutt testified that subsequent to the preparation of Exhibit G, two additional departments have started using the OPN, bringing the current number to 34 departments. Tr. 199:21-25. In the ten-year span from 2006 to 2016, there were only four new departments that used the OPN. Tr. 204:8-11.

Orcutt attributes the advent of the Taser for the downward spiral in the number of departments utilizing his weapon, though he has no data or reliable authority to support that position. Tr. 145:12-17; 204:17-21. Notably, even at the height of the OPN's sales, the PR-24 baton was more in common use than the OPN. Tr. 189:4-10. "Everyone was running to [the PR-24]." Tr. 189:15-16.

Orcutt estimates that currently between 5,000 to 10,000 law enforcement officers carry and use his OPN. Tr. 128:1-2; 209:5-7. He offered a "guess" that 8,000 to 10,000 officers used his weapon in 2015. Tr. 161:18-21. Orcutt does not have a way to ascertain a more precise number of officers using the OPN and, indeed, admitted that he never tried to be accurate; his primary concern was to sell his product. Tr. 12-16.

In his estimation, there are currently 900,000 sworn police officers in the United States[7]. Tr. 208:12-17; 209:5-7. Utilizing Orcutt's figures, .55% to 1.0% of sworn members of police departments in this country use nunchucks. But even those percentages are too high because 5,000 to 10,000 law enforcement officials, not all of who are police officers, use the OPN.

Orcutt estimated that there are 11,000 police departments in the United States. Tr. 209:8-14. According to Plaintiff's Exhibit G, of the 34 agencies presently employing the OPN, only 20

---

[7] This number represents *police* departments and does not include other law enforcement agencies to which Orcutt sells his OPN.

of them are police departments. That amounts to a mere .18% of all police departments using nunchucks.

These numbers demonstrate that nunchucks are not common or popular weapons in the arsenal of law enforcement. Sgt. Orcutt is a businessman who, naturally, has a pecuniary interest in the popularity of this weapon and has artificially inflated the OPN's popularity. For example, during a December 2015 television interview, Orcutt represented that there were 50 departments using the OPN. However, at that time, only 32 departments were employing the OPN, an exaggeration of 40%. Tr. 200:23-201:6. Additionally, at the time of the trial in this matter Orcutt's website displayed five product endorsements, three of which were from agencies that no longer use the weapon. One of those departments that no longer employ the OPN had proclaimed that the OPN was the future of law enforcement. Tr. 201:9-203:4.

Plaintiff's Witness Christopher Pellitteri

Plaintiff offered the testimony of Christopher Pellitteri who has owned a martial arts studio in Upland, California for twenty-one years. Tr. 221:25-222:4. The State of California has a partial ban on nunchucks; they can be used inside a martial arts studio or dojo, but may not be possessed outside the studio. Tr. 222:7-11. Mr. Pellitteri founded the North American Nunchuck Association in 2003, which has approximately 200 members in the United States. Tr. 222:16-17; 223:1-3. NANA's activity is primarily internet-based and centered on the techniques contained on the DVD's which are sold online. NANA has no newsletters, no bulletins, no regular meetings, and no interaction by and between its members. Tr. 227:21-228:17. Reading between the lines, NANA is online/DVD course and its members are those who have ordered the DVD's.

*Number of Dojos in the United States is not a Reliable Figure*

There is no registry as to the number of martial arts schools in this country. Tr. 229:24-230:6; 230:21-25. Nor is Pellitteri aware of any published statistics pertaining to the use of nunchucks in the United States. Tr. 232:14-16. Nevertheless, Pellitteri

Pellitteri has no knowledge as to how many dojos use nunchucks in the United States. Tr. 223:4-7 (Q: "Do you have any basis to estimate the use of nunchaku in other dojos around the country?" A: "Only from some research I've done on the Internet. I can only kind of estimate what other places do."). However, there is no way to ascertain whether the raw data that Pellitteri utilizes is reliable. Pellitteri testified that he obtained his data from a single website, www.dojos.info/usa, which lists 20,324 schools teach martial arts. Tr. 241: 7-12; 241:19-23. He does not know how information is reported to that website, whether the information is accurate or not, or whether it has been verified in any way. Tr. 230:12-15; 281:24-282:4. Consequently, if the raw data contained number of dojos on the website is inaccurate, then Pellitteri's calculations are incorrect. 282:5-12. Indeed, if one logs onto that website, they will see that the entries are self-reported; companies list themselves on the site as opposed to an independent organization surveying and maintaining a database of active and legitimate dojos.

