ADMITTED TO PRACTICE IN:
NEW YORK; NEW JERSEY;
UNITED STATES SUPREME COURT;
U.S. COURTS OF APPEALS FOR THE
SECOND AND THIRD CIRCUITS;
U.S. DISTRICT COURTS FOR THE
EASTERN DISTRICT OF TEXAS,
DISTRICT OF NEW JERSEY,
NORTHERN DISTRICT OF FLORIDA,
NORTHERN DISTRICT OF ILLINOIS,
DISTRICT OF CONNECTICUT, AND
NORTHERN, SOUTHERN & EASTERN
DISTRICTS OF NEW YORK; U.S.
COURT OF INTERNATIONAL TRADE;
U.S. COURT OF FEDERAL CLAIMS.

# JAMES M. MALONEY
ATTORNEY AT LAW
PROCTOR IN ADMIRALTY

TEL: (516) 767-1395
FAX: (516) 708-1395

E-MAIL ADDRESS:
maritimelaw@nyu.edu

P.O. Box 551
33 BAYVIEW AVENUE
PORT WASHINGTON, NY 11050

November 12, 2018

The Honorable Pamela K. Chen
United States District Judge, E.D.N.Y.           **Via ECF**
Re:    *Maloney v. Singas*, 03-cv-786

Dear Judge Chen:

     I write in response to Your Honor's Memorandum & Order of October 1, 2018 (DE 210).[1] In part for purposes of facilitating the framing of issues to be clarified at oral argument,[2] I have subdivided this letter into four numbered parts, each with a short phrase as a title or rubric.

## 1. BANNING "BAD GUY" WEAPONS OK, BUT WHERE?

     The 10/18 M&O indicates that a weapon that is typically possessed for unlawful purposes may be entitled to no Second Amendment protection ("**2Ap**")[3] at all. Under *Heller*, denial of 2Ap on that basis would require not only that the "typical" use of a weapon be for unlawful purposes, but also that the term of art "typical" contemplate some fairly high degree of exclusivity as to unlawful versus lawful use. Otherwise, the very handguns that were the first class of weapons for which 2Ap was explicitly recognized (in *Heller*) would not be entitled to 2Ap. It is indisputable that handguns, which are easily concealed and deadly, are typically used

---

[1] Hereinafter, the "10/18 M&O." It is noted at the outset that an apparent error appears in the text of the 10/18 M&O at page 3, beginning five lines up from the bottom: "This reasoning [in *NYSRPA*] makes clear that a weapon being 'in common use' is not enough to deny Second Amendment protection;" It would appear that the word "not" should have been inserted between "weapon" and "being." Alternatively, the Court may have wished to write "grant" rather than "deny." In any event, it is acknowledged that the gravamen of this passage is that the analysis for a newly considered weapon's eligibility for Second Amendment protection does not turn solely on the "common use" inquiry, but must also include what may be perhaps framed as the "lawful-purposes/dangerous-and-unusual" analysis.

[2] Oral argument is scheduled for 11:00 am on Wednesday,. December 5, 2018.

[3] For brevity, the abbreviation 2Ap is used herein in such contexts as "2Ap jurisprudence," by which is meant the still-evolving legal analysis that is to be applied to determine if a given weapon, theretofore untested as to its 2Ap status, is eligible for Second Amendment protection.

in armed robberies and other crimes. These are clearly unlawful purposes, but handguns are just as clearly entitled to 2Ap under *Heller*, and that is because handguns are also typically owned by law-abiding citizens for such lawful purposes as home defense, self-defense, and target shooting.

The fact that nunchaku are typically possessed by law-abiding citizens for such lawful purposes as martial arts effectively ends this inquiry, even if (and it has not been proven) nunchucks were also associated with unlawful purposes (as indeed are most weapons to some degree or another). But a more subtle aspect of this inquiry is worthy of exploration.

As a hypothetical, consider the box-cutter. It is a small hand-held tool with a short, retractable, very sharp blade (often an insertable razor or similar thin metallic item). Next, consider a local criminal law banning any and all possession—whether in a building or in public and no matter the intent of the possessor—of a box cutter, perhaps in response to street crime involving victims being slashed by assailants and/or robbers. But whatever vicious and horrifying potential criminal uses of the tool exist, it remains true that box-cutters are also typically used by law-abiding citizens for such lawful purposes as, well, cutting open boxes. What would or should this fact do to 2Ap for box cutters in a challenge to this local law?

