UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
JAMES M. MALONEY,

                Plaintiff,

        -against-

MADELINE SINGAS, Nassau County District
Attorney,

                Defendant.
----------------------------------------------------------x

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**
03–CV–786 (PKC)(AYS)

PAMELA K. CHEN, United States District Judge:

        Plaintiff James M. Maloney, a *pro se* attorney and amateur martial artist, brings this action

against Defendant Madeline Singas, in her capacity as the Nassau County District Attorney,

seeking a declaration that New York State's 1974 ban on the possession of chuka sticks,[1] also

known as nunchaku, is unconstitutional under the Second Amendment.  Based on its review and

consideration of the evidence introduced at trial and the parties' post-trial submissions, the Court

makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil

Procedure 52.

## PROCEDURAL HISTORY

### I.    Initial Proceedings

        Plaintiff filed his initial complaint in this action on February 18, 2003 (Dkt. 1) and First

Amended Complaint on September 3, 2005 (Dkt. 42).  The Honorable Arthur D. Spatt dismissed

---

[1] "'Chuka stick' means any device designed primarily as a weapon, consisting of two or more lengths of a rigid material joined together by a thong, rope or chain in such a manner as to allow free movement of a portion of the device while held in the hand and capable of being rotated in such a manner as to inflict serious injury upon a person by striking or choking.  These devices are also known as nunchakus and centrifugal force sticks."  N.Y. Penal Law § 265.00(14).  The Court shall refer to chuka sticks and nunchakus interchangeably.

the First Amended Complaint in 2007, *Maloney v. Cuomo*, 470 F. Supp. 2d 205 (E.D.N.Y. 2007), and the dismissal was affirmed by the Second Circuit in 2009, *Maloney v. Cuomo*, 554 F.3d 56 (2d Cir. 2009). However, in light of its decision in *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (applying the Second Amendment as against the States through the Fourteenth Amendment), the United States Supreme Court vacated the Second Circuit's judgment and remanded the case to the Second Circuit for further consideration. *Maloney v. Rice*, 561 U.S. 1040 (2010). The Second Circuit subsequently vacated the district court's decision and remanded the case to the district court. *Maloney v. Cuomo*, 390 F. App'x 29 (2d Cir. 2010).

## II.     Second Amended Complaint

Plaintiff filed the Second Amended Complaint, the operative complaint in this action, on October 22, 2010. (Dkt. 116.) On April 23, 2013, this action was transferred from Judge Spatt to this Court. (04/23/13 docket entry.) Following the completion of discovery, both parties moved for summary judgment. (Dkts. 139, 140.) On May 22, 2015, the Court dismissed two of Plaintiff's three constitutional claims, leaving only the instant Second Amendment challenge to proceed to trial. *Maloney v. Singas*, 106 F. Supp. 3d 300 (E.D.N.Y. 2015).

## III.    Bench Trial in 2017 and 2018

The Court held a bench trial from January 9 to 12, 2017. (Dkts. 180, 181, 182.) At trial, Plaintiff presented the following evidence: (1) Plaintiff's own testimony about his history of nunchaku use; (2) testimony of retired Sergeant Kevin Orcutt of the Denver Police Department about his patented nunchaku, the Orcutt Police Nunchaku ("OPN"), which is used exclusively by law enforcement agencies; (3) purported expert testimony of a martial arts school ("dojo") operator, Christopher Pellitteri; (4) testimony of Susan Saraceni, Chief Financial Officer of Asian World of Martial Arts ("AWMA"), a martial arts weapons distributor, discussing AWMA's sales

data; and (5) exhibits documenting various forms of martial arts practice that incorporate the use of nunchaku and AWMA's sales data for nunchaku. At trial, Defendant presented: (1) the testimony of Catherine Rice, an employee of the Nassau County Internet Technology Department, who testified about Nassau County's nunchaku crime statistics, and (2) exhibits documenting the legislative history of New York Penal Law § 265.01(1) and Federal Bureau of Justice statistics on weapons used in crimes.

Following the trial, the parties submitted Proposed Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52. (Dkts. 184 (Plaintiff), 185 (Defendant).) However, after reviewing the trial record and the parties' post-trial submissions, the Court determined that both parties had neglected to consider the Second Circuit's leading case on Second Amendment challenges, *New York State Rifle & Pistol Association, Inc. v. Cuomo* ("*NYSRPA*") 804 F. 3d 242 (2d Cir. 2015), which was decided *after* the Court's summary judgment ruling, but *before* trial. (Dkt. 188.) In *NYSRPA*, the Second Circuit, *inter alia*, clarified that the *government* bears the burden of proving that the activity that is the subject of the challenged legislation falls outside the scope of the Second Amendment. 804 F.3d at 257 n.73 (explaining that the Supreme Court in *District of Columbia v. Heller ("Heller" or "Heller I"),* 554 U.S. 570 (2008) "identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting").

On July 23, 2017, the Court issued an order notifying the parties that because of their oversight regarding *NYSRPA*, they had litigated the case at the bench trial using the wrong burden of persuasion. (Dkt. 188.) The Court also admonished the parties for not addressing the level of constitutional scrutiny to be applied to Plaintiff's claim in their post-trial briefing. (*Id.* at 4, 6–7.) The Court re-opened the trial to allow the parties to conduct additional discovery and to

supplement the evidentiary record at trial to address these errors. (Dkts. 188, 191, 192, 193.) In the end, the parties chose to stipulate to the admission of additional documentary evidence offered by each side and to supplement the trial record solely with paper exhibits and argument, and no additional live testimony. (Dkts. 195, 196, 199, 202, 203, 204, 206.) Plaintiff's lone additional exhibit was a video of a Subaru commercial in which a child is shown with nunchaku in his backpack. (Dkt. 203.)[2] Defendant's additional evidence included: (1) legislative history materials of New York Penal Law § 265.01; (2) sales data for nunchaku from five additional manufacturers; and (3) a response to Plaintiff's Subaru commercial. (Dkts. 199, 199-1, 199-9, 199-10.)

On October 1, 2018, after receiving the parties' supplemental trial submissions, the Court *sua sponte* amended its July 23, 2017 order to further clarify the applicable burden of persuasion. *Maloney v. Singas*, No. 03–CV–786 (PKC)(AYS), 2018 WL 4771900, at *1 (E.D.N.Y. Oct. 1, 2018). The Court explained that, with respect to the threshold issue of whether the possession of nunchaku falls outside the scope of the Second Amendment, Defendant cannot meet her burden simply by demonstrating that nunchakus are not "in common use," but that Defendant must show, at a minimum, that nunchakus are "not typically possessed by law-abiding citizens for lawful purposes." *Id*. at *1–3.[3] The Court permitted the parties to submit supplemental briefing in response to the Court's amended order; that briefing was completed on November 12, 2018. (Dkt. 212 (Plaintiff), 213 (Defendant).) On December 5, 2018, the Court held oral argument ("Oral

---

[2] 2017 Subaru Outback Commercial, *Take the Subaru*, YouTube, https://www.youtube.com/watch?v=CHYZtPA2Tss (last visited December 14, 2018).

[3] In its earlier order, on July 23, 2017, the Court had stated that, pursuant to *NYSRPA*, Defendant was required to put forth evidence rebutting "the presumption in favor of Second Amendment protection, . . . i.e., evidence that nunchakus are either *not* 'in common use' *or* not 'typically possessed by law-abiding citizens for lawful purposes.'" (Dkt. 188, at 7 (emphasis in original).)

Argument").  (12/05/18 minute entry.)

## FINDINGS OF FACT

### I.    The Parties

James M. Maloney, appearing *pro se*, is a solo legal practitioner, an adjunct professor at the State University of Maritime College, and an amateur martial artist.  (Trial Transcript ("Tr."), at 11:13–16, 35:14–36:14.)[4]  He has developed his own martial arts style called "Shafan Ha Lavan,"[5] of which Plaintiff is the only practitioner.  (Tr. 36:10–37:11.)  Integral to Shafan Ha Lavan is the nunchaku, which is wielded for self-defense, particularly in the home.  (Tr. 20:4–22:3, 36:10–37:11, 72:8–73:7.)  Maloney wishes to teach Shafan Ha Lavan to his twin sons, but is unable to do so due to New York's nunchaku ban.  (Tr. 37:14–38:18.)

Madeline Singas, who is being sued in her official capacity, is the current Nassau County District Attorney.  *See* Nassau County District Attorney, *Meet the District Attorney*, http://www.nassauda.org/9/Meet-the-District-Attorney (last visited December 14, 2018).

### II.    The Nunchaku Ban: New York Penal Law § 265.01(1)

Since 1974, New York has had a complete ban on the possession of nunchaku by private citizens.  (Dkt. 184, at 2; *see generally* Dkt. 199-1.)  New York Penal Law § 265.01(1) ("Section 265.01(1)") criminalizes possession of nunchaku, along with a host of other banned weapons, as a Class A misdemeanor.  "A person is guilty of criminal possession of a weapon in the fourth degree when: (1) [h]e or she possesses any firearm, electronic dart gun, electronic stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack,

---

[4] The transcript of the January 9 to 12, 2017 bench trial can be found in Dockets 180, 181, and 182.