With no data, statistics or authority, Pellitteri estimates that one-third of martial arts schools teach weapons. Pellitteri's estimates are not taken from a representative sample. This information is derived solely from his personal experience in the "small community" of over 20,000 dojos (Tr. 232:20-243:3; 284:23-285:2) and involves his communications with other martial arts schools in California or the west coast (he does not indicate how many schools) (Tr. 19-22) and his visits to "maybe two dozen" of the 20,000 dojos. Tr. 283:9-13.

Pellitteri estimates that 85% of martial arts programs that teach weapons also teach nunchucks. Tr. 244:4-11. On cross-examination he acknowledged that he could not find any statistics on this issue. Tr. 282:21-22. This 85% represents only what Pellitteri estimates from his experience. Tr. 282:21-24. Excluding dojos in New York and Massachusetts because nunchucks are banned in those states, Pellitteri found approximately 18,233 dojos listed on the dojo.info/usa website. Pellitteri testified that he had visited "maybe two dozen." Tr. 283:9-13. He estimates that 85% of those two-dozen schools that he visited taught nunchucks. Tr. 284:14-16. Pellitteri's "representative sample" then is based upon 0.13% of the martial arts studios.

*No Data to Demonstrate Nunchucks Popularity in the United States*

Pellitteri has no data to substantiate his claim that nunchucks are used more widely in the United States than in any other country. Tr. 285:11-15; 286:4-15.

At trial Pellitteri offered his opinions on the popularity of nunchucks based upon a considerable number of interactions with other martial arts studios. Yet in his Rule 26 expert witness report, Pellitteri never indicated that his opinion was based upon hundreds of interactions with other martial arts studios. Tr. 233:2-8. The fact that Pellitteri's two-page expert report dated September 9, 2015 was authored by someone other than himself, possibly by the Plaintiff, should not be overlooked. Tr. 275:4-25.

*Pellitteri's Bias*

Pellitteri states that martial arts training cannot be complete without nunchucks. Tr. 286:19-22. That position delegitimizes two-thirds of all martial arts which are not weapons-based (Tr. 242:20-243:3), and all martial arts training in New York and Massachusetts where nunchucks are banned.

Additionally, Pellitteri claims that even knowing how to use nunchucks his own training in incomplete. Tr. 286:23-287:8. How, then, can he assert that the absence of nunchucks in one's martial arts regimen equates to that training being deficient?

*Challenges to Nunchuck Regulations in New York and California*

Other than the Plaintiff herein, Pellitteri is unaware of anyone who has challenged New York State's ban on possession of nunchucks. Tr. 295:3-6.

Pellitteri started an online petition to change the nunchuck regulations in California but has been unsuccessful. Tr. 295:16-23. In fact, he described efforts to change California's law as "hopeless." Tr. 296:1-3. Pellitteri was quoted as having said that "nunchucks is a subset of martial arts which is a subset of sports and you go down and down and down and I don't see that being enough people to care." Tr. 297:13-17. The clear language of this statement dictates that nunchucks are a small subcategory, and not common enough to draw sufficient interest in challenging the California statute.

*Are Nunchucks Practical for Home Defense or Do They Have Therapeutic Benefits?*

While most students don't train with nunchucks for self-defense because they are illegal in California (Tr. 255:24-25; 256:1-4), use of nunchucks for self-defense is not realistic (Tr. 256:18-25). Pellitteri testified that it is not as practical to use a pair of nunchucks for self-defense now as it might have been in Okinawa in the 1600's. Tr. 257:4-6. Now the uses of nunchucks are for coordination, fun aspects, spiritual. Tr. 256:18-25.

Notwithstanding Pellitteri's representation that his students need to learn to respect the weapon (Tr. 248:7-9), a lot of his students think that nunchucks are "neat, . . . flashy . . . fun." Tr. 256, 9-10. For most of them, the enjoyment of nunchucks has nothing to do with self-defense. Tr. 256:12-13.