Immediately, one recognizes that the typical use of a box-cutter *as a weapon* is readily distinguishable from its typical lawful use in general. (Of course, the same is not true of nunchaku, given that martial-arts practice is incident to self-defense in a way that access to packaged goods is not, but before next considering that, I'll address further the question posed.)

It is submitted that since the local legislators included no *mens rea* requirement, Second Amendment challenges to the local law may well fare differently depending on the *locus* of the right to possession being sought. For example, a criminal defendant charged under the local law with possessing a box cutter on the street and raising a Second Amendment challenge in response would likely not fare as well as might (and indeed should) a defendant charged with the same crime for keeping a box cutter under her pillow for self-defense.

Thus, it may be that the "lawful-purposes/dangerous-and-unusual" analysis (see footnote 1, *supra*, and discussion under 3, *infra*) should at least in some cases be somewhat more deferential to the weapon's 2Ap status if a ban's extension into the home is all that is being challenged. Arguably, a level-of-scrutiny analysis that differs within or without the home could be the basis for achieving that distinction in a different way, but, as this Court has recognized, 10/18 M&O at 2, much of the available 2Ap case law is still often "opaque and contradictory." (A more thorough analysis of/proposal for principles of 2Ap jurisprudence being beyond the scope of this letter, I shall save further discussion for responsive commentary at oral argument.)

## 2. MARTIAL-ARTS PRACTICE AND SELF-DEFENSE INEXTRICABLY INTERTWINED

As noted parenthetically above, "martial-arts practice is incident to self-defense in a way that access to packaged goods is not." Put another way, the lawful purpose for which box-cutters are typically used is quite different in kind from the potential use of the same instrument as a

weapon. The same is true of many instrumentalities in common use for lawful purposes: chain saws, gasoline, matches, flare guns, etc. But instrumentalities the common use of which is martial-arts practice must fall into a different category because the lawful common use is one that is inextricably intertwined with the practice of self-defense. (At risk of stating the obvious, martial arts is itself a form of self-defense.) It is accordingly submitted that the nunchaku's widespread lawful common use for martial-arts practice negates any possibility that evidence of the same instrument's use for unlawful purposes could result in its being entitled to no 2Ap at all on the theory that it is "typically possessed for unlawful purposes." In any event, there is no evidence of that last-quoted proposition properly before the Court at this time. But even more importantly, a second opportunity for the defendant to supplement the record in that regard in the wake of the 10/18 M&O would be futile, since, as *Heller* illustrates (*see supra*), even if nunchucks were[4] widely used for unlawful purposes (as are handguns) there remains a typical lawful use that forecloses such summary 2Ap denial.

### 3. HOW IS "DANGEROUS AND UNUSUAL" RELATED TO "TYPICALLY POSSESSED FOR UNLAWFUL PURPOSES"?

It is worth noting at the outset that all of the weapons at issue in the cases that the Court cited in the 10/18 M&O at 2-3 as addressing weapons for which no 2Ap exists because they are "typically possessed for unlawful purposes" are weapons of considerable or even extraordinary destructive capacity, such as "Tommy guns" (*Friedman*), "sawed-off shotguns" (*Hatfield*), "pipe bombs" (*Tagg*), and "assault weapons" (*Kolbe*, *Worman*). In many of these cases, especially in the last two listed and most especially in *Kolbe*, the court's analysis was indeed more related to the military utility of the class of weapons at issue, i.e., their similarity to the M16, and, correspondingly, to the awesome firepower of which such weapons are capable.

Although the Supreme Court has yet to articulate the connection between the compound term of art it introduced in *Heller*, "dangerous and unusual," and the "typically possessed for unlawful purposes" test that, as this Court suggests, may lead to a denial of 2Ap entirely for a given weapon, it is axiomatic that some relationship between these legal concepts must exist. This Court appears to have acknowledged as much by its careful placement of footnote 2 in the 10/18 M&O following the text preceding it. That footnote quotes briefly from the *Caetano* concurrence; a slightly longer passage from the same appears below:

> As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are "unusual," it does not need to consider the lower court's conclusion that they are also "dangerous."

*Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J., concurring) (citing *per curiam* opinion, *id*. at 1027-1028) (emphasis in original).

---

[4] Grammatically, the use of "were" above is to indicate the subjunctive mood, not the past tense.

It follows that, under *Heller*,[5] if a weapon may be banned completely, i.e., give rise to no 2Ap at all, on the basis that it is "typically possessed for unlawful purposes," it must also be because it is "dangerous and unusual." Of those two adjectives, "unusual" is the better fit with the concept of "typically possessed for unlawful purposes." Thus, the hidden element, which was present in all of the cases that the Court cited in the 10/18 M&O at 2-3, is that the weapon was also "dangerous." Of course, all weapons are too some degree dangerous (or else they would not be very effective as weapons), but the level of dangerousness[6] is not the same for "Tommy guns" (*Friedman*) or "sawed-off shotguns" (*Hatfield*) on the one hand as it is for stun guns (*Caetano*) or nunchaku (the instant case) on the other.

It is submitted that "dangerous and unusual" is an evolving term of art, and that, based on existing case law (including and especially *Heller*, *Caetano*, *NYSRPA*, and the cases that the Court cited in the 10/18 M&O at 2-3), the "unusual" component refers to the question of whether the instrument is "typically possessed for lawful purposes" or "typically possessed for unlawful purposes" (an absence of the former and a preponderance of the latter equating to "unusual"). The "dangerous" component, although less well-established,[7] must, in turn, relate to the destructive capacity of the weapon and, relatedly, to the question of whether it may be too lethal even for law-abiding citizens to possess, a consideration that the Second Circuit explicitly articulated in *NYSRPA*:

> Looking solely at a weapon's association with crime[8] . . . is insufficient. We must also consider more broadly whether the weapon is "dangerous and unusual" in the hands of law-abiding civilians.

804 F.3d at 256.

The nunchaku is neither "dangerous" nor "unusual." It is far less dangerous than even the handguns at issue in *Heller*, and it is "typically possessed for lawful purposes" and therefore not "unusual." To deny it 2Ap here, in the absence of any evidence showing that it is "typically possessed for unlawful purposes" and where the challenge is solely to the ban as applied to simple in-home possession, would be inconsistent with Second Amendment jurisprudence.

---

[5] Justice Alito wrote (emphasis in bold added): "**As the *per curiam* opinion recognizes**, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual."

[6] That is, the capacity to kill large numbers of people quickly and/or to cause disproportionate harm, see my discussion in the brief, DE 202, at pages 20-21; pdf pages 25-26 of 31.

[7] See the discussion in Part II of my brief, DE 195, at pdf pages 5-6, addressing long-term jurisprudential considerations, including and especially the dangers of too casually allowing any weapon to satisfy the "dangerous" criterion, which would inevitably pose obstacles to gaining support for sensible legislation aimed at limiting access to truly dangerous weaponry.

[8] A weapon's "association with crime" appears to be similar if not identical to the question of whether it is "typically possessed for unlawful purposes."

4. A TOTAL BAN ON NUNCHAKU DOES NOT SERVE THE SAME PURPOSES AS A TOTAL BAN ON MANUFACTURED WEAPONS

With manufactured firearms that are capable of rapid repeat-fire, states have imposed total bans on any and all possession, even in the home, with the goal in mind of preventing the entry of such weapons into the state.

Such considerations have no counterpart in New York's ban on "chuka sticks." The nunchaku, unlike any firearm, requires no complex manufacturing process to be brought into existence, and can be readily manufactured with little more than a pair of dowels, some cordage or chain, and common carpentry tools. Since nunchucks can easily be fashioned with readily available materials virtually anywhere, a complete prohibition of in-home possession would have little if any effect in stemming any perceived tide of illegal nunchaku entering New York.

This final consideration may be of some pragmatic relevance to the Court in its final consideration of this long-standing challenge to simple in-home possession only.

Respectfully submitted,

James Michael Maloney