[5] According to Plaintiff, Shafan Ha Lavan is Hebrew for "White Rabbit."  (Tr. 72:12–73:2.)

bludgeon, plastic knuckles, metal knuckles, **chuka stick**, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or 'Kung Fu star.'" N.Y. Penal Law § 265.01(1) (emphasis added); *see also* N.Y. Penal Law § 265.00(14) (defining "chuka stick" as "any device designed primarily as a weapon, consisting of two or more lengths of a rigid material joined together by a thong, rope or chain in such a manner as to allow free movement of a portion of the device while held in the hand and capable of being rotated in such a manner as to inflict serious injury upon a person by striking or choking"). The ban on nunchaku arose out of a concern that, as a result of the rising popularity "of 'Kung Fu' movies and shows," "various circles of the state's youth"—including "muggers and street gangs"—were "widely" using nunchaku to cause "many serious injuries." (Dkt. 199-1, at ECF[6] 4–5 (letter from New York Attorney General Louis J. Lefkowitz, dated April 8, 1974); *id.* at ECF 17 (letter from New York State District Attorneys Association, dated April 1, 1974).)[7] New York Penal Law § 265.10 criminalizes the manufacture, transport, and disposal of nunchaku as a Class A misdemeanor. Section §§ 265.10(1), (2), & (4).

---

[6] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[7] (*See also* Dkt. 199-1, at ECF 11 (letter from New York State Assemblyman Richard C. Ross, dated April 2, 1974, recommending approval of the nunchaku ban because "[w]ith a minimum amount of practice it may be effectively used as a garrote, bludgeon, thrusting or striking device. The chukka stick is designed primarily as a weapon and has no purpose other than to maim, or, in some instances, kill.")); Paul L. Montgomery, *How a Radical-Left Group Moved Toward Savagery*, The New York Times (Jan. 20, 1974), https://nyti.ms/2zX5c0h (discussing the "militants of a Marxist group called the National Caucus of Labor Committees" and how the "Committee youths assigned to 'security' sit at the door twirling nunchaku sticks"); (*but see* Dkt. 199-1, at ECF 9 (letter dated April 4, 1974 from the New York State Division of Criminal Justice refusing to endorse the ban because nunchaku "are also used in karate and other 'martial arts' training" and "it appears unreasonable—and perhaps even unconstitutional—to prohibit those who have a legitimate reason for possessing chukka sticks from doing so").)

### III. Nunchaku Usage

#### A. The Purpose of Nunchaku

It is undisputed that the nunchaku is a "martial arts instrument" used recreationally in martial arts training, practice, and performance.[8] (Tr. 43:22–44:1 (Testimony of James Maloney), 255:12–258:25 (Testimony of Christopher Pellitteri).) It is primarily used for self-defense and as a weapon. (Tr. 212:25–213:6 (Testimony of Christopher Pellitteri).) There are no licensing or permit requirements for nunchaku possession in the United States. (Tr. 88:25–89:3 (Testimony of James Maloney).) There are two basic styles of nunchaku use: the traditional, "practical" style, which is "striking and blocking," and freestyle, which is "more flashy, spinning, less effective, [and] more coordination based." (Tr. 239:1–8 (Testimony of Christopher Pellitteri).) Additionally, the OPN is used by a number of law enforcement agencies across the country. (Tr. 119:12–16, 127:25–128:4, 130:9–12, 201:1–7, 209:5–7 (Testimony of Kevin Orcutt).)

#### B. Data Regarding the Prevalence of Nunchaku

At trial, the parties collectively submitted nunchaku sales data from six American nunchaku distributors: (1) American Nunchaku Company; (2) KarateDepot.com, a.k.a. Zengu; (3) Macho Products; (4) Swords Knives and Daggers; (5) Martial Arts Mart, a.k.a. Tigerclaw.com; and (6) AWMA. (Dkt. 199-9; Pl.'s Exhs. I & J.[9]) Based on the data provided, at least 64,890 metal and wood nunchakus were sold to individuals[10] in the United States between 1995 and

---

[8] Defendant conceded this fact at Oral Argument as well.

[9] Exhibits I and J are subject to a protective order and, therefore, have not been filed on the public docket. (Dkt. 203.)

[10] The Court only includes retail, not wholesale, sales for purposes of its Second Amendment analysis. *See Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) ("The more relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to *private citizens*.") (Alito, J., concurring) (alterations, citation, and internal quotation marks omitted;

2018.[11]  No evidence has been presented to explain what percentage of the United States nunchaku

market share this data represents.  (*See* Tr. 354:25–358:18 (Testimony of Susan Saraceni).)  No

reliable data was submitted about how many martial arts schools or dojos use nunchaku.  (*See* Tr.

238:9–10, 278:25–279:4 (Pellitteri testifying "[t]here's no specific data or statistics that I know of

regarding the use of nunchaku as far as the number of people [using them]," but "nunchaku seem

to be the most popular martial arts weapon").)[12]

---

emphasis added); (Tr. 358:20–359:2 (stating that wholesale sale is "selling to another distributor, like a store or a school" versus retail sale, which is "selling to an individual").)  Additionally, the Court does not include sales data for foam or plastic nunchaku.  Under New York law, the nunchaku is defined as a weapon "consisting of . . . *rigid material.*"  N.Y. Penal Law § 265.00(14) (emphasis added).  Since foam nunchaku are not made of "rigid material," they do not qualify as nunchaku that are banned in New York.  (*See* Tr. 26:5–10 (Plaintiff stating that a foam nunchaku is "just hollow plastic with foam"); *id.* at 288:4–12 (Pellitteri calling foam nunchaku "a toy").)  Similarly, plastic nunchakus appear not to be included because they are often "hollow plastic" and, therefore, not "designed primarily as a weapon."  N.Y. Penal Law § 265.00(14); (Tr. 26:5–10 (Plaintiff describing these nunchakus as "just hollow plastic with foam on them . . . [t]hey don't have enough weight to be designed primarily as a weapon"), 80:15–22.)  Notably, at Oral Argument, Defendant suggested, though did not provide a firm opinion, that hollow plastic nunchaku would not come under the New York Penal Law ban.  In any event, the Court errs on the side of being conservative in excluding plastic nunchaku in determining the number of nunchakus sold based on the data introduced at trial.

        The Court also does not include the sales data for the OPN because these nunchakus are used exclusively by law enforcement (Tr. 173:9–11, 174:4–176:24), and the Second Amendment is only concerned with weapons "typically possessed by law-abiding citizens for lawful purposes," *Heller,* 554 U.S. at 625.  Additionally, New York Penal Law § 265.01(1) does not prohibit possession of nunchaku by law enforcement officers.  N.Y. Penal Law § 265.20 (exception to N.Y. Penal Law § 265.01(1) for law enforcement).

        [11] None of the distributors reported sales data for the years 1974 to 1994.

        [12] The Court does not give any weight to the estimates of nunchaku sales testified to by Plaintiff's expert, Christopher Pellitteri, at trial.  Pellitteri, a long-time martial arts instructor, estimated that 5,165 martial arts schools teach nunchaku.  (Tr. 245:1–4.)  To arrive at this number, Pellitteri determined that there are 18,233 dojos in the United States based on a list on a website (https://dojos.info/usa/) and then "conservative[ly] estimate[d]," based on "his personal experience and [his] knowledge of other karate schools that teach martial arts," that 28.3% of those dojos teach nunchaku.  (Tr. 241:19–243:3, 243:11–16, 244:4–11, 245:1–4, 282:25–283:2 (stating that 33% of all dojos teach weapons, and 85% of those dojos teach nunchaku).)  This testimony is

In addition to data about nunchaku sales, Defendant also presented statistics regarding nunchaku-related crime in Nassau County. Between December 14, 2014 and January 11, 2017, there were five prosecutions in Nassau County involving nunchaku: two cases of assault and three cases of possession. (Tr. 373:1–12, 375:11–376:7 (Testimony of Catherine Rice).)[13]

---

speculative and does not meet the requirements for admission under Federal Rule of Evidence 702. Under Rule 702, it is the role of the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). While a district court has "broad latitude" in how it determines reliability, *Restivo v. Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017) (quoting *Daubert*, 509 U.S. at 142), "expert testimony should be excluded if it is speculative or conjectural," *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). Here, Pellitteri estimated the use of nunchaku in other dojos around the country "[o]nly from some research I've done on the Internet. I can only kind of estimate what other places do." (Tr. 223:4–7.) Moreover, Pellitteri did not know where the website he used obtains its data and could not attest to its veracity. (Tr. 281:17–282:12; *see also* Dkt. 185, at 14–15.) By his own admission, the quantitative estimates proffered by Pellitteri were based on a combination of basic internet searches and his own anecdotal observations—precisely the kind of speculation and conjecture the Federal Rules of Evidence were intended to bar. *See Boucher*, 73 F.3d at 21 (holding that "expert testimony should be excluded if it is speculative or conjectural").