16

There is no known study or statistics on the use of nunchucks for therapeutic purposes. Tr. 281:7-9. Pellitteri testified about knowing of individuals who switched from other forms of martial arts to nunchucks because they had physical limitations. On cross-examination Pellitteri agreed that the examples he cited were of individuals who substituted one form of martial arts for another due to some physical limitation. Contrary to the implication, those students did not switch to nunchucks because it afforded them any therapeutic benefit. Tr. 280:18-281:6.

Plaintiff's Witness, Nunchuck Supply Company Representative

As part of his case-in-chief, Plaintiff solicited information about the sales of nunchucks from an American company that sells nunchucks, among other martial arts weapons, supplies and uniforms. The company furnished Plaintiff's Trial Exhibit J which is a 4-page compilation detailing sales[8] of nunchucks from June 2010 through August 2, 2016. The company also provided a second compilation which is Plaintiff's Trial Exhibit I. Exhibit I is a more detailed version of the company's same sales data for the same period of time. The differences between Exhibits I and J is that the former is a six-page document broken down into three separate categories of nunchucks: hardwood, foam, and plastic. Tr. 343:15-22; 347:20-25. The first two pages of Exhibit I detail the hardwood nunchucks listed by their catalog number, and broken down by wholesale and retail sales for the period June 2010 through August 2, 2016. The third and fourth pages of Exhibit I list nunchucks made with foam, and contains the number of units sold wholesale and retail during the same period. The fifth and sixth pages of Exhibit I provides the same breakdown of units sold wholesale versus retail for the period involving nunchucks made of plastic.

---

[8] The exhibit lists the catalog number and description of each type of nunchuck followed by the number of units sold per year.

At trial, a representative of the company was called to authenticate Exhibits I and J. The witness clarified that wholesale sales would include sales to martial arts studios while retail sales reflect transactions with individual purchasers. Tr. 358:20-359:3.

Looking at Exhibit I, retail sales of hardwood nunchucks amount to approximately 10% of the wholesale sales, while retail sales of foam and plastic nunchucks are a minute fraction of sales to dojos and training facilities[9].

Though the Court opined that the sales of nunchucks are "not inconsequential" (Tr. 365:25-366:1) the court was looking to total sales figures which includes sales to martial arts studios and training facilities. Because in this case Plaintiff is seeking to lift the ban only on in-home possession (and specifically not to use in training facilities and dojos), it is respectfully submitted that the number of sales to martial arts studios, training facilities and dojos are not relevant to the analysis as to whether nunchucks are "in common use." Rather, whether nunchucks are commonly used should be assessed by the numbers of individuals utilizing them, as reflected through retail sales. Looking to Plaintiff's Exhibit I sales of all three types of nunchucks to individuals over the 5-year period amounts to approximately 11,000 units.

The witness was not able to testify how sales of nunchucks compare with the number of other martial arts weapons sold by the company. Tr. 358:11-17. Nor did the representative have data about the company's market share of nunchuck sales as compared to other manufacturers and suppliers. Tr. 354:25-355:3.

---

[9] Plaintiff testified that foam nunchucks are sufficient to train with because they would be full weight and have a realistic feel to them. Tr. 26:5-7. With respect to plastic nunchucks, Plaintiff questions whether Penal Law § 265.01 would apply since, in Plaintiff's opinion, plastic nunchucks "do not have enough weight to be designed primarily as a weapon.: Tr. 26:7-10

Defendant's Witness, Catherine Rice

Catherine Rice is employed in the Information Technology Department of the Nassau County District Attorney's Office. Tr. 367:12-23. Starting December 15, 2014 the DA's Office was able to track criminal prosecutions by the type of weapon. Tr. 368:7-17. Case management systems used prior to December 15, 2014 were not able to track the number of prosecutions which involved nunchucks. Tr. 368-369. Between December 15, 2014 and January 6, 2017, there were five cases where nunchucks was the weapon involved in the offense. Tr. 373:10-12. Of those five, two cases involved assaults with nunchucks while the remaining three cases involved charges of unlawful possession of the weapon under Penal Law § 265.01. Tr. 375;11-376:7.

This information is contained in a data compilation which was admitted into evidence as Defendant's Exhibit D. The significance of these figures is to address the issue of commonness of nunchucks and to demonstrate that they are not frequently used.