[13] Defendant complained in her November 12, 2018 supplemental submission that the Court's October 1, 2018 Order—issued after the parties had supplemented the trial record and clarifying that Defendant had to show that the common use of nunchaku is an unlawful one— "place[d] Defendant in an untenable position because there is no question that nunchaku are martial arts weapons." (Dkt. 213, at 2.) However, any suggestion that Defendant was prejudiced by this clarification, even if belated, is belied by the fact that Defendant has never indicated that there was any other evidence she could, or would, have introduced on the issue of how nunchakus are commonly used, nor did she seek to reopen the trial record for that purpose after the October 1, 2018 Order. Indeed, at Oral Argument, when asked this question, she responded that there is a dearth of data about nunchaku crime and implied that she would be unable to secure any additional statistical evidence. Furthermore, it is not the Court's responsibility to decide how a party should litigate its case. Given the ambiguity in this area of the law, Defendant should have anticipated that she might have to, and certainly should, endeavor to prove both prongs of the test regarding Second Amendment coverage. *See NYSRPA*, 804 F.3d at 254–55.

The Court also notes that although Defendant cited four newspaper articles about nunchaku crime in her opposition to Plaintiff's motion for summary judgment, she did not offer that evidence at trial. (Dkt. 140, at 5 (citing four articles from 1983 to 2007).)

**CONCLUSIONS OF LAW**

Plaintiff alleges in his Second Amended Complaint that New York Penal Law § 265.01(1) "infringe[s] upon [his] rights as conferred by the Second Amendment of the Constitution of the United States" to the extent it "criminalize[s] the simple possession of nunchaku within one's home for martial-arts practice and/or home defense," and should be "declare[d] . . . unconstitutional and of no force and effect." (Dkt. 116, at ¶ 51 (First Cause of Action) & Wherefore Clause, at ¶ 2.)

## I.     Plaintiff's Claim for Declaratory Relief and the Court's Limited Authority

As an initial matter, the Court clarifies the scope of Plaintiff's claim for declaratory relief in terms of the remedy he is seeking and can obtain in this action. Despite the above-quoted language from the Second Amended Complaint, Plaintiff has, at times, suggested that he does not seek to have New York's nunchaku ban struck down in its entirety, but rather, seeks to have Section 265.01(1) declared unconstitutional *only* as applied to home possession and use of nunchaku. (*See, e.g.*, Dkt. 212, at 4 (stating "the challenge is solely to the ban as applied to simple in-home possession"); Tr. 66:21–67:22 (Plaintiff explaining that he is seeking a declaration that, under the Second Amendment, he should be allowed to use nunchaku in his home for "[his] personal use, for home defense purposes, . . . [a]nd for any other lawful use that they may have").) However, while Plaintiff is clear about the relief he wants, i.e., to be able to legally use nunchaku in his home, he fails to appreciate that the Court lacks the authority to rewrite Section 265.01(1).

While courts, under some circumstances, might be able to reform a statute to make it constitutional by "sever[ing] its problematic portions while leaving the remainder intact," that is not possible here given how Section 265.01(1) is constructed. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006). To achieve the remedy Plaintiff argues that he is

seeking would require the court to write in an exception to the complete ban on nunchaku in Section 265.01(1). This the Court cannot do here. *Id.* at 229–330 (holding that courts must "restrain [themselves] from rewrit[ing] state law to conform it to constitutional requirements even as [courts] strive to salvage it" because, to do more, would go beyond "devis[ing] a judicial remedy" and, instead, "entail quintessentially legislative work" that is a "far more serious invasion of the legislative domain than [a court] ought to undertake") (citations and internal quotation marks omitted). Moreover, as discussed *infra*, Section 265.01(1) as applied to nunchaku constitutes a "'complete prohibition[]' of [a] Second Amendment right," which, "under *Heller*[,] . . . [is] always invalid." *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017) (quoting *Heller*, 554 U.S. at 629). The "total ban on exercises of [a Second Amendment] constitutional right . . . [is] enough to sink [a] law under *Heller*." *Id.* at 667; *see also Ezell v. City of Chi.*, 651 F.3d 684, 703 (7th Cir. 2011) ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right . . . are categorically unconstitutional.")

Plaintiff's reliance on "the seven principles of constitutional construction and adjudication" set forth in Justice Brandeis's concurrence in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–48 (1936) does not dictate a different result. (Dkt. 202, at 8–10.) In fact, the Court's decision is consistent with the principles set forth in *Ashwander* and, more recently, in *Ayotte*. Plaintiff argues that the Court should issue "no broader relief than a declaration that the statute as applied to simple in-home possession is unconstitutional" and urges the Court to abide by two of the *Ashwander* principles:

> (3) The Court will not formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.
> . . .
> (7) When the validity of an act of the Congress is drawn into question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which

the question may be avoided.

(*Id.* (quoting *Ashwander*, 297 U.S. at 346–48) (citations and internal quotation marks omitted).)
As discussed *supra*, the Court can only grant the relief Plaintiff seeks by striking down, as violative
of the Second Amendment, the portion of Section 265.01(1) that applies to nunchaku. That is the
rule of constitutional law "required by the precise facts to which it is to be applied" and cannot "be
avoided." *Ashwander*, 297 U.S. at 346–48. Additionally, as discussed, the Court "may impose a
limiting construction on a statute only if it is readily susceptible to such a construction," but may
"not rewrite a . . . law to conform it to constitutional requirements." *United States v. Stevens*, 559
U.S. 460, 481 (2010) (citations and internal quotation marks omitted). To read Section 265.01(1)
as Plaintiff wishes "requires rewriting, not just reinterpretation." *Id.* "[T]he touchstone for any
decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent
the intent of the legislature." *Ayotte*, 546 U.S. at 330 ("After finding an application or portion of
a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of
its statute to no statute at all?") (citation and internal quotation marks omitted).

Thus, the Court declines to adopt Plaintiff's suggestion of constitutional overreach,[14] and
construes Plaintiff's claim to seek a declaration that Section 265.01(1), as applied to nunchaku,
violates the Second Amendment.[15] *See Michelsen v. Brush*, 224 F. Supp. 951, 953 (E.D.N.Y.

---

[14] To the extent that Plaintiff contended at Oral Argument that *NYSRPA* supports this
Court's re-writing of a statute to make it constitutional, he is incorrect. In *NYSRPA*, the Second
Circuit merely struck down a portion of the statute it found to be unconstitutional, which is no
different than what the Court is doing here. So, although *NYSRPA* supports the result in this case,
it is not for the reason that Plaintiff argues.

[15] The Court also notes that Defendant certainly is not prejudiced by this approach, given
that she herself has assumed throughout the litigation that this is the remedy Plaintiff is seeking.
(Dkt. 199, at 2 (Defendant stating that the relief sought by Plaintiff is "a declaratory judgment that
New York Penal Law § 265.01 is unconstitutional pursuant to the Second Amendment of the
United States Constitution to the extent that it prohibits the in-home possession of 'nunchucks' or

1963) ("Every judgment must grant the relief to which the party is entitled, even if that party has not demanded such relief in his pleadings. The character and the nature of the action is thus determined not by the prayer for relief but by the facts alleged and proved. Stated another way, the legal theories upon which the action may be bottomed do not determine the validity of a claim.") (citations omitted).

## II.    Legal Standards for Second Amendment Challenges

There is a rebuttable presumption that "'the Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms,' not just to a small subset." *NYSRPA*, 804 F.3d at 255–56 (quoting *Heller*, 554 U.S. at 582) (emphasis in original). The Second Circuit has "adopt[ed] a two-step analytical framework" to determine whether a challenged statute violates the Second Amendment. *Id.* at 253. "First, [the Court] consider[s] whether the restriction burdens conduct protected by the Second Amendment. If the challenged restriction does not implicate conduct within the scope of the Second Amendment, [the Court's] analysis ends and the legislation stands. Otherwise, [the Court] move[s] to the second step of [the] inquiry, in which [the Court] must determine and apply the appropriate level of [constitutional] scrutiny." *Id.* at 254.