## PROPOSED CONCLUSIONS OF LAW

### PRELIMINARY STATEMENT

Plaintiff James M. Maloney seeks a declaratory judgment that New York Penal Law § 265.01 is unconstitutional pursuant to the Second Amendment of the United States Constitution to the extent that it prohibits the in-home possession of "nunchaku" or "nunchucks," defined as "any device designed primarily as a weapon, consisting of two or more lengths of a rigid material joined together by a thong, rope or chain in such a manner as to allow free movement of a portion of the device while held in the hand and capable of being rotated in such a manner as to inflict serious injury upon a person by striking or choking." N.Y. Penal Law § 265.00 (McKinney).

Maloney's claim alleging that the ban on nunchucks violates the Second Amendment fails because nunchucks are dangerous and unusual weapons and are not typically used by law abiding

citizens for lawful purposes. Nunchucks have the potential to cause serious injury or death, and have been repeatedly recognized by various courts as dangerous and deadly weapons. The relevant questions and issues for this Court is whether nunchucks "are commonly used for lawful purposes." (4/15/16 Order, DE 164). Trial in this matter was to provide "further guidance on how the 'commonly used for lawful purposes' standard is to be interpreted or how a plaintiff may meet that standard as an evidentiary matter." (4/15/16 Order, DE 164).

## POINT I

## THE SECOND AMENDMENT DOES NOT GUARANTEE THE RIGHT TO POSSESS NUNCHUCKS

In *D.C. v. Heller*, 554 U.S. 570, 626, 128 S. Ct. 2783, 2816, 171 L. Ed. 2d 637 (2008), the Supreme Court noted that "the right secured by the Second Amendment is not unlimited," and does not constitute the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Indeed, the Court acknowledged that the types of weapons protected by the Second Amendment are those "in common use," particularly in light of the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons." *Id.* at 627. As such, the Court expressly held "the Second Amendment does not protect those weapons not typically possessed by law abiding citizens for lawful purposes." *Id.* at 624-625; *See also McDonald v. City of Chicago, Ill.*, 130 S. Ct. 3020, 3047, 177 L. Ed. 2d 894 (2010) (affirming that *Heller* "does not imperil every law regulating firearms"); *U.S. v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), 90-91 (right to bear arms only extends "to those [weapons] typically possessed by law-abiding citizens for lawful purposes" and "affords no protection to 'weapons not typically possessed by law-abiding citizens for lawful purposes."). The Second Amendment right to bear arms, as delineated by *Heller*, has been made applicable against the states pursuant to *McDonald v. City of Chicago, Ill.*, 130 S. Ct. at 3050. *State v. Mitchell*, 371 N.W.2d 432 (1985),

Nunchucks are a dangerous and unusual weapon which are not typically possessed by law abiding citizens for lawful purposes. Nunchucks are "unusual" in that it is not "in common use," inasmuch as it is clear that only a small subset of the population even attempts to use nunchucks for martial arts related purposes. Tr. 297:13-17 ("[n]unchucks is a subset of martial arts which is a subset of sports.") Furthermore, nunchucks is a dangerous weapon. Plaintiff's witness Kevin Orcutt testified that he would not sell his patented nunchucks to civilians (i.e., non-Law Enforcement personnel) because he recognized "the injurious potential of the nunchaku in the wrong hands: and of the potential of nunchucks to cause physical harm or be used as a weapon in the commission of a crime. Tr. 176:12-15; 176:20-21. Sergeant Orcutt also testified that nunchucks have the potential to be destructive and cause lethal damages. Tr.167:10-17. Plaintiff, as well, concedes that nunchucks can be dangerous, meaning that they can inflict harm or injury. Tr. 89:14-20.