The determination of whether the challenged restriction implicates the Second Amendment, in turn, involves a two-part standard. "The Second Amendment protects only the 'sorts of weapons' that are (1) 'in common use' and (2) 'typically possessed by law-abiding citizens for lawful purposes.'" *Id.* at 254–55 (quoting *Heller*, 554 U.S. at 625, 627); *see also id.* at 253 ("*Heller* . . . endorsed the 'historical tradition of prohibiting the carrying of dangerous and unusual weapons.'") (quoting *Heller*, 554 U.S. at 627). Furthermore, it is the government that bears the burden of rebutting the "prima facie presumption of Second Amendment protection" that

'nunchaku'").)

extends to all bearable arms. *Id*. at 257 n.73. While the logical implication of the two criteria identified in *Heller*—"common use" *and* "typical possession by law-abiding citizens for lawful purposes"—is that the government need only disprove the existence of one or the other criterion to exempt the challenged law from Second Amendment coverage, the Court has concluded that the "common use" factor is ultimately irrelevant and that the government must show that, at a minimum, nunchakus are not typically possessed by law-abiding citizens for lawful purposes. *Maloney*, 2018 WL 4771900, at *1, 3; *see Caetano*, 136 S. Ct. at 1031 (stating that the test for whether a weapon falls within the scope of the Second Amendment is "a conjunctive test: A weapon may not be banned unless it is both dangerous *and* unusual.") (Alito, J., concurring).[16]

---

[16] As discussed *supra*, although the Court initially interpreted the government as having to prove only that nunchaku *either* were not "in common use" *or* were not "commonly used for a lawful purpose" (Dkt. 188, at 7), in its October 1, 2018 Order the Court sought to clarify the "opaque and contradictory" caselaw interpreting the "common use" and "typical possession" elements identified in *Heller*, *Maloney*, 2018 WL 4771900, at *1. As explained in the Order, "[t]he overwhelming majority of courts that have addressed Second Amendment challenges have found that the weapon's 'typical possession' for an unlawful purpose, in itself, is sufficient to deny Second Amendment protection," even where a weapon is "extraordinarily popular." *Id.* (collecting cases). Therefore, regardless of whether the appropriate test is conjunctive or disjunctive, Defendant cannot simply prove that nunchakus are not in common use in order to rebut the prima facie presumption of Second Amendment protection; Defendant must show that the "typical possession" of nunchakus is for an unlawful purpose. *Id.* at *3 & n.3. Notably, neither the parties nor the Court has "identified a single case in which a court has found that a bearable arm is outside of the scope of the Second Amendment simply because it is not in 'common use.'" *Id.* at *2 (collecting cases).

Defendant asks that the Court consider a third factor, i.e., public policy considerations, in assessing whether nunchakus are covered by the Second Amendment. (Dkt. 199, at 10–11.) The Court declines to do so. Although it is difficult to discern exactly what Defendant is arguing, it appears to contend that without the nunchaku ban, non-law-abiding citizens would be able to get nunchaku without restriction or any registration requirement. (*Id.*) However, this is not a proper consideration for the Court in deciding the constitutionality of Section 265.01(1) as applied to nunchaku. *Heller* does not permit this Court to subject the Second Amendment's "core protection . . . to a freestanding 'interest-balancing' approach." 554 U.S. at 634. As Plaintiff correctly argues, "[i]t is neither the province nor the duty of a federal court to refrain from constitutional adjudication in perceived deference to prior state legislative inaction, especially, where, as here, such prior inaction can readily be remedied if the legislature deems it necessary to take appropriate

The Court applies a clear and convincing evidence standard of proof.[17]

### III. Nunchaku Fall Within the Ambit of the Second Amendment

Here, "the parties do not dispute that nunchakus constitute a 'bearable arm'" (Dkt. 188, at 4),[18] and so the rebuttable presumption that nunchakus are protected by the Second Amendment applies.[19]

_____

regulatory action in the wake of the federal court's constitutional pronouncement." (Dkt. 202, at 24.)

[17] The parties have not identified an evidentiary standard for evaluating a Second Amendment challenge; therefore, the Court assumes the "clear and convincing" standard applies. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983) ("[W]e have required proof by clear and convincing evidence where particularly important individual interests or rights are at stake."). However, even under a lower "preponderance of the evidence" standard, the outcome in this case would be the same.

[18] Although Defendant previously conceded that the nunchaku is a bearable arm, she now argues that the nunchaku is not "a bearable arm within the meaning of the Second Amendment because it is not used by law abiding citizens for the defense of hearth and home." (Dkt. 199, at 7.) The Court rejects this argument. "As *Heller* explained, the term includes any 'weapon of offence' or 'thing that a man wears for his defence, or takes into his hands,' that is 'carried . . . for the purpose of offensive or defensive action.'" *Caetano*, 136 S. Ct. at 1030 n.3 (quoting *Heller*, 554 U.S. at 581, 584) (alterations omitted) (Alito, J., concurring). This definition clearly applies to nunchaku.

[19] The Court rejects Defendant's argument that Section 265.01(1) is entitled to a presumption of constitutionality because it has existed for 44 years. (Dkt. 206, at 1 & n.1.) In *Heller*, the Supreme Court emphasized in dicta that its decision did not upend "longstanding prohibitions" on the possession of certain bearable arms. 554 U.S. at 626–627 & n.26. The Supreme Court in *Heller* did not set out a test for determining what qualifies as "longstanding," *id.*, and courts have found the definition of a "longstanding prohibition" to be "far from clear." *United States v. McCane*, 573 F.3d 1037, 1048 (10th Cir. 2009) (Tymkovich, J., concurring). For example, in *United States v. Skoien*, the Seventh Circuit found, "[i]t would be weird to say that [a statute] is unconstitutional in 2010 but will become constitutional by 2043, when it will be as 'longstanding' as [the felon-in-possession statute] was when the Court decided *Heller*." 614 F.3d 638, 641 (7th Cir. 2010). Nonetheless, courts have generally interpreted *Heller* to preserve exceptions to the Second Amendment that "deriv[e] from various historical restrictions on possessing and carrying weapons," including: "(1) laws prohibiting the carrying of concealed weapons, (2) laws prohibiting the possession of firearms by felons and the mentally ill, (3) laws prohibiting the carrying of firearms 'in sensitive places such as schools and government buildings,' (4) laws imposing conditions and qualifications on the commercial sale of arms, and (5) laws

## A.  Typical Use of Nunchaku

The next step, under *NYSRPA*, is that the Court must determine whether the nunchaku ban impinges upon conduct protected by the Second Amendment, i.e., whether Defendant has proved, by clear and convincing evidence, that nunchakus are not typically possessed by law-abiding citizens for lawful purposes.  Admittedly, there is no defined analytical standard for what constitutes "typical possession by law-abiding citizens for lawful purposes."  *See NYSRPA*, 804 F.3d at 257 (describing "reliable empirical evidence of lawful possession for lawful purposes" as "elusive, beyond ownership statistics") (footnotes omitted); *see also Friedman v. City of Highland Park,* 136 S. Ct. 447, 449 (2015) (stating that the "typical possession" requirement is met where "[t]he overwhelming majority of citizens who own and use [the] rifles [at issue] do so for lawful purposes") (Thomas, J., dissenting from denial of certiorari).  However, in *NYSRPA*, the Second Circuit indicated that to determine a weapon's "typical possession," the Court is "require[d] . . . to

---

prohibiting the carrying of 'dangerous and unusual weapons.'"  *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (quoting *Heller*, 554 U.S. at 626); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) ("This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification.").  *But see Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue.  After all, *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid–20th century vintage.") (citations omitted) (collecting cases).

The nunchaku ban does not fall into any of these categories.  Moreover, in *Heller II*, the D.C. Circuit held that a number of the District's firearm registration requirements, which were passed in the mid-1970s, were "novel" and "not longstanding" for the purposes of the Second Amendment.  *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1255 (D.C. Cir. 2011).  The nunchaku prohibition at issue here, signed into law in 1974, is likewise "novel" and thus is not exempted from Second Amendment scrutiny under the "longstanding prohibitions" exception.  *United States v. Marzzarella*, 614 F.3d 85, 93 (3d Cir. 2010) ("[P]rudence counsels caution when extending the[] recognized ['longstanding prohibition'] exceptions to novel regulations unmentioned by *Heller*.").

look into both broad patterns of use and the subjective motives of [the weapon's] owners."  804 F.3d at 256.

Considering the scant evidence presented, the Court finds that Defendant has not met her burden to exclude nunchaku from the ambit of Second Amendment protection.  Simply put, Defendant does not contradict the contention that the nunchaku's primary use, which Defendant concedes is as "a tool from the sphere of martial arts" (Dkt. 199, at 10), is a lawful one.  To the extent any evidence was offered at trial regarding the "subjective motives of [nunchaku] owners," the Court has considered the testimony of Plaintiff himself, Pelletieri, and Orcutt as further support for the conclusion that the typical possession of nunchaku in this country is for recreational and other lawful purposes.

Furthermore, although the criminality associated with a weapon is not the only relevant inquiry, *NYSRPA*, 804 F.3d at 256, here, there is virtually no evidence that nunchakus are associated with, or have been used to engage in, criminal conduct since Section 265.01(1) was amended to include nunchaku over forty years ago.[20]  The only evidence presented by Defendant as to the unlawful use of nunchaku are five nunchaku prosecutions, two cases of assault and three cases of possession, between December 14, 2014 and January 11, 2017 in Nassau County.  (Dkt.