Numerous courts have recognized the dangerous and unusual character of nunchucks. In *In re S.P., Jr.*, 465 A.2d 823 (D.C. Ct. Apps. 1983), the District of Columbia Court of Appeals acknowledged the "socially acceptable uses" of nunchucks, but nevertheless held that "because of the inherent character of the nunchucks as an offensive weapon" the device constitutes a "deadly or dangerous weapon." Similarly, in *R.V. v. State*, 497 So.2d 912 (1986), the District Court of Appeal of Florida for the Third District affirmed a trial court decision that nunchucks, "a potentially lethal device which originated from the martial arts, is a deadly weapon." In *State v. Courtier*, 166 Or.App. 514 (2000), the Court of Appeals of Oregon held that even if nunchucks was not enumerated as a "dangerous or deadly weapon" by the relevant statute, the device would still qualify as such due to "essential characteristics that make them dangerous or deadly." In *State v. Mitchell*, 371 N.W.2d 432 (1985), the Court of Appeals of Iowa held that there was sufficient

21

evidence to conclude that nunchucks constituted a dangerous weapon regardless of its use or intended use because it "is designed to inflict death or injury" and "is actually capable of inflicting death on a human being."

The essence of *Heller*, at least as relevant to this matter, is that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 54 U.S. at 625. The Second Amendment plainly allows states ban the simple, in home possession of dangerous and unusual weapons that are not in common use among law abiding citizens.

The fact that the *Heller* court indicated that States may still prohibit simple possession of *all* firearms by felons and the mentally ill (by way of example) suggests that the contours of the right to bear arms are not necessarily defined by the destructive capability of a weapon. Similarly, the Court did not hold that handgun possession must be legal because they are less dangerous than assault rifles; it did so because "handguns are the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 54 U.S. at 629. The fundamental right to bear arms is simply not governed by the destructive capability of a device, but rather whether the device is "typically possessed by law abiding citizens for lawful purposes." Moreover, if this Court were to grant the declaration requested by Plaintiff, there is no State registration or licensing mechanism in place that would regulate or evaluate whether an individual should be entrusted to possess a weapon. For example, there are licensing requirements for handguns which check, among other things, criminal histories and mental health histories, and size restrictions exist for bladed instruments. Kevin Orcutt, a 30-year veteran law enforcement officer, testified about what he calls "quality control". More specifically, Orcutt expressed concern that nunchucks may not be used safely or appropriately as one of the reasons that he refuses to sell nunchucks to civilians and why he does

22

not train civilians in the use of nunchucks. Tr. 211:14-25. Regulation over nunchucks is not uncommon. Indeed, Orcutt testified that in "[a] lot of states there are statutes prohibiting the nunchaku in use." Tr. 123:10-11.

Maloney's may argue that nunchucks were recognized as being typically possessed by law abiding citizens prior to the New York ban is without merit. During trial Maloney referred to a memorandum to the Governor from the State's Division of Criminal Justice Services chief, Archibald Murray, acknowledged that nunchucks "have legitimate uses in the martial arts." However, as pointed out during the trial, the legislative history for Penal Law § 265.01 contains many other documents which explicitly suggest that nunchucks were recognized at the time of the ban as dangerous and unusual. Notwithstanding Mr. Murray's assertions contained in his memorandum, the proscription against possession of nunchucks was enacted into law in 1974. Defendant's Exhibit D; Tr. 60:2-4. As Plaintiff acknowledged during trial, there is no evidence of any effort to amend that proscription other than Plaintiff's litigation. Tr. 60:5-7. Some of the other documents contained in the legislative history of Penal Law § 265.01 include:

- An April 8, 1974, memorandum from then Attorney General Louis J. Lefkowitz noted that nunchucks have "apparently been widely used by muggers and street gangs and [have] been the cause of many serious injuries."

- An April 1, 1974 letter from B. Anthony Morosco, Legislative Secretary of the District Attorneys Association of the State of New York, to Michael Whiteman, Counsel to Governor Wilson, noted that "[a]s a result of the recent popularity of 'Kung Fu' movies and shows, various circles of the state's youth are using" nunchucks, which "can kill."

- An April 2, 1974, letter to Mr. Whiteman from Assemblyman Richard C. Ross noted that "[w]ith a minimum amount of practice, [nunchucks] may be effectively used as a garrote,

bludgeon, thrusting or striking device" and that nunchucks "is designed primarily as a weapon."

- An April 1, 1974 letter to Mr. Whiteman from Albert M. Rosenblatt, District Attorney of Dutchess County, noted that "[i]t appears that [nunchucks] are used in the same criminal manner and with a frequency that now approximates other per se contraband weapons" prohibited by the Penal Law.

These letters suggest that the State Legislature determined that nunchucks were not typically possessed by law abiding citizens, but were rather dangerous and unusual weapons which must be controlled.