---

[20] Indeed, while concerns about unlawful violence by "street gangs" involving the use of nunchaku evidently motivated the state assembly to pass the nunchaku ban into law, there are no specific examples or crime statistics regarding these alleged "street gang" nunchaku crimes cited in the legislative materials.  (*See generally* Dkt. 199-1); *see also* Brook Larmer, *"Ninja" Movies, Mail–Order Loophole Help Martial-Arts Weapons to Spread*, Christian Science Monitor (Nov. 19, 1985), https://www.csmonitor.com/1985/1119/amart.html ("[M]ost evidence on weapons–related crimes in the martial arts . . . is limited to scattered police reports that vaguely identify assailants as ninja warriors.  Steve Schlesinger, director of the Bureau of Justice Statistics, says that 'the lack of data reflects only our current inability to obtain it and not the magnitude of the problem to society.'").

199-3.)  Moreover, Defendant presents no national data on the unlawful use of nunchaku.[21]  Given Defendant's concession that the nunchaku is primarily a tool of martial arts, pointing to these isolated incidents falls far short of Defendant's burden of establishing that the nunchaku's typical use is an unlawful one.  (Dkt. 213, at 2 (Defendant stating that, "[t]here is no question that nunchaku are martial arts weapons").)[22]  Moreover, unlike a sawed-off shotgun, gun without a serial number, or pipe bomb—weapons that courts have found to be outside the ambit of Second Amendment protection—nunchaku have no special propensity for unlawful use.  *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015).  In fact, its intended use as a weapon for recreational martial arts practice and training appears to greatly outstrip its use in crime.

The Court rejects Defendant's argument that the Court's "typical use" analysis should be limited to whether the nunchaku is typically used for home self-defense—and should not consider the nunchaku's use in martial arts—because Plaintiff's request for relief is limited to this use.  (Dkt. 199, at 7–8; Dkt. 213, at 2.)  Defendant cites no caselaw to support such a limited understanding

---

[21] To allay its concerns about completeness, the Court, on its own, has identified 52 nunchaku-related incidents in the United States since 1974, with the vast majority occurring since 2011.  They are listed chronologically, along with the four newspaper articles cited by Defendant in her summary judgment briefing, in an appendix to this opinion.  Even if Defendant had offered evidence of these 56 incidents at trial, they do not constitute clear and convincing evidence, or a preponderance of evidence, that nunchakus are *not* commonly used by law-abiding citizens for lawful purposes.

[22] For this additional reason, *see supra* note 13, the Court rejects Defendant's complaint that she "was not given an opportunity to submit a brief in accordance with the Court's revised standard of proof but, rather, given a limited opportunity to opine whether the evidence previously submitted has met the newly-defined legal standard."  (Dkt. 213, at 2.)  Additional briefing could not have rectified the fundamental lack of evidence.  The Court also rejects Defendant's argument that the Court's consideration of the "lawful use" of nunchaku for martial arts practice reflects "an over-simplified application of Second Amendment jurisdiction," (*id.*), because, in actuality, the Court has "consider[ed] more broadly whether the weapon is 'dangerous and unusual' in the hands of law-abiding civilians," *NYSRPA*, 804 F.3d at 256.  In this case, Defendant has failed to demonstrate that the "typical possession" of nunchaku is for an unlawful purpose.

of "typical use." *See Friedman*, 136 S. Ct. at 449 (discussing "self-defense and target shooting" in determining a weapon's "typical use") (Thomas, J., dissenting from denial of certiorari); *NYSRPA*, 804 F.3d at 256 (considering "lawful pursuits like self-defense and hunting"); *Fyock*, 779 F.3d at 998 (examining "marketing materials and sales statistics" to determine the "lawful purposes" for which large-capacity magazines are possessed); (Dkt. 202, at 16–17.) Defendant's reliance on *Heller* for this argument (Dkt. 206, at 2–3) is also unavailing, since nowhere in *Heller* does the Supreme Court state that Second Amendment protection only extends to "bearable arms" that are typically used for home defense, *Heller II*, 670 F.3d at 1260 ("[T]he Court [in *Heller I*] also said the Second Amendment protects the right to keep and bear arms for other 'lawful purposes,' such as hunting, but self-defense is the 'core lawful purpose' protected.") (citing *Heller I*, 554 U.S. at 630).

The Court also rejects Defendant's argument that the nunchaku ban should be upheld because "the dangerous potential of nunchucks is almost universally recognized." (Dkt. 185, at 25–26; *see also id.* at 21–22 (collecting cases); Dkt. 199, at 8–10.) "If *Heller* tells us anything, it is that [weapons] cannot be categorically prohibited just because they are dangerous," since the "relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring); *see also NYSRPA*, 804 F.3d at 256.[23]

---

[23] Inexplicably, Defendant states that "[o]bviously, spring-guns and carrying/using mace or stun guns are not constitutionally protected activities" because they are dangerous. (Dkt. 213, at 2.) This statement is plainly incorrect, at least as to stun guns and mace. In *Caetano*, Justice Alito explicitly argued that stun guns are constitutionally protected weapons. 136 S. Ct. at 1028–1033 (Alito, J., concurring); *see also People v. Yanna*, 297 Mich. App. 137 (2012) (striking down Michigan's complete prohibition on Tasers and stun guns). Mace is, in fact, legal in all 50 states, Jim Dwyer, *A Spray Like a Punch in the Face*, N.Y. Times (Sept. 27, 2011), https://www.nytimes.com/2011/09/28/nyregion/a-burst-of-pepper-spray-like-a-punch-in-the-face.html, and the Court sees no reason why mace would not also be constitutionally protected.

Therefore, because Defendant has failed to demonstrate, by clear and convincing evidence, or even by a preponderance, that nunchakus are not typically used by law-abiding citizens for lawful purposes, she has failed to rebut the presumption that the possession and use of nunchaku is within the scope of the Second Amendment's protections.

## B. Nunchaku Being "In Common Use"

Although the Court has concluded that, under the standard established in *Heller*, a bearable arm is entitled to Second Amendment protection where the government fails to show that the weapon's typical use is not a lawful one, out of an abundance of caution, the Court also finds that Defendant has failed to show, by clear and convincing evidence,[24] that nunchakus are not in common use. Based on the evidence introduced at trial, at least 64,890 metal and wood nunchaku were sold on the retail market in the United States between 1995 and 2018. Courts have not set a numerical floor for determining what constitutes "common use." *See, e.g.*, *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) ("Every post-*Heller* case to grapple with whether a weapon is 'popular' enough to be considered 'in common use' has relied on statistical data of some form, creating a consensus that common use is an objective and largely statistical inquiry.") (citation and internal quotation marks omitted); *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("[W]hat line separates 'common' from 'uncommon' ownership is something the [Supreme] Court did not say.").[25] In his concurrence in *Caetano*, Justice Alito found that stun guns were in "common use" because "hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States." 136 S. Ct. at 1032 (Alito, J.,

---

[24] As previously discussed, *see supra* note 17, while the Court applies a "clear and convincing" standard of proof, Defendant's evidence also fails under a preponderance standard.

[25] The virtual impossibility of the task itself convinces the Court that common use cannot be a relevant, and certainly not the only relevant, criterion under *Heller*.

concurring) (citation and internal quotation marks omitted).  Here, *at least* 64,890 nunchakus have been sold over the past 23 years to private citizens, who may lawfully possess them in 48 states. (Dkt. 184, at ¶ 19.)  The Court finds that based on this magnitude of sales—especially given the outright bans on nunchaku (in New York and Massachusetts), the other restrictions placed on nunchaku ownership and use in the states where they may be lawfully possessed,[26] and the apparent incompleteness of Defendant's nunchaku sales data[27]—and the relevant, albeit limited, case comparators,[28] Defendant has failed to establish that nunchaku are not in common use.

---

[26] *See, e.g.*, Ariz. Rev. Stat. Ann. §§ 13–3101(A)(8)(a)(v) & 13–3102(H) (banning nunchaku except "if such weapon is possessed for the purposes of preparing for, conducting or participating in lawful exhibitions, demonstrations, contests or athletic events involving the use of such weapon"); Cal. Penal Code §§ 22010 & 22015 (banning nunchaku except for schools "teaching arts of self–defense"); N.H. Rev. Stat. Ann. § 159:24 (banning "sell[ing], deliver[ing], or otherwise transfer[ing] any martial arts weapon," including nunchaku, "to a person under the age of 18 without first obtaining the written consent of such person's parent or guardian"); Wis. Stat. Ann. § 948.60 (banning possession of "nunchaku or any similar weapon consisting of 2 sticks of wood, plastic or metal connected at one end by a length of rope, chain, wire or leather" by "[a]ny person under 18 years of age").

[27] Defendant subpoenaed 17 nunchaku distributors, and seven companies responded.  (Dkt. 199, at 6; Dkt. 199-9.)