The Supreme Court in *McDonald* explicitly recognized that state and local experimentation with weapons regulation "will continue under the second amendment," *McDonald*, 130 S.Ct. at 3046, clearly indicating that the Court acknowledges that what constitutes a "dangerous and unusual weapon" may vary on a state by state basis.

There are viable alternatives to this inquiry such as the use of training nunchucks. Since his arrest in 2000, Plaintiff has created an improvised technique for his Shafan Halavan martial arts style to account for not using nunchucks. Tr. 85:11-14. Despite the absence of nunchucks from his regimen, Plaintiff testified that he has been able to effectively maintain his fighting skills. Thus, Plaintiff has suffered no detriment from the loss of his weapon. Plaintiff also testified that there are what he calls "training" nunchucks that have a realistic feel and a similar weight as his wooden nunchucks. Tr. 26:5-7. It is for this Court to determine whether the "training" nunchucks constitute an item made or intended "primarily as a weapon" thus falling under the definition in Penal Law 265.00.

Plaintiff's preference to using hardwood nunchucks, clearly a weapon under the New York statute, should not be controlling. He may *prefer* to work with the real weapon, but that does his desire does not dictate. Suppose Plaintiff were engaging in studying defensive techniques against knife or gun attacks. Suppose also that Plaintiff was not practicing his techniques in a vacuum, utilizing a sand bag in his basement, but, rather, was practicing with another person. Should Plaintiff insist that his "opponent" use a loaded handgun or an unsheathed knife in order for Plaintiff to "learn from his bruises?" Indeed, martial arts studios regularly train their students in self-defense tactics and also conduct seminars instructing in real-life scenarios (i.e., defense in a car-jacking) using rubber knives and guns. These rubber "weapons" mimic the size, shape and weight of the real weapon. Accordingly, should this Court determine that "training" nunchucks do not violate Penal Law §§ 265.00 and 265.01, the use of these "training" devices would adequately satisfy Plaintiff's martial arts pursuits.

While Plaintiff would argue that a "training" nunchucks would not be of value for self-defense and defense of his home, he has not demonstrated that nunchucks are used for self-defense or home defense. Plaintiff is fixated with the fear of being attacked with a knife. Tr. 16:23-25. Notwithstanding Plaintiff's hope of disarming a possible attacker with his nunchucks, Sgt. Orcutt who is a trained defensive tactics coordinator, testified that nunchucks would not be his choice for a weapon to defend against a knife attack. Orcutt rejected Plaintiff's suggestion that the threat posed by a knife-wielding attacker could be neutralized by nunchucks, or more specifically, through a "surgical strike" to the attacker's hand. Tr.159-160.

Plaintiff's efforts to compare nunchucks to baseball bats is unavailing. While baseball bats have potential to be used as a weapon, they are clearly commonly used by law abiding citizens for peaceful and legitimate purposes. On the other hand, the dangerous potential of nunchucks is

almost universally recognized, and as discussed herein the device is considered a weapon far more than a sporting implement.

It is apparent that the possession of nunchucks may be prohibited based on the fact that it is a dangerous and unusual weapon. Plaintiff has not demonstrated that these devices common and that their common usage is a lawful one. Looking at the statistics contained in Plaintiff's Exhibit I, the common usage by citizens, as defined by the retail sales, is de minimis. Defendant contends that the wholesale sales figures should be given little if any weight because the wholesale purchases were made by or on behalf of martial arts schools. Because Plaintiff is not seeking a declaration that nunchucks should be permitted in dojos, sales to those facilities do not affect the analysis of whether the device is common among citizens.

## CONCLUSION

New York State's ban on the possession of nunchucks does not infringe on Maloney's Second Amendment rights, and as such Defendant Madeline Singas respectfully requests that the Court grant judgment in her favor.

Dated: Mineola, New York
March 2, 2017

> CARNELL T. FOSKEY
> Nassau County Attorney
> One West Street
> Mineola, New York 11501
> Attorney for Defendant

> By:   *Liora M. Ben-Sorek*
> Liora M. Ben-Sorek
> Deputy County Attorney
> (516) 571-3014

To:   James M. Maloney, Esq. (Via ECF)
P.O. Box 551
Port Washington, New York 11050
Plaintiff *Pro Se*

26