[28] The Court has only identified one case in which a court found that a weapon was not in common use.  In *Hollis v. Lynch*, the Fifth Circuit found that the existence of 175,977 civilian-owned machine guns did not rise to the level of "common use" for three reasons: (1) the number of machine guns was "below [the] more than 8 million AR- and AK-platform semi-automatic rifles manufactured in or imported into the United States [that] the Fourth Circuit held was sufficient for a showing of common use [in *Kolbe v. Hogan*, 849 F.3d 114, 174 (4th Cir. 2017)]"; (2) unlike the stun guns in *Caetano*, which Justice Alito found "may be lawfully possessed in 45 states[,] . . . 34 states and the District of Columbia prohibit possessing machineguns"; and (3) that machine guns represent a "quite low" percentage of all firearms produced or manufactured for the domestic civilian market.  827 F.3d 436, 449–50 (5th Cir. 2016) (citations and internal quotation marks omitted).  Notably, however, the Fifth Circuit did not rely solely on its finding that civilian-owned machine guns were not in common use to determine that the Second Amendment was not implicated; rather, the Fifth Circuit also analyzed the "lawful purpose" prong.  *Id.* at 448.  Furthermore, as a point of comparison, the number of jurisdictions in which nunchaku are legal, as discussed *supra*, is 48 states (versus 16 states in *Hollis* and 45 states in *Caetano*).  In addition, even though the Court does not credit Pellitteri's testimony with respect to the number of nunchakus sold in the United States, the Court has considered his testimony that "nunchucks seem

Thus, even assuming that Defendant need only prove that nunchakus are not in common use to exempt them from Second Amendment coverage, she has failed to do so.

*     *     *

Accordingly, the Court concludes that the possession and use of nunchaku is protected by the Second Amendment.

## IV.    Constitutional Scrutiny

Having concluded that Section 265.01(1), as applied to nunchaku, impinges upon Plaintiff's Second Amendment rights, the Court must next determine and apply the appropriate level of scrutiny.  804 F.3d at 257.  Although "*Heller* did not specify the precise level of scrutiny applicable to [weapons] regulations," *id.* at 258, it is clear that, at a minimum, intermediate scrutiny applies, *id.* at 259–61; *see also Maloney*, 106 F. Supp. 3d at 311 (collecting cases).  Because the blanket ban imposed by Section 265.01(1) as applied to nunchaku easily fails constitutional muster under intermediate scrutiny, the Court need not decide whether intermediate or strict scrutiny should apply.

The test for determining the proper level of constitutional scrutiny with respect to a Second Amendment challenge has two factors: "(1) how close the law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right."  *NYSRPA*, 804 F.3d at 258 (citation omitted).  Given that Section 265.01(1) completely bans the possession and use of nunchaku in New York State, the determinative issue is whether possession and use of nunchaku is an activity that is at the core of the Second Amendment.  The centuries-old history of nunchaku being used as defensive weapons, *Maloney*, 106 F. Supp. 3d at 314 n.22, strongly suggests their

_____

to be the most popular martial arts weapon" with respect to the "in common use" analysis.  (Tr. 238:9–10.)

possession, like the possession of firearms, is at the core of the Second Amendment. Nonetheless, even as recreational items, nunchaku may still be at the core of the Second Amendment's protections. *Heller*, 554 U.S. at 599 (stating that founding-era Americans thought that the right to own firearms was "even more important for self-defense and hunting" than for militia service). The Court, therefore, finds that at least intermediate scrutiny applies to Section 265.01(1)'s ban on nunchaku.[29]

"Though 'intermediate scrutiny' may have different connotations in different contexts, here the key question is whether the statute[] at issue [is] 'substantially related to the achievement of an important governmental interest.'" *NYSRPA*, 804 F.3d at 261 (quoting *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012)). "The legitimate and compelling state interest in protecting the community from crime cannot be doubted." *Schall v. Martin,* 467 U.S. 253, 264 (1984) (citation and internal quotation marks omitted). Therefore, the Court "need only inquire . . . whether the challenged laws are 'substantially related' to the achievement of that governmental interest." *NYSRPA*, 804 F.3d at 261. Given the dearth of nunchaku-related crime, discussed *supra*,

---

[29] Although Defendant suggested in her November 12, 2018 submission that a rational basis review standard might apply to Section 265.01(1), based on "law of the case" (Dkt. 213, at 2), the Court rejects that argument. As an initial matter, Judge Spatt's prior decision applying a rational basis test cannot be viewed as law of the case, in light of the decision ultimately being overturned by the Supreme Court. *N.Y.C. Dep't of Fin. v. Twin Rivers, Inc.*, No. 95–CV–1389 (HB)(HBP), 1997 WL 299423, at *2 (S.D.N.Y. June 5, 1997) ("Courts generally depart from the law of the case when there is a change in controlling law, when new evidence becomes available, to correct a clear error, or prevent manifest injustice."). In any event, the Court finds that based on the applicable standards, rational basis is not the correct level of review, given that the possession and use of nunchaku is close to the core of Second Amendment activity and given the severity of the burden imposed on that activity by Section 265.01(1). *Nat'l Rifle Ass'n of Am., Inc.*, 700 F.3d at 197 (stating that *Heller* "[took] rational basis review off the table" for all bearable arms); *NYSRPA*, 804 F.3d at 257; *Ezell*, 651 F.3d at 701, 706–07 ("For our purposes, . . . we know that *Heller*'s reference to 'any standard of scrutiny' means any *heightened* standard of scrutiny; the Court specifically excluded rational-basis review.") (citing *Heller*, 554 U.S. at 628–29) (emphasis in original).

and the all-encompassing nature of the New York nunchaku ban, it cannot be said that the "fit between the challenged regulation" and the state interest is "substantial." *Kachalsky*, 701 F.3d at 97; *NYSRPA*, 804 F.3d at 264 ("[O]n intermediate scrutiny review, the state cannot get away with shoddy data or reasoning.") (citation and internal quotation marks omitted). "To survive intermediate scrutiny, the defendant[] must show '*reasonable* inferences based on *substantial* evidence' that the statute[] [is] substantially related to the governmental interest." *NYSRPA*, 804 F.3d at 264 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)) (emphasis in original). With respect to the nunchaku ban, Defendant has plainly failed to do so. As previously discussed, Defendant has offered virtually no evidence supporting a public safety rationale for a total ban (as opposed to lesser restrictions)[30] on the possession and use of nunchaku in New York State. *Ezell*, 651 F.3d at 709 ("[T]he [defendant] produced no empirical evidence whatsoever and rested its entire defense of the . . . ban on speculation.").

Accordingly, the Court finds that Section 265.01(1), as applied to nunchaku, does not survive intermediate scrutiny and must be invalidated as unconstitutional. However, this ruling merely reflects Defendant's failure to present sufficient evidence and argument to support Section 265.01(1)'s constitutionality as applied to nunchaku and "do[es] not foreclose the possibility that [the government] could in the future present evidence to support such a prohibition[]," or some lesser restriction, on the possession and/or use of nunchaku in New York. *NYSRPA*, 804 F.3d at 257 n.73.

---

[30] At Oral Argument, Defendant argued that Section 265.01(1) is not a "total ban" on nunchaku because individuals may use foam and plastic nunchaku. However, as stated in note 10, Defendant has not shown, and cannot even commit to the view, that these types of nunchaku are not covered by Section 265.01(1). Moreover, there is no evidence that foam or plastic nunchaku are "adequate alternatives . . . for self-defense." *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012).

## V.  Additional Relief

In light of the Court's finding that Section 265.01(1) as applied to nunchaku is unconstitutional, the Court also invalidates the portions of N.Y. Penal Law § 265.10 ("Section 265.10") that apply to nunchaku.  The relevant portions of Section 265.10 are, as follows:

> 1. Any person who manufactures or causes to be manufactured any machine-gun, assault weapon, large capacity ammunition feeding device or disguised gun is guilty of a class D felony. Any person who manufactures or causes to be manufactured any switchblade knife, gravity knife, pilum ballistic knife, metal knuckle knife, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, Kung Fu star, ***chuka stick***, sandbag, sandclub or slungshot is guilty of a class A misdemeanor.
>
> 2. Any person who transports or ships any machine-gun, firearm silencer, assault weapon or large capacity ammunition feeding device or disguised gun, or who transports or ships as merchandise five or more firearms, is guilty of a class D felony. Any person who transports or ships as merchandise any firearm, other than an assault weapon, switchblade knife, gravity knife, pilum ballistic knife, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, Kung Fu star, ***chuka stick***, sandbag or slungshot is guilty of a class A misdemeanor.
> . . .
> 4. Any person who disposes of any of the weapons, instruments or appliances ***specified in subdivision one of section 265.01,*** except a firearm, is guilty of a class A misdemeanor, and he is guilty of a class D felony if he has previously been convicted of any crime.

N.Y. Penal Law §§ 265.10(1), (2), &(4) (emphasis added).  It is clear that these provisions exist to create a comprehensive ban on the prohibited weapons listed in Section 265.01 by criminalizing all means to possess them.  (*See* Dkt. 199-1, at ECF 9 (letter from the Commissioner of the State of New York's Division of Criminal Justice, dated April 4, 1974, stating that the purpose of the nunchaku ban was "to outlaw the possession, manufacture or shipment of 'chuka sticks'"); *id.* at ECF 11 (letter from New York State Assemblyman Richard C. Ross, dated April 2, 1974, stating that "[t]he proposed legislation to control the possession and use, as well as the manufacture and transport of chuka sticks would insure uniformity of prosecution which currently varies from county to county within the state of New York")); *see also* New York Bill Jacket, 2008 S.B. 7528,

Ch. 257, at §§ 3–6 (simultaneously banning the possession, manufacture, shipment, and disposal of plastic knuckles); Donnino, Practice Commentary, McKinney's Cons. Laws of N.Y., Penal Law § 265.10 (stating that Section 265.10 "generally makes it unlawful to manufacture . . . , transport . . ., or 'dispose of' . . . the listed weapons, *the possession of which is unlawful*") (alterations omitted; emphasis added). In light of the fact that, by this Order, possession of nunchaku is no longer unlawful, the Court finds that the subsections of Section 265.10 barring manufacture, transport, and disposal of nunchaku are no longer valid or enforceable. *Walden v. Bodley*, 39 U.S. 156, 164 (1840) ("Under the general prayer for relief, the Court will often extend relief beyond the specific prayer."); *see also Watts v. Waddle*, 31 U.S. 389 (1832) ("[A]ny relief may be given for which the basis is laid in the [complaint]."); *Michelsen*, 224 F. Supp. at 953.

To leave these subsections intact, would render the Court's Order meaningless and without effect, because the combination of these prohibitions would prevent anyone from lawfully possessing nunchaku in New York State unless they already (illegally) possess them now. *Ezell*, 651 F.3d at 710–11 (holding that, in order for the Seventh Circuit's preliminary injunction "[t]o be effective," the court "must also prevent [the government] from enforcing other provisions of the [gun range] [o]rdinance that operate indirectly to prohibit range training," not just the ordinance that "plaintiffs asked the [court] to enjoin the enforcement of"). While Section 265.10, on its face, does not preclude Plaintiff from purchasing nunchaku in a brick-and-mortar store in New York State, if Section 265.10 remains on the books, no store could legally have them because they would have to, at a minimum, aid and abet the transportation, shipment, or manufacturing[31] of nunchaku.

---

[31] Or, alternatively, the store could be charged with "caus[ing] [nunchaku] to be manufactured" in violation of Section 265.10. N.Y. Penal Law § 265.10(1).

N.Y. Penal § 20.00.  In sum, the effect of leaving Section 265.10 intact would be "another complete ban on [nunchaku] ownership" within the state.  *Ezell*, 651 F.3d at 712 (Rovner, J., concurring).

Therefore, the Court declares that the portions of Section 265.10(1), (2), & (4) that apply to nunchaku are void as violative of the Second Amendment.

## CONCLUSION

For the reasons stated herein, the Court grants judgment in favor of Plaintiff, declaring that New York Penal Laws § 265.01(1) and § 265.10(1), (2), & (4), as applied to nunchaku, are an unconstitutional restriction on the right to bear arms under the Second Amendment and are, therefore, void.  The Clerk of Court is respectfully requested to enter judgment and close this case accordingly.

SO ORDERED.

/s/Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: December 14, 2018
        Brooklyn, New York

# APPENDIX

1. *Courthouse Records: Worcester Central District Court*, Telegram.com (Sept. 26, 2018), https://www.telegram.com/news/20180926/courthouse-records.

2. Mark D. Wilson, *Man Used Nunchucks in Street Attack in Downtown Austin, Police Say*, Statesman (Sept. 26, 2018), https://www.statesman.com/news/20180906/man-used-nunchucks-in-street-attack-in-downtown-austin-police-say.

3. Maura Grunlund, *Man Recounts Scary Battle with Nunchucks-Slinging Ninja Burglar*, SILive.com (Sept. 17, 2018), https://www.silive.com/expo/news/erry-2018/09/d44987c24d9566/from-straw-hats-to-dresses-dis.html.

4. Jeff Bonty, *Man Charged with Attempted Kidnapping of Child*, Daily Journal (Sept. 1, 2018), https://www.daily-journal.com/news/crime/man-charged-with-attempted-kidnapping-of-child/article_f287aef0-ad53-11e8-a088-436c975df517.html.

5. *Three Charged with Aggravated Assault*, MRT (Aug. 7, 2018), https://www.mrt.com/news/crime/article/Three-charged-with-aggravated-assault-13139270.php.

6. Leroy Polk, *Torture and Terror in a Fairbanks Hotel Ends in Arrest*, KTUU-TV (Jul. 18, 2018), https://www.ktuu.com/content/news/Torture-and-terror-in-a-Fairbanks-hotel-ends-in-arrest-488543961.html.

7. *Man Charged with Making Nunchaku Threats, Home Invasion Arraigned*, WAND17 (Jul. 12, 2018), https://www.ktuu.com/content/news/Torture-and-terror-in-a-Fairbanks-hotel-ends-in-arrest- 488543961.html.

8. Elizabeth O'Gorek, *Police Investigate Nunchucks Assault in Northeast*, HillRag (June 15, 2018), http://hillrag.com/2018/06/15/police-investigate-assault-with-nunchucks/.

9. Saphara Harrell, *Police Log: Husband Attacked Caller with Nunchucks*, The News-Review (May 22, 2018), https://www.nrtoday.com/news/police_logs/police-log-husband-attacked-caller-with-nunchucks/article_053b60e9-d8f5-5051-8fe0-d01835f7914b.html.

10. Nancy Bowman, *Piqua Man Pleads in Nunchucks Attack, Standoff with Police*, Dayton Daily News (May 22, 2018), https://www.daytondailynews.com/news/piqua-man-pleads-nunchucks-attack-standoff-with-police/m7fNu18ZyGzR4AerGQYZLM/.

11. Bryna Zumer, *County Crime: Nunchucks Used in Randallstown Attack, Towson Royal Farms Robbed*, Fox5News (Apr. 23, 2018), https://foxbaltimore.com/news/local/county-crime-nunchucks-used-in-randallstown-robbery-towson-royal-farms-robbed.

12. Saphara Harrell, *Police Log: Man Swinging Nunchucks Around*, The News-Review (Apr. 20, 2018), https://www.nrtoday.com/news/police_logs/police-log-husband-attacked-caller-with-nunchucks/article_053b60e9-d8f5-5051-8fe0-d01835f7914b.html.

13. WKYT News Staff, *Police: Pulaski Co. Man Impersonated Officer, Used Nunchucks to Threaten Teen*, WKYT (Mar. 28, 2018), https://www.wkyt.com/content/news/Police-Pulaski-Co-man-impersonated-officer-used-nunchucks-to-threaten-teen-478189803.html.

14. Craig Shoup, *5th Grader Reportedly Threatened to Kill Teacher, Students*, Fremont News Messenger (Mar. 19, 2018), https://www.thenews-messenger.com/story/news/crime/2018/03/19/bellevue-5th-grader-kill-list-threatened-teacher/437405002/.

15. Lisa Kaczke, *Two Duluth Residents Charged with Kidnapping, Attempted Murder*, Duluth News Tribune (Mar. 12, 2018), http://www.duluthnewstribune.com/a/crime-and-courts/4416425-two-duluth-residents-charged-kidnapping-attempted-murder.

16. Amanda Cochran, *Knife v. Nunchucks: Baytown Man Stabbed in Fight Over Woman, Police Say*, Click2Houston (Feb. 25, 2018), https://www.click2houston.com/news/knife-vs-nunchucks-baytown-man-stabbed-in-fight-over-woman-police-say.

17. Douglas Fritz, *Concord Student Armed with Nunchakus Accused of Threatening Neighbor*, WVNS-TV (Feb. 9, 2018), https://www.wvnstv.com/local-news/mercer-county/concord-student-armed-with-nunchakus-accused-of-threatening-neighbor/963488635.

18. Emily Bohatch, *65-Year-Old Man Used Nunchucks to Hit His Neighbor, St. Lucie County Sheriff's Office Says*, TC Palm (Jan. 17, 2018), https://www.tcpalm.com/story/news/crime/st-lucie-county/2018/01/17/nunchucks-involved-before-arrest-daniel-larmon-aggravated-battery-st-lucie-county/1040419001/.

19. Seaborn Larson, *Alleged Nunchuck Assailant Makes Initial Court Appearance*, Great Falls Tribune (Jan. 8, 2018), https://www.greatfallstribune.com/story/news/crime/2018/01/08/alleged-nunchuck-assailant-makes-initial-court-appearance/1014218001/.

20. Douglas Walker, *Muncie Man, 65, Held in Nunchucks Attack*, Star Press (Sept. 27, 2017), https://www.thestarpress.com/story/news/crime/2017/09/27/muncie-man-65-held-nunchucks-attack/709940001/.

21. Khyati Patel, *HCSO Investigator at Trial: Nunchucks Possibly Used in Murder of Grapeland Woman*, KTRE9 (Aug. 23, 2017), http://www.ktre.com/story/36201192/hcso-investigator-at-trial-nunchucks-possibly-used-in-murder-of-grapeland-woman/.

22. Jason Auslander, *Homeless Man Charged with Hate Crime in Aspen Attack*, The Aspen Times (July 1, 2017), https://www.aspentimes.com/news/crime/homeless-man-charged-with-hate-crime-in-aspen-attack/.

23. *Salisbury Man Pulls Out a Set of Nunchucks on Sheriff's Deputy at Butler's Bar*, Southern Maryland News Net (Apr. 30, 2017), https://smnewsnet.com/archives/418556/salisbury-man-pulls-out-a-set-of-nunchucks-on-sheriffs-deputy-at-butlers-bar/.

24. Patty Coller, *Youngstown Report: Man Said He Attacked Woman with Nunchucks and Scissors*, WKBN 27 (May 2, 2017), https://www.wkbn.com/local-news/youngstown-report-man-said-he-attacked-woman-with-nunchucks-and-scissors/1067813149.

25. Ryan DiPentima, *Florida Man Threatens Roommate with Nunchucks*, The Palm Beach Post (Mar. 28, 2017), https://www.palmbeachpost.com/news/crime--law/new-florida-man-threatens-roommate-with-nunchucks/TigOkw7hQbb1Ep6HsAqcnM/.

26. Elizabeth Choi, *Man Shoots Wife's Nunchuck-Wielding Ex-Husband After Cell Phone Dispute*, WISHTV.com (May 24, 2016), https://www.wishtv.com/news/crime-watch-8/hendricks-county-authorities-respond-to-shooting/1116532455.

27. John Annese and Graham Rayman, *Felon Confesses to Being Staten Island 'Ninja Burglar' Linked to 19 Burglaries in 2007 and 2008*, New York Daily News (Apr. 19, 2016), http://www.nydailynews.com/new-york/nyc-crime/staten-island-ninja-burglar-arrested-10-years-free-article-1.2607624 (discussing burglaries from the 1980s and 1990s).

28. Dillon Kato, *Missoula Man Awaiting Sentencing for Threats at Church Accused of Nunchuck Attack*, Missoulian (Jan. 20, 2016), https://missoulian.com/news/local/missoula-man-awaiting-sentencing-for-threats-at-church-accused-of/article_343c44c6-15a0-512e-ad65-c1521fd39c8b.html.

29. Teddy Kulmala, *Police: Rock Hill Woman Assaulted Husband with Nunchucks*, The Charlotte Observer (Jan. 20, 2016), https://www.charlotteobserver.com/news/local/crime/article55584565.html.

30. Kay Fate, *Three Adults, Three Juveniles in Custody for Austin Fight*, Post Bulletin (Oct. 1, 2015), https://www.postbulletin.com/news/crime/three-adults-three-juveniles-in-custody-for-austin-fight/article_863016e9-c49b-5c36-bb5b-b738397e7123.html.

31. Paul Daquilante, *Nunchuck Attacker Said He Wanted to Kill His Mother*, Yamhill Valley News Register (Sept. 20, 2015), https://newsregister.com/article?articleTitle=nunchuck-attacker-said-he-wanted-to-kill-his-mother--1442746504--19416--.

32. Levi Pulkkinen, *Charges: Shampoo Thief Beat Grocery Workers with Nunchuks*, Seattle Post-Intelligencer (May 26, 2015), https://www.seattlepi.com/local/article/Charges-Shampoo-thief-beat-grocery-workers-with-6286948.php.

33. Penny Ray, *Police Arrest Man Who Used Nunchucks During Trenton Street Fight*, The Trentonian (May 26, 2015), https://www.trentonian.com/news/police-arrest-man-who-used-nunchucks-during-trenton-street-fight/article_77eff243-a683-50e2-a357-20e54cc39989.html.

34. Andrew Dys, *Police: Caretaker Killed Elderly York County 'Mercy Killer' with Nunchucks*, The Charlotte Observer (May 14, 2015), https://www.charlotteobserver.com/news/local/crime/article21000753.html.

35. David Harding, *Man Uses Nunchucks to Threaten, Attack Japanese Restaurant Worker in Florida After Not Paying His Bill*, New York Daily News (Apr. 18, 2015), http://www.nydailynews.com/news/national/fla-man-threatens-attacks-restaurant-worker-nunchucks-article-1.2189941.

36. Lynsi Burton, *Police: Woman Uses Nunchucks to Attack Friend in Greenwood*, Seattle Post-Intelligencer (Oct. 4, 2014), https://blog.seattlepi.com/seattle911/2014/10/08/woman-attacks-friend-with-nunchucks-in-greenwood/.

37. *Police: Man with Nunchucks is No Ninja, Gets Tackled By Victim*, Montana Standard (Apr. 11, 2014), https://mtstandard.com/news/local/police-man-with-nunchucks-is-no-ninja-gets-tackled-by/article_e78adea2-c1a6-11e3-8902-0019bb2963f4.html.

38. Rick Bruni Jr., *Nunchaku Attack Lands Georgia Man in Jail*, Trib Live (Feb. 26, 2014), https://triblive.com/neighborhoods/yourmonvalley/yourmonvalleymore/5662182-74/burgess-police-gudel.

39. *OKC Woman Accused of Nunchuck Attack*. News on 6 (Dec. 2, 2013), http://www.newson6.com/story/24113520/okc-woman-accused-of-nunchuck-attack.

40. Michael Harthorne, *Police: Would-Be Ninja Arrested for Flailing 'Nunchucks' at Woman*, KomoNews (Apr. 24, 2013), https://komonews.com/archive/police-would-be-ninja-arrested-for-flailing-nunchucks-at-woman-11-22-2015.

41. *Subway Muggers Beat Victim with Nunchucks After Demanding His Jacket*, NBC New York (Jan. 31, 2013), https://www.nbcnewyork.com/news/local/Subway-Nunchuck-Beating-Robbery-Jacket-157th-Street-189222491.html.

42. Michael Walsh, *Maine Woman Uses Nunchucks on Ex-Boyfriend Who Allegedly Attacked Her*, New York Daily News (Oct. 11, 2012), http://www.nydailynews.com/news/crime/maine-woman-nunchucks-ex-boyfriend-allegedly-attacked-article-1.1181156.

43. Buck Sexton, *Colorado Man Charged with Assault After Using Nunchucks in 'Self-Defense,'* The Blaze (Nov. 1, 2011), https://www.theblaze.com/news/2011/11/01/colorado-man-charged-with-assault-after-using-nunchucks-in-self-defense.

44. Tim Newcomb, *Inmate Escapes St. Louis Jail Using Makeshift Nunchucks*, Time (Sept. 21, 2011), http://newsfeed.time.com/2011/09/21/inmate-escapes-st-louis-jail-using-makeshift-nunchucks/.

45. James Cannon, *Man Allegedly Assaults Sonic Employees with 'Nunchucks,'* MRT (Aug. 30, 2011), https://www.mrt.com/news/crime/article/Man-allegedly-assaults-Sonic-employees-with-7445872.php.

46. Associated Press, *Making Peace with a Brother's Murder*, NBC News (Dec. 8, 2007), http://www.nbcnews.com/id/22160729/ns/us_news-crime_and_courts/t/making-peace-brothers-murder/#.W6-jgxNKhaU (discussing a nunchaku-related murder from October 1981).

47. *The World: Party death charge*, Birmingham Mail (Nov. 5, 2007), at 10.

48. Bob Laylo, *Carbon Man Pleads Guilty in Nunchaku Case*, The Morning Call (Sept. 26, 2007), http://articles.mcall.com/2007-09-26/news/3778179_1_nunchaku-state-s-sentencing-guidelines-assault-charge.

49. Jon Hilkevitch, *Midway Passenger Seized on Flight with Nunchucks*, Chicago Tribune (Oct. 24, 2003), http://www.chicagotribune.com/news/ct-xpm-2003-10-24-0310240055-story.html.

50. *Court denies nunchaku murder appeal*, Milwaukee Journal Sentinel (June 18, 1999), at 2.

51. Molly Sinclair, *Crime and Punishment: Korean Family Learns Anger in Md.*, The Washington Post (Sept. 1, 1986), at A1.

52. Lyle V. Harris, *Man Pleads Guilty in Death During Montgomery Brawl*, The Washington Post (Apr. 25, 1986), https://www.washingtonpost.com/archive/politics/1986/04/25/man-pleads-guilty-in-death-during-montgomery-brawl/b06d5df7-ce25-4c56-b2f7-b02c2c9e9de0/?utm_term=.ee4f64dccbd9.

53. Desiree Hicks, *8 Arrested in School Melee*, The Washington Post (June 1, 1985), https://www.washingtonpost.com/archive/local/1985/06/01/8-arrested-in-school-melee/04a27419-5464-4052-8590-26d2c5555b24/?utm_term=.58a896bae596.

54. *Martial Arts Weapon Reportedly Used by Two Rapists*, Boston Globe (Aug. 1, 1983), at 1.

55. Kitty Dumas, *Ten Arrested, One Hurt in Arlington Fight*, The Washington Post (July 19, 1983), at B5.

56. Ron Davis, *Robbers Use "Kung Fu" Weapon*, The Washington Post (Aug. 15, 1976), at B1.